IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                                            )
YANTAI ORIENTAL PROTEIN TECH                )
CO., LTD., *et al*.,                                       )
                                                            )
        Plaintiffs,                                    )
                                                            )
    and                                                )
                                                            )
ZHAOYUAN JUNBANG TRADING                    )
CO., LTD., *et al*.,                                       )
                                                            )
        Consolidated-Plaintiffs,                 )
                                                            )
    and                                                )
                                                            )
KTL PHARMACEUTICAL, CO., LTD., *et al.*,   )
                                                            )
        Plaintiff-Intervenors,                    )
                                                            )       PUBLIC VERSION
    v.                                                   )       Consol. Court No. 24-00181
                                                            )
UNITED STATES,                                       )       Confidential Information
                                                            )       Redacted In [Brackets] On
        Defendant,                                     )       Pages 12-13, 18-23, and 25-30
                                                            )
    and                                                )
                                                            )
PURIS PROTEINS, LLC D/B/A PURIS,           )
                                                            )
        Defendant-Intervenor.                    )
_____)

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

Of Counsel:

SAPNA SHARMA
Senior Counsel
Office of the Chief Counsel for
    Trade Enforcement and Compliance
United States Department of Commerce

February 3, 2026

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendant United States

## TABLE OF CONTENTS

Page:

TABLE OF AUTHORITIES .................................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 .............................................................2

I.      The Administrative Determination Under Review ..................................2

II.     Statement Of The Issues ............................................................................3

STATEMENT OF FACTS ........................................................................................3

I.      Legal and Regulatory Framework ............................................................3

II.     Administrative Proceedings Before Commerce........................................6

SUMMARY OF THE ARGUMENT .......................................................................8

ARGUMENT ............................................................................................................10

I.      Standard of Review....................................................................................10

II.     Commerce's Determination Not to Grant Zhongzhen a Separate Rate Is Supported by
        Substantial Evidence And Is in Accordance With Law......................................11

        A.      Substantial Record Evidence Supports Commerce's Determination That High-
                Level Zhongzhen Management Are Chinese Government Officials....................12

        B.      Commerce Lawfully Found that Zhongzhen Did Not Rebut The Presumption of
                *De Facto* Government Control ..............................................................17

                1.      Government Control Over Contracts and Agreements............................18

                2.      Government Control Over Selection of Management ..............................19

                3.      Government Control Over Disposition of Profits And
                        Financing of Losses ..................................................................20

III.    Commerce's Determination Not to Grant Junbang a Separate Rate Is Supported by
        Substantial Evidence And Is in Accordance With Law......................................24

        A.      Commerce Reasonably Determined That The Chinese Government Has The
                Potential to Exercise Control Over Junbang's Export Activities And General
                Operations ............................................................................................25

                1.      Junbang's Ownership Structure ...............................................25

**TABLE OF CONTENTS (continued)**

Page:

      2.      Government Agent as Senior Leadership at Junbang ..............................26

      3.      Chinese People's Congress and Shuangta Food ........................................28

    B.     Junbang's Challenges to Commerce's *De Facto* Analysis are Meritless ..............29

IV.    Commerce Lawfully Assigned Plaintiffs And The China-Wide Entity a Rate Pursuant to Adverse Facts Available .................................................................................32

V.     Commerce Lawfully Determined That Critical Circumstances Existed With Regard to The China-Wide Entity ..........................................................................................36

VI.   Commerce Lawfully Calculated The Duty Rate for Unexamined Companies That Qualified for A Separate Rate .................................................................................38

CONCLUSION ..........................................................................................................................39

## **TABLE OF AUTHORITIES**

**Cases:**                                                                                    **Page(s):**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315
    (Ct. Int'l Trade 2013)...................................................................................................5

*Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342
    (Ct. Int'l Trade 2013)...................................................................................................6

*Altex, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) .........................................11

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350
    (Ct. Int'l Trade 2018)...................................................................................................22

*Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010).......39

*Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017).........5

*China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021) ...............33

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966).....................................................30

*Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304
    (Fed. Cir. 2017).....................................................................................5, 23, 24, 33, 34

*Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) ....................10

*ICC Indus., Inc. v. United States*, 812 F.2d 694 (Fed. Cir. 1987)...............................4, 36

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317
    (Ct. Int'l Trade 2014)...................................................................................................21

*Jilin Forest Indus. Jinqiao Flooring Group Co., Ltd. v. United States*, 145 F.4th 1308
    (Fed. Cir. 2025)....................................................................................................5, 33

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) .........10

*Pirelli Tyre Co. v. United States*, 128 F.4th 1265 (Fed. Cir. 2025)............................21, 22

*PrimeSource Bldg. Prods. v. United States*, 111 F.4th 1320 (Fed. Cir. 2024) .............39

*Qingdao Taifa Grp. Co. v. United States*, 637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009)...........4, 36

*Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997) .................................5, 33

*Sunpreme Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) ..................................10

*Transcom, Inc. v. United States*, 294 F. 3d 1371 (Fed. Cir. 2002) ................................33

## <u>TABLE OF AUTHORITIES (continued)</u>

**Cases (continued):**                                                                                         **Page(s):**

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ...................................................................10

*Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317
    (Ct. Int'l Trade 2017) ........................................................................................ 5-6, 17, 21

*Zhejiang Mach. Imp. v. United States*, 65 F.4th 1364 (Fed. Cir. 2023)........................5, 17, 21, 22

**Statutes:**

19 U.S.C. § 1516a .......................................................................................................................10

19 U.S.C. § 1673 ...........................................................................................................................3

19 U.S.C. § 1673a ..........................................................................................................................3

19 U.S.C. § 1673b ..........................................................................................................................7

19 U.S.C. § 1673d ........................................................................................................ 4, 10, 37-39

19 U.S.C. § 1677 ................................................................................................................3, 4, 6, 18

19 U.S.C. § 1677b ......................................................................................................................3, 4

19 U.S.C. § 1677e ....................................................................................................... 7, 33-38

19 U.S.C. § 1677m .......................................................................................................................34

*Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*,
    H.R. Doc. 103-316, vol. 1 (1994) ......................................................................................35

**Regulations:**                                                                                               **Page(s):**

19 C.F.R. part 207 ..........................................................................................................................4

19 C.F.R. § 351.205 ........................................................................................................................4

19 C.F.R. § 351.210 ........................................................................................................................4

19 C.F.R. § 351.206 ......................................................................................................................37

19 C.F.R. § 351.401 ...................................................................................................................6, 18

# TABLE OF AUTHORITIES (continued)

**Administrative Determinations:** Page(s):

*Certain Pea Protein from China*, 89 Fed. Reg. 55,559
(Dep't of Commerce July 5, 2024) (final AD determination) .................................. *passim*

*Certain Pea Protein from China*, 89 Fed. Reg. 68,390
(Dep't of Commerce Aug. 26, 2024) (AD order) ............................................................2

*Certain Pea Protein from China*, 89 Fed. Reg. 10,038
(Dep't of Commerce Feb. 13, 2024) (prelim. determination)................................... 6-8, 11

*Certain Pea Protein from China*, 88 Fed. Reg. 52,124
(Dep't of Commerce Aug. 7, 2023) (initiation notice) ......................................................6

*Ceramic Tile from China*, 85 Fed. Reg. 19,425
(Dep't of Commerce Apr. 7, 2020) (final AD determination)..........................................38

*Certain Preserved Mushrooms from France*, 87 Fed. Reg. 72,963
(Dep't of Commerce Nov. 28, 2022) (final AD determination)........................................38

*Certain Preserved Mushrooms from Spain*, 88 Fed. Reg. 18,120
(Dep't of Commerce Mar. 27, 2023) (final AD determination) ...................................38, 39

*Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof, from
China*, 86 Fed. Reg. 14,077 (Dep't of Commerce March 12, 2021)
(final AD determination)........................................................................................ 14-16

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from
China*, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012)
(final AD determination)........................................................................................14, 16

*Lightweight Thermal Paper from China*, 73 Fed. Reg 57,329
(Dep't of Commerce Oct. 2, 2008) (final AD determination) ......................................14, 16

*Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474
(Dep't of Commerce Sept. 9, 2016) (final results AD review)..................................... 14-16

*Thermal Paper from Spain*, 86 Fed. Reg. 54,162
(Dep't of Commerce Sept. 30, 2021) (final AD determination)........................................38

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____

|  |  |  |
|---|---|---|
| YANTAI ORIENTAL PROTEIN TECH CO., LTD., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ZHAOYUAN JUNBANG TRADING CO., LTD., *et al.*, | ) | |
| | ) | |
| Consolidated-Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KTL PHARMACEUTICAL, CO., LTD., *et al.*, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | PUBLIC VERSION |
| v. | ) | Consol. Court No. 24-00181 |
| | ) | |
| UNITED STATES, | ) | Confidential Information |
| | ) | Redacted In [Brackets] On |
| Defendant, | ) | Pages 12-13, 18-23, and 25-30 |
| | ) | |
| and | ) | |
| | ) | |
| PURIS PROTEINS, LLC D/B/A PURIS, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____

DEFENDANT'S RESPONSE IN OPPOSITION TO
<u>MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response to the motions for judgment on the agency record filed by filed

by plaintiffs Yantai Oriental Protein Tech Co., Ltd. (Yantai), Yantai Zhongzhen Trading Co.,

Ltd. (Yantai Zhongzhen), Jiujiang Tiantai Food Co., Ltd. (Jiujiang), and Yantai Yiyuan

Bioengineering Co., Ltd. (Yiyuan) (collectively Zhongzhen), consolidated-plaintiffs Zhaoyuan

Junbang Trading Co., Ltd. (Junbang), Linyi Yuwang Vegetable Protein Co., Ltd., Shandong

Yuwang Ecological Food Industry Co., Ltd., Fenchem Biotek Ltd, Jianyuan International Co.,

Ltd., Yosin Biotechnology (Yantai) Co., Ltd., and Yosin Import and Export (Yantai) Co., Ltd,

and plaintiff-intervenor Yantai T.Full Biotech Co. Ltd. (T.Full).  *See* Zhongzhen Br., May 13,

2025, ECF Nos. 46-47; Junbang Br., May 13, 2025, ECF No. 48-1; T.Full Br., May 27, 2025,

ECF No. 53.  In this brief, we collectively refer to Zhongzhen, Junbang, and T.Full as plaintiffs.

Plaintiffs challenge the final determination by the Department of Commerce (Commerce) in the

less-than-fair-value investigation of certain pea protein from the People's Republic of China

(China).  As demonstrated below, Commerce's final determination is supported by substantial

evidence and is otherwise in accordance with law.  Therefore, we respectfully request that the

Court deny plaintiffs' motion and enter judgment in favor of the United States.

STATEMENT PURSUANT TO RULE 56.2

I.    The Administrative Determination Under Review

The determination under review is *Certain Pea Protein from China:  Final Affirmative*

*Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances*

*Determination*, 89 Fed. Reg. 55,559 (Dep't of Commerce July 5, 2024), P.R. 387 (*Final*

*Determination*), and the accompanying Issues and Decision Memorandum (IDM), P.R. 386.  As

a result of the affirmative Final Determination, Commerce subsequently issued the antidumping

duty order on certain pea protein from China.  *Certain Pea Protein from China:  Antidumping*

*and Countervailing Duty Orders*, 89 Fed. Reg. 68,390 (Dep't of Commerce Aug. 26, 2024).

II.    Statement of the Issues

1.    Whether Commerce lawfully determined that Zhongzhen failed to rebut the presumption of *de facto* government control and therefore was ineligible for a separate rate.

2.    Whether Commerce lawfully determined that Junbang failed to rebut the presumption of *de facto* government control and therefore was ineligible for a separate rate.

3.    Whether Commerce lawfully assigned an adverse facts available (AFA) rate to the China-wide entity, when exporters and/or producers that were part of the China-wide entity did not respond to the agency's requests for information during the investigation.

4.    Whether Commerce lawfully applied AFA in its critical circumstances analysis with respect to the China-wide entity.

5.    Whether Commerce lawfully calculated a duty rate using margins from the petition for certain unexamined exporters that were eligible for a separate rate.

## STATEMENT OF FACTS

I.    Legal and Regulatory Framework

The Tariff Act of 1930 establishes a remedial regime to combat unfair trade practices. Under that regime, Commerce imposes duties upon imported products that are sold – or likely to be sold – in the United States "at less than fair value" to the detriment of a domestic industry.  19 U.S.C. §§ 1673; 1677(34).  When an interested party files a petition on behalf of a domestic industry claiming that imported products are being dumped, if the standards are met, Commerce initiates an antidumping duty investigation.  *Id.* § 1673a.  As part of that investigation, Commerce calculates the "normal value" of the imported goods and compares that price with the price at which the imported goods are sold in the United States.  *Id.* §§ 1677(35), 1677b(a).

If Commerce finds that the goods of a foreign producer or importer are being sold below normal value, it makes an affirmative determination of dumping.  The United States International Trade Commission (ITC), in turn, determines whether such dumping has "materially injured" or threatened material injury to a United States industry.  19 U.S.C. § 1673d(b)(1).  If Commerce makes a final determination that "the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value," and if the ITC makes a final determination that a U.S. industry has suffered or is threatened with material injury, Commerce issues an antidumping duty order that imposes duties on the imports covered by the order.  *Id.* § 1673d(a)(1), (b)(1), (c)(2); *see also* 19 C.F.R. part 207; 19 C.F.R. §§ 351.205(a), 351.210(a).  Such an order imposes a duty that is an amount equal to the amount by which the normal value of the imported goods exceeds the export price (or the constructed export price).

Commerce uses a special nonmarket economy (NME) methodology to calculate normal value for producers and exporters from NME countries such as China.  19 U.S.C. § 1677b(c).  A non-market economy country is "any foreign country that {Commerce} determines does not operate on market principles of cost or pricing structures."  *Id.* § 1677(18).

In antidumping proceedings involving NME countries, Commerce applies a rebuttable presumption that the export activities of *all* firms within the NME country are subject to government control and influence.  This is "because prices and costs are not reliable in valuing goods from {NME} countries 'in view of the level of intervention by the government in setting relative prices.'"  *Qingdao Taifa Grp. Co. v. United States*, 637 F. Supp. 2d 1231, 1243 (Ct. Int'l Trade 2009) (quoting *ICC Indus., Inc. v. United States*, 812 F.2d 694, 697 (Fed. Cir. 1987)).  Typically, when Commerce determines that an exporter in an NME country has failed to demonstrate independence from state control, Commerce declines to conduct any further inquiry

into the exporter's individual business practices. *Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997). An exporter will receive the country-wide rate by default, unless it demonstrates affirmatively that the exporter maintains both *de jure* and *de facto* independence from the government and deserves to receive separate rate status. *Id.* at 1405. The burden of rebutting the presumption of government control rests with the exporter. *Id.* at 1405-06.

Commerce considers four factors in determining whether a company is free from *de facto* government control: (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See Zhejiang Mach. Imp. v. United States*, 65 F.4th 1364, 1366 (Fed. Cir. 2023)*; Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 n.21 (Ct. Int'l Trade 2013) (citation omitted).

The Court of Appeals for the Federal Circuit (Federal Circuit) has sustained Commerce's application of the rebuttable presumption of government control for non-market economies. *Jilin Forest Indus. Jinqiao Flooring Group Co., Ltd. v. United States*, 145 F.4th 1308, 1315-16 (Fed. Cir. 2025) ("Thus, once a country has been found to be an NME country, there is nothing unreasonable about presuming that exporters in that country are subject to government control, unless proved otherwise in each individual case."); *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1311 (Fed. Cir. 2017); *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1009 (Fed. Cir. 2017). All four factors of the *de facto* test must be satisfied for a company to rebut the presumption of government control. *See Yantai CMC Bearing Co. v.*

*United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017); *see also Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1348 (Ct. Int'l Trade 2013) (agreeing with our argument that "each of the de facto prongs must be satisfied for a company to get a separate rate."), *aff'd without op.*, 581 F. App'x 900 (Fed. Cir. 2014).

II.    Administrative Proceedings Before Commerce

In August 2023, Commerce initiated an antidumping duty investigation of certain pea protein from China. *Certain Pea Protein from China*, 88 Fed. Reg. 52,124 (Dep't of Commerce Aug. 7, 2023) (*Initiation Notice*). In the *Initiation Notice*, Commerce notified exporters and producers that to obtain an individual dumping rate separate from the China-wide entity, they must submit a separate rate application and directed them to requirements for doing so on Commerce's website. *Id.* at 52,127. Subsequently, Zhongzhen[1] and Junbang submitted timely separate rate applications and Commerce selected them as mandatory respondents in the investigation. *See* Respondent Selection Memorandum, P.R. 83.

In February 2024, Commerce published its preliminary determination. *Certain Pea Protein from China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 89 Fed. Reg. 10,038 (Dep't of Commerce Feb. 13, 2024), P.R. 358 (*Preliminary Determination*), and the accompanying preliminary Issues and Decision Memorandum, (Feb. 13, 2024), P.R. 347 (PDM). Commerce preliminarily found that neither Zhongzhen nor Junbang were eligible for a separate rate because they did not demonstrate an absence of *de facto* government control. PDM at 7, *see also*

---

[1]  Commerce determined that Yantai, Yantai Zhongzhen, Jiujiang, and Yiyuan (collectively Zhongzhen) were affiliated parties within the meaning of 19 U.S.C. § 1677(33), and should be treated as a single entity pursuant to 19 C.F.R. § 351.401(f). C.R. 252.

Preliminary Determination:  Separate Rate Analysis Memorandum – the Zhongzhen Companies,

P.R. 354, C.R. 251 at 1-2 (Zhongzhen SRM); Preliminary Determination:  Separate Rate

Analysis Memorandum – Zhaoyuan Junbang Trading Co., Ltd.," P.R. 356, C.R. 253 at 1

(Junbang SRM).  With regard to Zhongzhen, this determination was based on an analysis of

company ownership and control linking Zhongzhen to the Chinese government and Commerce's

determination that the Chinese government had the ability to control Zhongzhen's (1) selection

of management, (2) disposition of profits and financing of losses, and (3) ability to negotiate and

enter into contracts and agreements.  Zhongzhen SRM, C.R. 251 at 5.  With regard to Junbang,

this determination was based on Commerce's finding that the Chinese government exercised

control over Junbang's (1) export activities, including its ability to set export prices, (2) selection

of management, (3) disposition of profits and financing of losses, and (4) ability to negotiate and

enter into contracts and agreements.  Junbang SRM, C.R. 253 at 4.  Consequently, Commerce

preliminary determined to treat Zhongzhen and Junbang as a part of the China-wide entity.  PDM

at 11.

     A number of Chinese exporters and producers that did not demonstrate that they were

eligible for a separate rate also did not respond to Commerce's requests for information during

the investigation.  PDM at 11.  Accordingly, Commerce determined that the China-wide entity

failed to cooperate to the best of its ability and preliminarily assigned it an antidumping duty rate

based on adverse facts available (or AFA) pursuant to section 19 U.S.C. § 1677e(b).  PDM at 12-

15.  As AFA, Commerce chose to apply the highest margin from the petition, 280.31 percent.  *Id*.

at 14.  Commerce also relied on AFA to preliminarily determine that critical circumstances exist

for the China-wide entity, pursuant to 19 U.S.C. § 1673b(e).  *Id*. at 19.  Finally, Commerce

invited interested parties to comment on the *Preliminary Determination*. *Preliminary Determination*, 89 Fed. Reg. at 10,041.

In July 2024, Commerce published its *Final Determination*. 89 Fed. Reg. 55,559 (July 5, 2024). In the *Final Determination*, Commerce continued to find that plaintiffs did not demonstrate and absence of *de facto* government control and treated them as a part of the China-wide entity. *Final Determination*, 89 Fed. Reg. at 55,560. Commerce considered plaintiffs' arguments that they were not subject to control by the Chinese government but found them unsupported by the record and unconvincing. IDM at 6-20. Commerce also continued to find that the China-wide entity did not cooperate to the best of its ability. *Id*. at 31-37. Consequently, Commerce continued to rely on AFA to find that critical circumstances existed, and assigned the China-wide entity, as AFA, a final antidumping duty rate of 280.31 percent. *Final Determination*, 89 Fed. Reg. at 55,560.

SUMMARY OF THE ARGUMENT

Commerce's determination that plaintiffs failed to rebut the presumption of *de facto* government control, and were thus ineligible for a separate rate, is supported by substantial evidence and is in accordance with law. First, Commerce properly determined based on record evidence that senior management at Zhongzhen were also Chinese government officials. Commerce then found that Zhongzhen failed to rebut three of the four criteria for analyzing *de facto* government control because of the roles and duties of these government officials within the company. Those three criteria are: (1) selection of management, (2) disposition of profits and financing of losses, and (3) negotiate and enter into contracts and agreements. Similarly, for Junbang, Commerce properly determined that the Chinese government is able to exert control over Junbang through its parent company, whose largest and controlling shareholder is a

government entity.  Commerce also found that an agent of the Chinese government held senior positions in both Junbang and its parent company.  Accordingly, Commerce properly found that Junbang had failed to rebut all four of the criteria for analyzing *de facto* government control: (1) the ability to set export prices, (2) negotiate and sign contracts, (3) selection of management, and (4) disposition of profits and financing of losses.

Second, plaintiffs' arguments that that Commerce must base its determination on evidence of actual government control misstate Commerce's NME framework, which repeatedly has been upheld by this Court and the Federal Circuit.  Specifically, Commerce presumes that a respondent from an NME country is controlled by that country's government unless the respondent comes forward with sufficient evidence to rebut the presumption of government control.  Because plaintiffs failed to rebut this presumption, Commerce properly determined that they were part of the China-wide entity.

Plaintiffs' remaining arguments contesting the application of AFA in determining the antidumping duty rate for the China-wide entity and in determining the existence of critical circumstances are unavailing.  The China-wide entity in this proceeding included exporters and producers who did not respond to Commerce's requests for information and did not demonstrate their eligibility for a separate rate.  Accordingly, Commerce properly determined that the China-wide entity did not cooperate to the best of its ability.  Commerce's application of an AFA rate to the China-wide entity and in determining the existence of critical circumstances was based on substantial evidence and in accordance with law.

Finally, Commerce's calculation of the duty rate for separate rate companies was based on substantial evidence and in accordance with law.  Because both mandatory respondents, Zhongzhen and Junbang, were determined to be a part of the China-wide entity, and their

assigned margins were based on AFA, Commerce calculated a duty margin for the separate rate companies pursuant to 19 U.S.C. § 1673d(c)(5)(B).  This provision directs Commerce to "use any reasonable method to establish the estimated all-others rate for exporters and producers not individually examined," in circumstances where the individually examined companies calculated rates have been zero, *de minimis*, or based on AFA.  *Id*.  Here, consistent with long-standing practice, Commerce calculated the rate for the separate rate companies using a simple average of the margins alleged in the petition for a rate of 122.19 percent.  *Final Determination*, 89 Fed. Reg. at 55,560.

<u>ARGUMENT</u>

I.    <u>Standard of Review</u>

Commerce's determinations, findings, or conclusions in an antidumping duty proceeding are upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  A party challenging a determination under the substantial evidence standard "has chosen a course with a high barrier to reversal."  *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).  Substantial evidence is "more than a mere scintilla" and is evidence that "a reasonable mind might" accept as adequate.  *Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020).  The agency's findings may be supported by substantial evidence even if the possibility of drawing two inconsistent conclusions exists.  *Id*. at 1308-09.  The Court must sustain the determination if it is "reasonable and supported by the record as a whole, even if

some evidence detracts from {Commerce's} conclusion." *Altex, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004).

II.    Commerce's Determination Not to Grant Zhongzhen a Separate Rate Is Supported by Substantial Evidence And Is in Accordance With Law

Commerce's determination that Zhongzhen failed to rebut the presumption of Chinese government control is supported by substantial evidence and otherwise in accordance with law. Commerce first properly determined that high-level management at Zhongzhen were also Chinese government officials.  IDM at 10-20; *see also* Zhongzhen SRM, C.R. 251 at 5-10.[2] Commerce then applied its *de facto* analysis and properly determined that these Chinese government officials, in their roles as Zhongzhen's "president/executive director and general manager/legal representative," had the ability to control and influence Zhongzhen's "selection of management, disposition of profits and financing of losses, ability to negotiate and enter into contracts and agreements, and their general business operations."  IDM at 10-11.  Accordingly, Commerce properly determined that Zhongzhen had not rebutted three of the four factors considered in determining whether a company is free from *de facto* government control. Zhongzhen incorrectly contends that the agency's determination was unlawful because no Chinese government entity owns any shares of Zhongzhen, Commerce was required to find evidence of actual government control over Zhongzhen, and the Chinese People's Political Consultative Conference (CPPCC) and local Chinese People's Congress (CPC) – of which Zhongzhen's high-level management are members – are not part of the Chinese government.

---

[2]  In this brief, we cite the final IDM as well as the preliminary Zhongzhen and Junbang SRMs because Commerce did not make any changes to its preliminary separate rate analysis in its final determination.  IDM at 1 ("As a result of our analysis and consideration of comments submitted by interested parties, we have not made changes to the Preliminary Determination" and "continue to find that Junbang … and" Zhongzhen "are not eligible for a separate rate.").

Zhongzhen Br. 18-32.  Commerce properly weighed the totality of the record evidence and

determined that Zhongzhen had not rebutted the presumption of *de facto* government control.

      A.      Substantial Record Evidence Supports Commerce's Determination That High-
               Level Zhongzhen Management Are Chinese Government Officials

Commerce began its analysis of the potential for Chinese government control over

Zhongzhen by examining its ownership structure.  The agency explained that Zhongzhen is a

limited liability company wholly owned by [     ], which in turn has one individual as a

majority owner and four minority owners.  Zhongzhen SRM, C.R. 251 at 5 (citing C.R. 75 at 14,

128-132).  One of these minority owners is [    ], who directly holds a [ ] percent share of

Zhongzhen's parent company [  ].  *Id.*  Commerce further explained that [   ] has

additional indirect ownership of Zhongzhen through his shares in the [           ]

that have a minority ownership of Zhongzhen.  *Id.*  Specifically, the agency found that [   ]

directly and indirectly owns [   ] percent of Zhongzhen's sole parent company, [   ].  *Id.*

In addition to his ownership share in Zhongzhen, [   ] serves as its President and Executive

Director.  *Id.*; C.R. 75 at 152.  Similarly, Commerce noted that [    ] serves as

Zhongzhen's General Manager and Legal Representative.  IDM at 11; Zhongzhen SRM, C.R.

251 at 6.  He also owns a minority share in one of Zhongzheng's parent companies.  Zhongzhen

SRM, C.R. 251 at 6.  Commerce further determined that both Zhongzhen's President / Executive

Director ([   ]) and its General Manager and Legal Representative ([     ]) are

Chinese government officials because of their memberships in various parts of the Chinese

government, as explained below.  IDM at 11; Zhongzhen SRM, C.R. 251 at 5-10; C.R. 74 at 22.

Specifically, Commerce found that Zhongzhen's President/Executive Director [   ]

is a representative to the Zhaoyuan City People's Congress and the Yantai City People's

Congress.  Zhongzhen SRM, C.R. 251 at 5 (citing C.R. 74 at 22).  The agency also found that

local people's congresses are agencies of the Chinese government.  Commerce cited to a 2022

China Daily article that explained these local people's congresses are one of the ways in which

"people exercise State power."  *Id*. at 6 (citing P.R. 170 at 8-9).  Commerce also pointed to

record evidence explaining that local people's congresses "ensure the observance and

implementation of the Constitution and the law … in their respective administrative areas."  *Id.*

(citing P.R. 170 at 13).  The Chinese Constitution tasks local people's congresses with

"legislating on specific matters relating to the localities and drafting local regulations to

implement certain National People's Congress laws."  *Id*. (citing P.R. 170 at 24).  Perhaps most

importantly, Commerce found that the Government of China (GOC) itself has described local

people's congresses as having "the power to examine and decide on major issues" including to

"decide on the plans for the construction of the local economy."  IDM at 11 (citing P.R. 170 at

11).  In sum, local people's congresses "supervise provincial-level government activities."  IDM

at 14 (citing P.R. 170 at 23).  Accordingly, record evidence supports Commerce's determination

that the President/Executive Director and part-owner of Zhongzhen is a government official

because of his membership in two separate people's congresses.

Similarly, Commerce explained that Zhongzhen's General Manager and Legal

Representative, [          ] is a member of the Chinese People's Political Consultative

Conference (CPPCC) of Zhaoyuan City.  Zhongzhen SRM, C.R. 251 at 6 (citing C.R. 150 at 22).

Commerce then outlined the extensive record evidence demonstrating that the CPCCC is an

agency of the Chinese government.  First, Commerce explained that the CPPCC was created by

the Communist Party of China (CPC) and has both national and regional committees, with the

local committees having "the obligation to observe and carry out regional decisions adopted by

the higher level committees."  *Id*. at 6-7 (citing P.R. at 18).  Commerce cited to a 2020 East Asia

Forum report that explained that "the NPC {National People's Congress} and CPPCC have played increasingly important legislative roles in China in recent years." *Id.* at 6 (citing P.R. 170 at 27). The 2020 report summarized this legislative role by explaining that "the function of the NPC and CPPCC is akin to the steering mechanism of a car that enables the {Chinese Communist} Party to transform its opinions and directives into national will through the enactment of laws." *Id.* at 7 (citing P.R. 170 at 27). Further, this report concluded that "the NPC and the CPPCC have become core institutions of party-state constitutionalism within China." IDM at 12 (citing P.R. 170 at 26). Indeed, Commerce noted that Zhongzhen itself cites to an article indicating that local congresses "do, in fact, have legislative powers." *Id.* (discussing C.R. 189 at 291). In sum, record evidence in this investigation indicated that these organizations fulfill legislative functions and serve to implement the Chinese government's priorities at the local level. After analyzing record evidence regarding the role people's congresses and local CPPCCs play as agencies of the Chinese government, Commerce properly found that both Zhongzhen's President/Executive Director and its General Manager and Legal Representative are Chinese government officials.

Zhongzhen cites several prior Commerce determinations and argues that Commerce has previously found membership in people's congresses or the CPPCC was insufficient to find that a company was subject to Chinese government control. Zhongzhen Br. 26-28.[3] Zhongzhen's

---

[3] Zhongzhen cites to *Lightweight Thermal Paper from China*, 73 Fed. Reg 57,329 (Dep't of Commerce Oct. 2, 2008) (final AD determination) (*Lightweight Thermal Paper*); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) (final AD determination) (*Solar Cells*); *Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Dep't of Commerce Sept. 9, 2016) (final results AD review) (*Graphite Electrodes*); and *Certain Vertical Shaft Engines Between 99cc and up to 225cc, and Parts Thereof, from China*, 86 Fed. Reg. 14,077 (Dep't of Commerce March 12, 2021) (final AD determination) (*Vertical Shaft Engines*).

arguments are unavailing because the facts and record evidence before the agency differed in those proceedings.  In *Graphite Electrodes*, although the owner of a respondent company held positions in various local people's congresses, "specific information on the record of the review indicated that neither of those bodies were directly involved in the export-related decision making of the respondent."  IDM at 14.  For another respondent in that case, Commerce found that Shareholder A's membership in a people's congress was sufficient to find they were a government official, but that this was outweighed by specific record evidence in that case of autonomy to "set prices, negotiate and sign agreements, select management, or decide how to dispose of profits or finance losses with respect to export activities."  IDM at 14 (citations omitted).  Unlike *Graphite Electrodes*, here, Commerce determined that the record evidence was not sufficient to demonstrate that Zhongzhen had such autonomy, or that the Chinese government did not have the ability to control Zhongzhen's export operations.  *Id*.

The facts before the agency in *Vertical Shaft Engines* also differed from those in the instant case.  As Commerce explained, the owner of the respondent company in *Vertical Shaft Engines* "served as a representative to the NPC and CPPCC *prior to*" the period of examination in that investigation.  IDM at 14 (emphasis added).  Moreover, in *Vertical Shaft Engines*, Commerce found that "information on the record demonstrates that these organizations have no real power, serve in advisory or other unofficial roles, and do not have any policymaking ability."  *Id*.  In contrast, Commerce explained that the record in this case had been more fully developed and indicated that "the local People's Congresses and CPPCC have real power and that local People's Congresses 'supervise provincial-level government activities.'"  *Id*. (citing P.R. 170 at 8-9, 23).  Zhongzhen asserts that its President/Executive Director's positions in the local people's congresses are "unpaid and honorary," Zhongzhen Br. 29, but Commerce properly

weighed this evidence and ultimately determined that it was not sufficient to rebut other record evidence indicating that these people's congresses "are nonetheless government entities and their members that serve in such entities are government officials." IDM at 14 (citing P.R. 170); *see also* C.R. 150 at 22.

Commerce further explained that it must make its decision based on the record of the proceeding before it. IDM at 15. The agency explained that the records for *Lightweight Thermal Paper*, *Solar Cells*, *Graphite Electrodes*, and *Vertical Shaft Engines* were established before 2020. *Id*. By contrast, the record of this investigation "suggests that the power and influence of the NPC and CPPCC have been increasing since 2020," with those organizations developing "'increasingly important legislative roles.'" *Id*. (quoting P.R. 170 at 27). Commerce also explained that record evidence indicated that local people's congresses "'also have risen in prominence and importance in recent years.'" *Id*. (quoting P.R. 170 at 24). Summarizing the evidence, Commerce noted that "in the context of the local People's Congresses, '{t}he Communist Party still exercises control over the lawmaking process at every level.'" *Id.* at 13 (citing P.R. 170 at 24). Moreover, the agency explained that "the CPPCC 'is an important organ of multi-party cooperation and political consultation under the leadership of the CPC.'" *Id*. (citing P.R. 170 at 34). Citing to Commerce determinations in which the administrative records were established prior to 2020 does not sufficiently rebut the record evidence in this case demonstrating the increasing importance of these government entities in the years since. Indeed, Commerce noted that Zhongzhen failed "to cite to any affirmative evidence against the growing power of the CPPCC and the local people's congresses on the record of this investigation," and that "the record of this investigation is distinct from the records of other proceedings." *Id.* at 15. Accordingly, Commerce's determination that that both Zhongzhen's President/Executive

Director and its General Manager and Legal Representative are Chinese government officials

was supported by substantial evidence and in accordance with law.

B.    Commerce Lawfully Found that Zhongzhen Did Not Rebut The Presumption of *De Facto* Government Control

Commerce properly determined that Zhongzhen did not demonstrate an absence of *de facto* government control.  As explained above, a company that is not majority-owned by the government must nevertheless demonstrate an absence of *de facto* government control. *Zhejiang*, 65 F.4th at 1366.  Commerce considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.  *Id*.  Companies must rebut the presumption with regard to all four criteria, but Commerce can lawfully determine that an entity is presumably under *de facto* government control if it fails to rebut even one factor.  *E.g.*, *Yantai CMC Bearing*, 203 F. Supp. 3d at 1325-26.  In this case, Commerce found that Zhongzhen had failed to demonstrate an absence of *de facto* government control with regard to *three* of the four criteria, any one of which is fatal to its separate rate application.  Specifically, as demonstrated below, Commerce examined Zhongzhen's Articles of Association and properly determined that Chinese government officials in Zhongzhen's management had the ability to control and influence Zhongzhen's ability to negotiate and enter into contracts and agreements (factor 2), the company's selection of management (factor 3), and its disposition of profits and financing of

losses (factor 4).  IDM at 15-16; Zhongzhen SRM, C.R. 251 at 5.  Consequently, this Court

should hold Commerce's determination was based on substantial evidence.

        1.    <u>Government Control Over Contracts and Agreements</u>

During the period of investigation, [          ] served as Zhongzhen's President and

Executive Director, while also serving as a representative to the People's Congresses of

Zhaoyuan City and Yantai City.  Zhongzhen SRM, C.R. 251 at 7; C.R. 75 at 152; C.R. 74 at 22.

Similarly, during the investigation [              ] was both the general manager of Zhongzhen,

and [                  ] for Yantai and Jiujiang[4] while also serving as a member of the CPPCC

of Zhaoyuan City.  Zhongzhen SRM, C.R. 251 at 6; C.R. 74 at 22.  Article 17 of Zhongzhen's

Articles of Association explains that the Executive Director "shall represent the company" by,

among other things, "signing relevant legal documents in accordance with the provisions of laws,

administrative regulations and the articles of association of the company." *Id.* (citing C.R. 75 at

140).  Commerce explained that the Articles of Association make clear that the Executive

Director [          ] "is responsible for authorizing documents on behalf of Zhongzhen." *Id.*

(citing C.R. 75 at 137-144).  Because [       ] is both Executive Director of Zhongzhen and a

member of two people's congresses, and because [            ] was [                  ] for

Zhongzhen while being a member of the CPPCC of Zhaoyuan City, Commerce determined that

Zhongzhen did not demonstrate "autonomy from government influence" in negotiating and

signing "export contracts and other agreements (i.e., conduct independent price negotiations and

independently negotiate and sign agreements)."  Zhongzhen SRM, C.R. 251 at 7; *see also* C.R.

75 at 140.

---

    [4]  Commerce determined that Yantai and Jiujiang were affiliated parties within the
meaning of 19 U.S.C. § 1677(33), and should be treated as a single entity in this investigation
pursuant to 19 C.F.R. § 351.401(f).  C.R. 252 at 1.

2.    <u>Government Control Over Selection of Management</u>

Zhongzhen also was unable to rebut the presumption of Chinese government control over

decisions regarding the selection of management.  Commerce explained that Zhongzhen is a

limited liability company wholly owned by [

].  Zhongzhen SRM, C.R. 251 at 5 (citing C.R. 74 at 17; C.R. 75 at 128-132).  In

turn, [      ] has a [    ] percent holding in [        ] as well as minority ownership in entities

that have a holding in [        ], such that [        ] directly and indirectly owns [        ] percent

of the Zhongzhen's parent company, [      ].  *Id.* (citing C.R. 75 at 128-132).  Commerce

determined that Zhongzhen failed to rebut the presumption of government control over selection

of management for three reasons:  "(1) [        ] influence over [        ], which selects

Zhongzhen's executive director; (2) [      ] authority as executive director of Zhongzhen to

appoint the general manager and other personnel; and (3) [          ] authority over

personnel as general manager of Yantai and Jiujiang."  *Id.* at 8.

Commerce explained that Article 10 of Zhongzhen's Articles of Association provides

that its [                                                           ]

Zhongzhen SRM, C.R. 251 at 8 (citing C.R. 75 at 138).  There was only one such shareholder,

"[        ], in which [        ] has a cumulative [      ] percent ownership.  *Id.*; *see* C.R. 74 at

19; C.R. 75 at 128-132.  Further, Article 11 provided that [

] *Id.*

(citing C.R. 75 at 138).  Based upon this substantial record evidence, Commerce rationally

determined that Zhongzhen's Articles of Association provide for the [                  ] of

a board of directors to be exercised by the Executive Director [        ], including the powers to [

] *Id.*

Commerce underscored that this was not merely a theoretical outline for how Zhongzhen was supposed to operate but in fact was how Zhongzhen operated.  The agency cited to record evidence showing that "[          ] acting as executive director signed [      ] own appointment letter as [          ] of Zhongzhen, ultimately granting this position to [            ]."  Zhongzhen SRM, C.R. 251 at 8 (citing C.R. 75 at 154); *see also* C.R. 75 at 138.  The agency recognized that the record evidence was mixed regarding whether the [          ] position at Zhongzhen referred to [          ], [            ], or both.  *Id.* at 9.  However, after considering the totality of the evidence, Commerce explained that, regardless of whether the [          ] position referred to [      ] or [            ], both were government officials and for this reason management decisions at Zhongzhen were controlled by representatives of the Chinese government.  *Id.*  Thus, Commerce properly found that Zhongzhen had not rebutted the presumption of *de facto* government control over selection of management.

        3.    <u>Government Control Over Disposition of Profits And Financing of Losses</u>

As explained above, Zhongzhen did not [                        ], but rather those duties were carried out by its Executive Director.  Article 10 of Zhongzhen's Articles of Association provides that the company's sole shareholder [          ] will [

] *Id*. at 9 (citing C.R. 75 at 138).  Because [          ] was a cumulative [      ] percent owner of Zhongzhen's sole shareholder, Commerce determined that he exerts influence over the approval of Zhongzhen's disposition of profits and financing of losses.  Separately, because the articles provide that the Executive Director will carry out the responsibilities of a board of directors including

[

], [        ] has influence over both the formulation of these plans as Executive
Director and their approval as a [        ] percent direct and indirect owner of Zhongzhen's sole
shareholder. *Id*. at 9-10. The fact that he fulfilled these functions while also serving as a
government official supports Commerce's finding that Zhongzhen had not rebutted the
presumption of government control over distribution of profits and financing of losses.

As explained above, this Court has held that all four factors of the *de facto* test must be
satisfied to rebut the presumption of government control. *E.g.*, *Yantai CMC Bearing*, 203 F.
Supp. 3d at 1326. Moreover, a company must demonstrate not just an absence of control, but
rather that the government did not have even the potential ability to exercise control over the
company. *Zhejiang*, 65 F.4th at 1371. Because Zhongzhen was unable to rebut the presumption
of government control for three of the four factors, the agency properly found that Zhongzhen
failed to rebut the presumption of government control for the purposes of Commerce's separate
rate test. Nevertheless, Zhongzhen cites to *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United
States*, 28 F. Supp. 3d 1317, 1349 (Ct. Int'l Trade 2014), and incorrectly argues that the agency
was required to find evidence of actual Chinese government control of the company rather than
mere potential for control. Zhongzhen Br. 19. As Commerce explained, *Jiangsu* was issued in
2012, prior to Commerce's revision of its separate rates practice in response to the *Diamond
Sawblades* litigation in 2014. IDM at 18. Further, as the agency noted, courts have upheld
Commerce's denial of a separate rate based on the *potential* for actual control. *Id.* at 19; *see also
Pirelli Tyre Co. v. United States*, 128 F.4th 1265, 1268 (Fed. Cir. 2025). Zhongzhen cannot shift
away its burden of proving that even potential government control did not exist during the period
of Commerce's investigation.

Citing to *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1355-64 (Ct. Int'l Trade 2018), Zhongzhen argues further that Commerce "should be required to provide extraordinary indicia of control prior to concluding that a respondent company could not rebut the presumption of de facto government control where the government does not own" any shares in the company. Zhongzhen Br. 18. In doing so, Zhongzhen ignores that the Court in *An Giang sustained* Commerce's *denial* of a separate rate on remand based on the *potential* for actual control. *An Giang*, 284 F. Supp. 3d at 1363. Specifically, the Court sustained as reasonable Commerce's finding that "there existed the *potential* for actual control by the minority government shareholder" during the period of review. *Id.* at 1364 (emphasis added). Contrary to Zhongzhen's argument, Commerce's determination that the potential for government control was sufficient to find that the company had not rebutted the presumption of government control was consistent with its practice and judicial precedent. *See An Giang*, 284 F. Supp. 3d at 1363-1364; *Zhejiang*, 65 F.4th at 1371; *Pirelli Tyre*, 128 F.4th 1265 (Fed. Cir. 2025). There is no legal basis for Zhongzhen's claim that Commerce should be required to provide "additional indicia."

Zhongzhen also contends that Commerce's determination that [      ] and [      ] were Chinese government officials was improper because "there is no evidence" that they had "anything other than unpaid ceremonial roles in a local People's Congress and the CPPCC." Zhongzhen Br. 26. It further contends that these memberships do not "transform them" into government officials "{g}iven the powerless nature of CPPCC and People's Congress membership." *Id.* at 31. However, Commerce based its determination on record evidence demonstrating that "local People's Congresses and CPPCC have real power and that local People's Congresses 'supervise provincial level government activities.'" IDM at 14 (citing P.R.

170 at 8-9, 23).  Indeed, Commerce noted that even the article provided by Zhongzhen "states that local legislatures and congresses do exercise government powers."  *Id.*

Zhongzhen also argues that, even if this Court agrees with Commerce that [      ] and [           ] are government officials, they only have minority ownership interests in Zhongzhen and have less control over the company than the majority owner.  Zhongzhen Br. 32-34.  Zhongzhen argues that this majority shareholder has the ability to replace both [        ] and [         ].  *Id*. at 33.  However, Commerce explained that just because there is a separate individual with majority ownership in the company, that "does not negate that in practice, the authority over the company has been delegated to the executive director/president who is a government official, and who exercises that authority over the Zhongzhen Companies' business operations and who exercised that authority to appoint a CPPCC member" (referring to [          ]) "to a key role" within the company.  IDM at 20.  The agency properly concluded that "regardless of degree of government ownership," Commerce had analyzed the criteria for *de facto* government control and found that Zhongzhen had failed to rebut the presumption for three of the four criteria.  *Id.*

Zhongzhen argues that Elon Musk's recent role as a special government employee does not mean that the U.S. government controls Tesla.  Zhongzhen Br. 26.  Zhongzhen's bizarre analogy overlooks a key fact and a key aspect of the legal framework that Commerce applies in its proceedings.  Unlike China, the United States is not an NME country.  For NME countries such as China, "all commercial entities in the country are presumed to export under the control of the state," and no company in an NME country will receive a separate antidumping duty rate "unless it could demonstrate that it enjoyed both de jure and de facto independence from the central government."  *Diamond Sawblades*, 866 F.3d at 1310-1311 (citations omitted).  The

Federal Circuit has reaffirmed that it is "within Commerce's authority to employ a presumption of state control for exporters in an {NME country}, and to place the burden on the exporters to demonstrate an absence of central government control." *Id.* at 1311. Here, Zhongzhen did not meet that burden based on the facts of this record. Consequently, this Court should affirm Commerce's determination not to grant Zhongzhen a separate rate.

III.    Commerce's Determination Not to Grant Junbang a Separate Rate Is Supported by
        <u>Substantial Evidence And Is in Accordance With Law</u>

Commerce's determination that Junbang failed to rebut the presumption of Chinese government control is supported by substantial evidence and otherwise in accordance with law. Commerce properly determined that the Chinese government had the ability to exert *de facto* control over Junbang through its sole parent company, whose largest and controlling shareholder was a government entity. Junbang SRM, C.R. 253 at 5-9. Commerce also found that an agent of the government held senior positions in both Junbang and its parent company and was able to fully control the parent company's board of directors. *Id.* Accordingly, Commerce properly found that Junbang had failed to rebut *all four* of the criteria for analyzing *de facto* government control:  (1) the ability to set export prices, (2) negotiate and sign contracts, (3) selection of management, and (4) disposition of profits and financing of losses. *Id.* Junbang disputes the conclusions that Commerce properly drew from record evidence and then argues that Commerce should have verified the absence of government control. As explained below, Junbang's arguments are unavailing and this Court should sustain Commerce's determination not to grant Junbang a separate rate.

A.  Commerce Reasonably Determined That The Chinese Government Has The Potential to Exercise Control Over Junbang's Export Activities And General Operations

1.  Junbang's Ownership Structure

Commerce began its analysis of the potential for Chinese government control over Junbang by examining its ownership structure.  Junbang SRM, C.R. 253 at 5.  The agency explained that Junbang was wholly owned by its sole shareholder Shuangta Food, which also appoints Junbang's executive director, manager, and supervisor.  *Id.*  In turn, Shuangta Food's largest and controlling shareholder (owning 34.31 percent) is Junxing Center[5], which is government entity collectively owned by the People's Government of Jinling Town, Zhaoyuan City.  *Id.*  Commerce noted that it has previously found that "local governments and village committees are not independent entities but rather, operate under the leadership" of the CPC.  *Id.*  Shuangta Food's financial statements affirmed "that the 'ultimate controller of [                    ] is the People's Government of Jinling Town, Zhaoyuan City."  *Id.* (citing C.R. 84 at 286).  In other words, record evidence demonstrated that Junxing Center was a Chinese government entity that "effectively owns 34.31 percent of Shuangta Food and, in turn, its wholly owned subsidiary Junbang."  *Id.*

Commerce then outlined how this 34.31 percent ownership share allowed Junxing, a government entity, to fully control Junbang's sole parent company Shuangta Food.  Specifically, Commerce explained that "*although not a majority owner*, the collectively-owned Junxing Center holds the plurality of shares (*i.e.*, a greater number of shares than any other single

---

[5]  Shuangta Food is owned as follows:  Junxing Center owns 34.31 percent. Yang Jun Min owns 12.25 percent.  Zhaoyuan Jinling Gold Mine owns 0.26 percent (and is itself wholly government owned).  The remaining 53.18 percent of shares are owned by other shareholders, each of whom hold less than 5 percent of the shares.  Junbang SRM, C.R. 253 at 5 (citing C.R. 80 at 24-29; C.R. 148).

shareholder) of [                ] and consequently exercises its position to nominate six of the nine board members…effectively exercising majority control of [                ], which in turn is the sole owner of Junbang." IDM at 23 (emphasis in original). The agency explained that *Junxing Center's plurality ownership* of [                ] gives the People's Government of Jinling Town the ability to exert control and influence, directly or indirectly, over Junbang's export activities including … setting prices, selecting management, negotiating and entering into contracts, and deciding how to distribute profits." *Id.* (emphasis in original). Put another way, this ownership structure afforded the government the ability to exert control over Junbang relative to all four of the *de facto* criteria for government control. Nevertheless, Commerce did not end its analysis there and considered the totality of the evidence before it in making its determination.

### 2.    Government Agent as Senior Leadership at Junbang

Commerce outlined the record evidence showing that an agent of the People's Government of Jinling Town, Zhaoyuan City held senior positions in both Junbang and its parent company Shuangta Foods and was able to fully control Shuangta Food. Specifically, Commerce noted that Yang Jun Min was Shuangta Food's founder, legal representative, and chairman of its board of directors. Junbang SRM, C.R. 253 at 6-7 (citing C.R. 80 at 27-28). Further, Yang Jun Min held one board membership and recommended "at least five of the nine board members of Shuangta Food." *Id.* at 7 (citing C.R. 80 at 28-29 and C.R. 148 at 128, showing that Yang Jun Min represented his ownership with [                ] shares and was entrusted with Junxing Center's [          ] shares to elect the Shuangta Food's board of directors). Thus, Yang Jun Min controlled the majority of Shuangta Food's board of directors. In turn, this board of directors "selected by Yang Jun Min and Junxing Center, *i.e.,* the local government, have appointed Yang Jun Min *as the executive director of Junbang*." *Id.* (emphasis added); *see also*

C.R. 82 at 34 (appointment letter). In this way, Yang Jun Min served as senior management at both Junbang and its sole parent company Shuangta Food. As executive director of Junbang, Yang Jun Min had "the power to decide Junbang's [                    ]; control the respondent's [              ] plans; [                    ]; including the [              ] and [                    ]; and organize the [                    ] of the company. Additionally, based on his powers as the executive director of the company, Yang Jun Min [                    ] of the company." *Id.* (citing Article 20 of Junbang's Articles of Association, C.R. 82 at 10).

Yang Jun Min's position and control over both Junbang and Shuangta Food was relevant to Commerce's analysis of potential government control because record evidence demonstrated that he was also an agent of the People's Government of Jinling Town, Zhaoyuan City. Specifically, Commerce outlined that Yang Jun Min also served as factory manager and legal representative of the Junxing Center and that that was the most senior position in that local government organization. Junbang SRM, C.R. 253 at 6 (citing C.R. 148 at 11-12, 14). Junxing Center's Articles of Association provide that Yang Jun Min's appointment to this position had to be "passed by a meeting of [                    ], and approved by the Market Supervision and Administration Bureau of Zhaoyuan City, a government entity." *Id.*; *see also* C.R. 148 at 115 (Article 15).[6] Commerce determined that "because a government entity must approve Yang Jun Min's senior leadership role, Yang Jun Min is an agent of the government." *Id.* In this role at Junxing Center, Yang Jun Min had the power to "[

---

[6] Article 15 states that after the legal representative has been nominated, that nomination will be considered by and "passed by the workers' representative meeting, and shall come into force after registration by the registration authority." C.R. 148 at 115. In turn, that "registering authority" can be found on the business license issued to Junbang: "Registration Authority: Market Supervision and Administration Bureau Zhaoyuan City." C.R. 81 at 23.

],” and therefore acted "under the authority and as an agent of the People's Government of Jinling Town, Zhaoyuan City, who collectively owns Junxing Center."[7] *Id.*

Looking at the totality of the evidence, Commerce determined that Yang Jun Min had "significant control over Junxing Center, Shuangta Foods, and Junbang" through his roles in each of those entities "as well as the ownership relationships among the companies." Junbang SRM, C.R. 253 at 6. Indeed, Junbang itself confirmed in a questionnaire response that Yang Jun Min controlled all three entities. *Id*. at 7 (citing C.R. 148 at 12, which states that Yang Jun Min "is controlling Junbang Trading, Shuangta Food and Junxing Center."). Therefore, Commerce reasonably determined even though Junxing Center owned less than the majority of shares in Shuangta Food, the "the People's Government of Jinling Town, through Yang Jun Min, has the potential to influence and control Junxing Center, Shuangta Food, and, the respondent, Junbang." IDM at 27-28.

### 3.    Chinese People's Congress and Shuangta Food

Finally, Commerce found further support for its determination in Shuangta Food's Articles of Association. Specifically, the Articles of Association "direct Shuangta Food to establish a party organization and party committee, in accordance with the [          ] of the" Chinese People's Congress (or CPC). Junbang SRM, C.R. 253 at 6 (citing Article 93, C.R. 148 at 88). This party committee is then directed to:

(1) "[

---

[7] Commerce cited Junxing Center's Articles of Association 17-21, which "list the expansive powers of the factory manager, including responsibility for the production, operation, and management of the entity, organizing the [          ] of the entity, nominating the [          ], [          ], and [          ], [      ], or [          ] for the entity, [          ], deciding on [          ], and presiding over [          ]." Junbang SRM, C.R. 253 at 6 (citing C.R. 148 at 115-116).

];" (2) "[                                              ];" and (3)
          "[

                                                              ]."

*Id*. (citing Article 95, C.R. 148 at 89).  Therefore, Commerce found that "the CPC is embedded

within Shuangta Food and, thereby, has the ability to influence Shuangta Food's subsidiaries,

*i.e.,* Junbang."  *Id*.  In sum, Commerce analyzed the totality of the record evidence and found

that the Chinese government was able to control and influence Junbang's actions through:

> (1) the People's Government of Jinling Town's effective control of
> Shuangta Food and Junbang through Junxing Center's ownership
> stake in the company; (2) the CPC organization embedded within
> Shuangta Food; (3) Yang Jun Min's influence on the majority of
> Shuangta Food's board of directors and control of Junbang's
> executive management as an agent of the People's Government of
> Jinling Town, Zhaoyuan City; and (4) Yang Jun Min's control and
> power within and across the Junxing Center, Shuangta Food, and
> Junbang.

Junbang SRM, C.R. 253 at 9.  Based on this evidence, Commerce determined that Junbang had

failed to rebut the presumption of government control with regard to all four *de facto* criteria:

Commerce lawfully determined that the government exercised "control and influence over

Junbang's export activities and general operations, including its ability to set export prices, to

negotiate and sign contracts, to select management, and to make decisions regarding dispositions

of profits and financing of losses."  *Id.* at 4.

     B.     <u>Junbang's Challenges to Commerce's *De Facto* Analysis are Meritless</u>

     Junbang challenges each piece of evidence upon which Commerce relied as insufficient

or inaccurate.  In doing so, Jungbang ignores that Commerce's determination was not based upon

a single fact, but rather, was based upon the whole record before the agency.  Moreover, the

possibility of drawing two inconsistent conclusions from the evidence in the record does not

preclude Commerce's determination from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Consequently, this Court should reject Junbang's arguments and affirm Commerce's determination.

First, Junbang points to a share transfer from Junxing Center to [   ] senior managers at Shuangta Food and argues that Junxing Center owned only "about 25% of the total shares of Shuangta Food" rather than the 34.31 percent that Commerce cited in its determination. Junbang Br. 8. However, Commerce reasonably explained that the agreement to transfer these shares was proposed in [   ], but the transfer did not occur until *after* the period of investigation. Junbang SRM C.R. 253 at 8.

Junbang also argues that Yan Jun Min and Junxing Center together "control slightly more than 1/3rd of the shares and less than 50%" of ownership share in Shuangta Food, and that this is "far less than a controlling amount of shares." Jungbang Br. 8. But Jungbang's argument misconstrues Commerce's reasoning. Commerce's determination was not based upon majority ownership. Rather, Commerce explained that "Junxing Center holds the plurality of shares (*i.e.,* a greater number of shares than any other single shareholder) … and consequently exercises its position to nominate six of the nine board members via Yang Jun Min, effectively exercising majority control of the company, which in turn is the sole owner of Junbang." IDM at 23. In fact, Commerce's determination was based on an analysis of share ownership as well as control over a majority of board members.

Next, Junbang argues that because some of its ownership shares are publicly traded, that is evidence of a lack of government control over the company or its shareholder Shuangta Food. Junbang Br. 8. Commerce addressed Junbang's argument that it is controlled by private, individual shareholders by noting that the company "fails to cite fails to cite any evidence that

these unnamed individuals control or have the potential to control Shuangta Food or its subsidiary Junbang, let alone evidence that these individuals are indeed private or free from government control." IDM at 27. Moreover, it is unclear how public trading of some shares would counterbalance the fact that a government agent, Yang Jun Min, controls the majority of Shuangta Food's board members and a government entity, Junxing Center, is its largest and controlling shareholder.

Junbang also takes issue with Commerce's finding that the Chinese Communist Party was embedded within Shuangta Food, arguing that the finding was based "on a mere reference to the CPC in the articles of incorporation." Junbang Br. 9. Junbang argues that these "mere formalities are insufficient to result in control." *Id.* Commerce rejected Junbang's argument because, "if the local administration, *i.e.*, government, can impose articles of association on a company, that information along with the other record evidence … is indicative of government control of the company, not that the company is free from it." IDM at 26. Nevertheless, Junbang contends that the CPC "does not appear in the shareholder structure of the Corporation," and its role is not relevant to "price or price negotiations or control over exports." Junbang Br. 12-13. Once again, Junbang overlooks the breadth of Commerce's analysis. Commerce did not base its separate rate determination only upon the reference to the CPC in the Articles of Association. Rather, the agency examined the record as a whole and found that Junbang had failed to rebut the presumption of government control based on a number of factors, including the articles of association, Junbang's ownership, senior leadership, government ownership of its parent company, and the presence of government agents in leadership positions.

Finally, Junbang attempts to minimize Yang Jun Min's various leadership positions, arguing that his role with the Junxing Center "does not make him a state controlled agent," that

he did not have the "authority to set government policy," and that Yang Jun Min only exerts control over the company "as an individual in his individual capacity." Junbang Br. 14. Junbang contends that "a position with the Communist Party does not establish that he acts on behalf of the Government on a day-to-day basis." Junbang Br. 10. Commerce rejected these arguments because Junbang did "not cite to any evidence on the record to support this minimization of Yang Jun Min's roles." IDM at 27. Indeed, Junbang merely asserts without evidence that Yang Jun Min acted in his individual capacity. By contrast, as discussed above, Commerce's determination was supported by evidence demonstrating that Yang Jun Min had "significant control over Junxing Center, Shuangta Food, and Junbang through his roles as factory manager/legal representative, board chairman, and executive director/manager, respectively, as well as the ownership relationships among the companies." *Id.* The record before the agency also supported its finding that "the People's Government of Jinling Town, through Yang Jun Min, has the potential to influence and control … Junbang." *Id.* at 28 (citing C.R. 148 at 12).

In sum, the substantial evidence cited by Commerce in support of its decision to deny Junbang a separate rate demonstrates the weakness of Junbang's arguments. Junbang simply did not meet its burden to affirmatively demonstrate an absence of *de facto* government control. Consequently, this Court should affirm Commerce's determination not to grant Junbang a separate rate.

IV.    **Commerce Lawfully Assigned Plaintiffs And The China-Wide Entity a Rate Pursuant to Adverse Facts Available**

Consistent with established practice and judicial precedent, Commerce properly determined that plaintiffs should be subject to the same antidumping duty rate (280.31 percent) as all other members of the China-wide entity that have not proven their independence from the government. IDM at 32-33. Commerce calculated this China-wide rate using adverse facts

available (or AFA) pursuant to 19 U.S.C. § 1677e(b) because certain Chinese exporters and producers that were part of the China-wide entity did not respond to Commerce's requests for information during the investigation and failed to cooperate to the best of their ability. *Id.* Ignoring the NME framework, plaintiffs argue that Commerce assigned them this rate unlawfully because, among other things, they fully cooperated with the agency to the best of their ability and were entitled to an individual rate calculated using their submitted data. As demonstrated below, Commerce's determination was based on substantial evidence and in accordance with law.

An exporter in an NME country will receive the country-wide rate by default, unless it demonstrates affirmatively that the exporter maintains both *de jure* and *de facto* independence from the government and deserves to receive separate rate status. *See Sigma Corp.*, 117 F.3d at 1405-06. The Federal Circuit has held that this country-wide rate "may be based in whole or in part on FA or AFA," and that Commerce may apply this rate to a respondent who "cooperates with an investigation or review but fails to rebut the presumption of government control." *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1039-1040 (Fed. Cir. 2021); *see also Jilin Forest*, 145 F.4th at 1314 ("Our holding in {*China Mfrs. Alliance*} that Commerce may lawfully assign an NME-wide antidumping duty rate to a cooperative mandatory respondent that has failed to rebut the presumption of government control requires reversing the CIT in this case."). The Court has explained that if Commerce determines that the China-wide entity should be subject to an AFA-based rate, that determination "logically requires Commerce to apply the same AFA-based rate to all members of the {China}-wide entity that have not proven their independence from the state." *Diamond Sawblades*, 866 F.3d at 1313 (citing *Transcom, Inc. v. United States*, 294 F. 3d 1371, 1373 (Fed. Cir. 2002)).

Zhongzhen nevertheless argues that Commerce improperly assigned it a rate based on AFA "because there is no evidence that Zhongzhen withheld information or impeded the investigation, as is statutorily required," citing to 19 U.S.C. § 1677e(a), which does not support its argument. The Federal Circuit has unambiguously held that "the fact that a country-wide rate may have been calculated using AFA does not change its applicability to an NME-entity that cooperated but ultimately failed to qualify for a separate rate." *Diamond Sawblades*, 866 F.3d at 1312.

Next, citing 19 U.S.C. § 1677m(d), Zhongzhen argues that Commerce was required to "attempt to collect information from" the government of China and allow it the opportunity to remedy any deficiency before applying an AFA rate to the China-wide entity. Zhongzhen Br. 40. This argument misconstrues the statute and the agency's NME practice. IDM at 33. Specifically, Commerce presumes that a company operating within an NME is subject to state control and "by failing to respond to … Q&V questionnaires and failing to submit separate rate applications, the non-responsive Chinese companies failed to rebut {the} presumption that they are subject to state control." *Id.* The agency further explained that section 1677m(d) only applies "when Commerce determines that *a response* to a request for information" was deficient. *Id.* (emphasis in original). Section 1677m(d) provides

> (d) Deficient submissions. If the administering authority or the Commission determines that *a response* to a request for information under this title does not comply with the request, the administering authority…shall promptly inform *the person submitting the response* of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this title.

19 U.S.C. 1677m(d) (emphasis added). Here, several companies did not provide any response at all, so there were no deficient submissions to remedy. IDM at 33. Commerce sent these

questionnaires to companies "for which the petitioner provided complete contact information" and also "posted the questionnaire, along with filing instructions {on its website} and invited parties who did not receive the questionnaire to file a response." *Id.* Under these circumstances, Commerce was not required to seek information from the government of China, to which the relevant request had not been directed. *Id.* Indeed, as Commerce further explained, the "purpose of applying AFA to noncooperating respondents, such as the China-wide entity in this investigation, is 'to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'" IDM at 34 (citing *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Doc. 103-316, vol. 1 (1994), at 870). Indeed, 19 U.S.C. § 1677e(d)(2) provides that in selecting an AFA rate, Commerce may apply the highest margin on the record based on an evaluation by Commerce of the situation that resulted in Commerce using the adverse inference. Furthermore, the agency is not required to demonstrate that the duty rate "reflects an alleged commercial reality of the interested party." *Id.* § 1677e(d)(3).

Nevertheless, Zhongzhen contends that the China-wide duty rate of 280.31 percent is "punitive and uncorroborated." Zhongzhen Br. 44. However, Commerce plainly stated that it *had* corroborated the China-wide rate. IDM at 32. Specifically, Commerce examined the petitioner's export price and normal value calculations in its initiation checklist and found them to be reliable. *Id.* (citing Antidumping Duty Investigation Checklist (Aug. 1, 2023), C.R. 19). Further no information had been submitted to Commerce during the course of the investigation that would cause it to "question the validity of the sources of information or the validity of information supporting the U.S. price or {normal value} calculations provided in the Petition." *Id.* Zhongzhen cites to none. Thus, the China-wide duty rate was properly corroborated.

Next, while ignoring Commerce's longstanding NME practice affirmed by this Court and the Federal Circuit, Zhongzhen and Junbang both argue that even if Commerce found that they had not rebutted the presumption of government control, the agency nevertheless should have calculated their antidumping duty rates using the data *they* provided.  Zhongzhen Br. 41, Junbang Br. 17.  However, the AFA statute expressly provides that Commerce has "no obligation" to do so.[8]  19 U.S.C. § 1677e(d)(3); *see also id.* § 1677e(d)(2).

Here, Commerce found that plaintiffs' data were not reliable sources of information because they had not demonstrated that their export activities were independent from government control.  IDM at 32-33.  By contrast, Commerce "confirmed the accuracy and validity of the information underlying the derivation of the margin in the Petition by examining source documents, as well as publicly available information" and determined that "the highest Petition rate is reliable for the purposes of assigning" an antidumping duty rate to the China-wide entity in this investigation.  *Id.* at 34.  Accordingly, Commerce lawfully assigned plaintiffs and the China-wide entity a duty rate based on adverse facts available, and this court should affirm Commerce's determination.

V.    Commerce Lawfully Determined That Critical Circumstances Existed With Regard to The China-Wide Entity

In its *Final Determination*, Commerce properly found that critical circumstances exist for imports of pea protein from China for the separate rate companies and the China-wide

---

[8]  Moreover, Zhongzhen and Junbang incorrectly presume that their own data would necessarily provide a more accurate rate than the China-wide rate.  For a company controlled by the Chinese government, assigning a rate based on a methodology that recognizes and reflects the realities of NME governmental control over a company could very well be more accurate than utilizing a method that ignores a country's NME status and is based solely on a company's individual data.  *See Qingdao Taifa*, 637 F. Supp. 2d at 1243 (noting that the statute treats NME countries differently "because prices and costs are not reliable in valuing goods from {NME} countries 'in view of the level of intervention by the government in setting relative prices.'") (quoting *ICC Indus.*, 812 F.2d 697).

entity. *Final Determination*, 89 Fed. Reg. at 55,560. Section 1673d(a)(3) provides that in any investigation where parties have alleged that critical circumstances exist, Commerce shall also determine (A) whether there is a history of dumping and material injury due to the imports under investigation, or the entity importing the merchandise "knew or should have known that the exporter was selling the subject merchandise for less than its fair value and that there would be material injury by reason of such sales," and (B) whether "there have been massive imports of the subject merchandise over a short period." To determine whether there were "massive" imports of subject merchandise, the agency's regulations provide that Commerce will "normally" examine the volume and value of imports on the record, seasonal trends, and the share of domestic consumption accounted for by the examined imports. 19 C.F.R. § 351.206(h)(1)(i)-(iii).

Commerce explained that it typically determines if imports were "massive" by subtracting "shipments reported by the cooperating mandatory respondents from import data for subject merchandise from" import data available through Global Trade Atlas (GTA). IDM at 37. However, in this investigation there were no cooperating mandatory respondents that qualified for a separate rate. *Id.* Consequently, Commerce relied on GTA data as "facts otherwise available" pursuant to 19 U.S.C. § 1677e(a), to determine if there were massive imports of the subject merchandise over a short period. *Id.* Zhongzhen contends that Commerce, instead, should have used its "timely filed" data in its critical circumstances analysis. Zhongzhen Br. 44-45. Zhongzhen challenges Commerce's critical circumstances determination as a whole because it "was subsidiary to its unlawful determinations that Plaintiffs were ineligible for a separate rate and should be assigned an AFA rate." Zhongzhen Br. 44-45. This is just another variation of the flawed arguments addressed above. *See* 19

U.S.C. § 1677e(d)(2)-(3).  Accordingly, Commerce's determination that Zhongzhen failed to rebut the presumption of government control and was, therefore, a part of the China-wide entity was based on substantial evidence and in accordance with law.

## VI.    Commerce Lawfully Calculated The Duty Rate for Unexamined Companies That Qualified for A Separate Rate

In the *Final Determination*, Commerce found that certain exporters – that had not been selected for individual examination but had filed separate rate applications (the separate rate companies) – were eligible to receive a separate rate.  *Final Determination*, 89 Fed. Reg. at 55,560.  Because the two mandatory respondents – Zhongzhen and Junbang – were determined to be part of the China-wide entity and their assigned margins were based on AFA, Commerce had to calculate a duty margin for the separate rate companies pursuant to 19 U.S.C. § 1673d(c)(5)(B), which directs Commerce to "use any reasonable method to establish the estimated all-others rate for exporters and producers not individually examined."  *Id.*  Here, in accordance with its practice, Commerce calculated the rate for the separate rate companies using a simple average of the margins alleged in the petition for a rate of 122.19 percent.[9]  *Final Determination*, 89 Fed. Reg. at 55,560.

Junbang argues that Commerce improperly relied on the petition rates for its calculation because those are "unrelated to actual transactions" and "unchallenged speculation."  Junbang Br. 17.  Junbang contends that, instead, this Court should remand this matter to the agency and direct it to calculate the duty for separate rate companies using "either or both" its data and

---

[9]  *See, e.g.*, *Certain Preserved Mushrooms from Spain*, 88 Fed. Reg. 18,120, 18,121 (Dep't of Commerce Mar. 27, 2023) (final AD determination); *Certain Preserved Mushrooms from France*, 87 Fed. Reg. 72,963, 72,964 (Dep't of Commerce Nov. 28, 2022) (final AD determination); *Thermal Paper from Spain*, 86 Fed. Reg. 54,162, 54,163 & n.9 (Dep't of Commerce Sept. 30, 2021) (final AD determination, collecting cases); *Ceramic Tile from China*, 85 Fed. Reg. 19,425, 19,426 (Dep't of Commerce Apr. 7, 2020) (final AD determination).

Zhongzhen's data. *Id.* But Commerce properly followed its established practice in calculating this rate using a simple average of the margins alleged in the petition. *Final Determination*, 89 Fed. Reg. at 55,560 n.8 (citing *Certain Preserved Mushrooms from Spain*, 88 Fed. Reg. 18,120 (Dep't of Commerce Mar. 27, 2023)). The Court has sustained this practice. *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1378-79 (Ct. Int'l Trade 2010). Junbang cites to no statutory authority or case precedent for the proposition that separate rate companies are entitled to receive a duty rate using data from companies that Commerce has determined are part of the NME-entity and *do not qualify for a separate rate*. Moreover, "{w}hen all mandatory respondents receive a rate that is zero, *de minimis*, or based entirely on AFA rates," as is the situation here, the Federal Circuit has emphasized that "Commerce's statutory obligation is to select '*any* reasonable method,' not the most reasonable method." *PrimeSource Bldg. Prods. v. United States*, 111 F.4th 1320, 1335 (Fed. Cir. 2024) (emphasis in original, quoting 19 U.S.C. § 1673d(c)(5)(B)). Plaintiffs entirely fail to demonstrate that Commerce's use a simple average of the petition rates, in accordance with longstanding practice, is unreasonable. Accordingly, Commerce's calculated rate was based on substantial evidence and in accordance with law.

<u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that this Court deny plaintiffs' motions for judgment on the agency record and sustain Commerce's Final Determination as supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

 s/ Douglas G. Edelschick
DOUGLAS G. EDELSCHICK

Of Counsel:                          Senior Trial Counsel
                                     Commercial Litigation Branch
SAPNA SHARMA                         Civil Division
Senior Counsel                       United States Department of Justice
Office of the Chief Counsel for      P.O. Box 480, Ben Franklin Station
    Trade Enforcement and Compliance Washington, DC 20044
United States Department of Commerce Tel: (202) 353-9303

February 3, 2026                     Attorneys for Defendant United States

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Court of International

Trade Standard Chambers Procedures § 2(B)(1) and contains 11,872 words, excluding the parts

of the brief exempted from the word limitation.  In preparing this certificate of compliance, I

have relied upon the word count function of the word processing system used to prepare the

brief.

_s/ Douglas G. Edelschick____