PUBLIC VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| **YANTAI ORIENTAL PROTEIN TECH CO., LTD. ET AL.,**<br><br>Plaintiffs,<br><br>and<br><br>**YANTAI T.FULL BIOTECH CO., LTD., ET AL.,**<br><br>Plaintiff-Intervenors,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>and<br><br>**PURIS PROTEINS, LLC, d/b/a PURIS,**<br><br>Defendant-Intervenor. | **Consolidated Court No. 24-00181**<br><br>**PUBLIC VERSION**<br><br>**Business Proprietary Information Removed From Pages 10, 11, 21, 30, 31, 32, 39, and 40.** |

## DEFENDANT-INTERVENOR'S OPPOSITION TO THE RULE 56.2 MOTIONS

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

Date:  February 17, 2026                    *Counsel to Defendant-Intervenor PURIS*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

RULE 56.2 STATEMENT ........................................................................................ 1

1. THE ADMINISTRATIVE DETERMINATION UNDER REVIEW ..................................... 1

2. THE ISSUES PRESENTED AND REASONS SUPPORTING COMMERCE'S DETERMINATION ......... 2

    A. Whether Commerce's determination that Junbang failed to rebut the presumption of *de facto* control by the Chinese government was supported by substantial evidence and otherwise in accordance with law. ........................................................................ 2

    B. Whether Commerce's determination that Zhongzhen failed to rebut the presumption of *de facto* control by the Chinese government was supported by substantial evidence and otherwise in accordance with law. ........................................................................ 2

    C. Whether Commerce's assignment of the highest antidumping duty margin derived from the petition as adverse facts available ("AFA") to the China-wide entity was supported by substantial evidence on the record and otherwise in accordance with law. ...... 3

    D. Whether Commerce's conclusion that critical circumstances existed was supported by substantial evidence on the record and otherwise in accordance with law. ........................ 4

    E. Whether the rate applied to the unexamined, separate rate respondents was supported by substantial evidence on the record and otherwise in accordance with law. ...... 4

JURISDICTION ...................................................................................................... 4

STANDARD OF REVIEW ........................................................................................ 4

STATEMENT OF FACTS ........................................................................................ 6

SUMMARY OF THE ARGUMENTS ............................................................................ 14

ARGUMENT ........................................................................................................ 15

    I. COMMERCE'S DETERMINATIONS THAT JUNBANG AND ZHONGZHEN DID NOT REBUT THE PRESUMPTION OF GOVERNMENT CONTROL, AND THEREFORE NO SEPARATE RATE WAS WARRANTED FOR THOSE RESPONDENTS, IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW ............................................. 15

        A. Legal Framework .................................................................................. 15

        B. The Chinese Government Has the Potential to Control or Influence Junbang's Export Activities and General Operations ............................................ 19

C.    The Chinese Government Has the Potential to Control or Influence Zhongzhen's Export Activities and General Operations ............................................... 30

1.    The executive director and the general manager of the Zhongzhen companies controlled Zhongzhen's export decisions and general operations during the POI ................................................................................................................... 30

2.    The People's Congresses and CPPCC had the potential to control Zhongzhen during the POI ................................................................................................... 31

3.    Zhongzhen's arguments do not undermine Commerce's conclusion in the Final Determination that Zhongzhen failed to rebut the presumption of government control ............................................................................................................. 37

II.    COMMERCE'S APPLICATION OF THE HIGHEST PETITION RATE AS AFA TO THE CHINA-WIDE ENTITY IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW ......................... 43

III.    COMMERCE'S DETERMINATION THAT CRITICAL CIRCUMSTANCES EXISTED IS IN ACCORDANCE WITH LAW ............................................................. 47

IV.    THE AD RATE COMMERCE APPLIED TO THE UNEXAMINED, SEPARATE RATE RESPONDENTS WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW ........................................................... 49

CONCLUSION ...................................................................................................................... 51

## TABLE OF AUTHORITIES

### CASES

*AMS Associates, Inc. v. United States*,
791 F. 3d 1,376 (Fed. Cir. 2013)..................................................................... 17, 28, 38

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
284 F. Supp. 3d 1,350 (Ct. Int'l Trade 2018) ........................................................ 38

*Atl. Sugar Ltd. v. United States*,
744 F.2d 1,556 (Fed. Cir. 1984)............................................................................. 5

*Baoding Mantong Fine Chem Co. v. United States*,
113 F. Supp. 3d 1,332 (Ct. Int'l Trade 2015) ...................................................... 46

*Bristol Metals L.P. v. United States*,
703 F. Supp. 3d 1370, 1378-1379 (Ct. Int'l Trade 2010) ..................................... 50

*China Manufacturers Alliance, LLC v. United States II*,
Court No. 2023-2391, 2025 WL 1214993 (Fed. Cir. Apr. 28, 2025)..................... 17

*Cleo In. v. United States*,
501 F.3d 1,291 (Fed. Cir. 2007)............................................................................. 5

*Consolidated Edison v. NLRB*,
305 U.S. 197 (1938)............................................................................................... 5

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)............................................................................................... 5

*Diamond Sawblades Manufacturers Coalition v. United States*,
866 F.3d 1,304 (Fed. Cir. 2017).................................................................. 16, 41, 43

*Dongtai Peak Honey Industry Co. v. United States*,
777 F.3d 1,343 (Fed. Cir. 2015)........................................................................... 16

*Fujitsu Gen'l Ltd. v. United States*,
88 F.3d 1,034 (Fed. Cir. 1996).............................................................................. 5

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1,323 (Ct. Int'l Trade 2006) ........................................................ 5

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
28 F. Supp. 3d 1,317 (Ct. Int'l Trade 2014) ........................................................ 37

*Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*,
145 F.4th 1,308 (Fed. Cir. 2025) ......................................................................... 16

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) ................................................................ 5

*Nan Ya Plastics Corp. v. United States*,
   810 F.3d 1,333 (Fed. Cir. 2016) ............................................................ 29

*Nippon Steel Corp. v. United States*,
   458 F.3d 1,345 (Fed. Cir. 2006) ............................................................ 6

*PAM, S.p.A v. United States*,
   582 F.3d 1,336 (Fed. Cir. 2009) ......................................................... 5, 6

*Pirelli Tyre Co. v. United States*,
   128 F. 4th 1,265 (Fed. Cir.  2025) ............................................ 15, 16, 38

*QVD Food Co. v. United States*,
   658 F.3d 1,318 (Fed. Cir. 2011) ...................................................... 29, 43

*Sigma Corp. v. United States*,
   117 F.3d 1,401 (Fed. Cir. 1997) .......................................................... 16

*Timken Co. v. United States*,
   699 F. Supp. 300 (Ct. Int'l Trade 1988) ............................................... 5

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ............................................................................. 5

*Zheijiang Machinery Import & Export Corp. v. United States*,
   65 F. 4th 1,364 (Fed. Cir. 2023) ................................................... *passim*

## STATUTES

19 U.S.C. § 1516a. ....................................................................................... 4

19 U.S.C. § 1673d(a)(3) ......................................................................... 4, 47

19 U.S.C. § 1673d(c)(1)(B)(I) ..................................................................... 16

19 U.S.C. § 1673d(c)(5)(B) ..................................................... 4, 14, 49, 50

19 U.S.C. § 1677(18)(A) ............................................................................. 15

19 U.S.C. § 1677(18)(B) ............................................................................. 16

19 U.S.C. § 1677e(a) ............................................................................. 3, 48

19 U.S.C. § 1677e(b) ................................................................................... 3

19 U.S.C. § 1677e(c) ................................................................................. 45

19 U.S.C. § 1677e(d) ................................................................................................ 45, 46

19 U.S.C. § 1677m(d) ..................................................................................................... 46

28 U.S.C. 1581(c) ............................................................................................................. 4

## REGULATIONS

19 C.F.R. § 351.107(d) .................................................................................................... 16

19 C.F.R. § 351.206 ..................................................................................................... 4, 48

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*53-Foot Domestic Dry Containers from the People's Republic of China*,
  74 Fed. Reg. 21,203 (Dep't of Commerce Apr. 17, 2015) (fin. determ.), and accompanying
  Issues and Decision Memorandum ............................................................................ 46

*Certain Pea Protein from China*,
  88 Fed. Reg. 52,124 (Aug. 7, 2023) (initiation) ......................................................... 6

*Certain Pea Protein from China*,
  89 Fed. Reg. 10,038 (Dep't of Commerce Feb. 13, 2024) (prelim. determ.), and accompanying
  Preliminary Decision Memorandum (Feb. 7, 2024) ................................................... 11

*Certain Pea Protein from China*,
  89 Fed. Reg. 55,559 (Dep't of Commerce July 5, 2024) (fin. determ.), and accompanying
  Issues and Decision Memorandum (June 27, 2024) ...................................... *passim*

*Silicon Carbide from the People's Republic of China*,
  56 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) (fin. determ.) .................................. 18

*Small Diameter Graphite Electrodes from the People's Republic of China*,
  81 Fed. Reg. 62,474 (Dep't of Commerce Sept. 9, 2016) (fin. determ.), and accompanying
  Issues and Decision Memorandum ............................................................................ 42

## OTHER AUTHORITIES

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 364 (2015)................. 46

CONFIDENTIAL VERSION

### RULE 56.2 STATEMENT

Defendant-Intervenor PURIS Proteins LLC d/b/a PURIS ("PURIS"), petitioner in the underlying investigation, respectfully submits this response to the Rule 56.2 motions for judgment on the agency record filed in this consolidated case by plaintiffs Yantai Oriental Protein Tech Co., Ltd. ("Yantai Oriental"), Yantai Zhongzhen Trading Co., Ltd. ("Yantai Zhongzhen"), Jiujiang Tiantai Food Co., Ltd. ("Jiujiang Tiantai") (collectively, the "Zhongzhen Companies" or "Zhongzhen"), and Yantai Yiyuan Bioengineering Co., Ltd ("Yiyuan Bioengineering"), ECF No. 46 and 47 ("Zhongzhen Br."); Yantai T.Full Biotech Co. Ltd. ("T. Full"), ECF No. 53 ("T.Full Br.");[1] Zhaoyuan Junbang Trading Co., Ltd. ("Junbang"), Linyi Yuwang Vegetable Protein Co., Ltd. ("Linyi Yuwang"), Shandong Yuwang Ecological Food Industry Co., Ltd. ("Shandong Yuwang"), Fenchem Biotek Ltd. ("Fenchem Biotek"), Jianyuan International Co., Ltd. ("Jianyuan"), Yosin Biotechnology (Yantai) Co., Ltd., ("Yosin Biotechnology"), and Yosin Import and Export (Yantai) Co., Ltd. ("Yosin Export"). ECF No. 48. ("Junbang Br.").[2]

### 1. The Administrative Determination Under Review

The administrative determination under review is the final determination in the U.S. Department of Commerce's ("Commerce") less-than-fair value ("LTFV") investigation of certain pea protein from the People's Republic of China ("China"), covering the period January 1, 2023, through December 31, 2023. *Certain Pea Protein from China*, 89 Fed. Reg. 55,559

---

[1] T. Full's Brief is merely a motion supporting the arguments set forth in Zhongzhen's Brief. Accordingly, PURIS will not address T. Full's claims separately from those of Zhongzhen.

[2] PURIS notes that Intervenor KTL Pharmaceutical Co., Limited, filed no motion for judgment on the agency record, pursuant to Rule 56.2 of this Court's Rules. Accordingly, KTL Pharmaceutical Co., Limited has no right to a remedy in accordance with this litigation.

(Dep't of Commerce July 5, 2024) (final determ.), P.R. 387 ("*Final Determination*"), and

accompanying Issues and Decision Memorandum (June 27, 2024), P.R. 386 ("*IDM*").[3]

### 2. The Issues Presented and Reasons Supporting Commerce's Determination

**A. Whether Commerce's determination that Junbang failed to rebut the presumption of *de facto* control by the Chinese government was supported by substantial evidence and otherwise in accordance with law.**

**Yes.** Commerce lawfully determined that Junbang did not rebut the presumption of *de facto* Chinese government control because the Government of China ("GOC") had the ability to control and influence Junbang's export activities and general operations. Commerce determined that the GOC had the ability to exercise control and influence over Junbang via its status as the largest shareholder; through the Articles of Association of Junbang's parent company; through the founder and legal representative of Junbang's parent company, who is also the chairman of its board of directors and a local leader in a GOC organization; and through other members of the parent company's board of directors associated with the GOC. Accordingly, Commerce's determination that Junbang failed to rebut the presumption of government control, and therefore the application of a separate rate to Junbang was not warranted, was supported by substantial evidence and was otherwise in accordance with law.

**B. Whether Commerce's determination that Zhongzhen failed to rebut the presumption of de facto control by the Chinese government was supported by substantial evidence and otherwise in accordance with law.**

**Yes.** Commerce correctly determined that Zhongzhen did not rebut the presumption of *de facto* Chinese government control because the GOC had the ability to control and influence

---

[3] Public documents in the administrative record are designated as "P.R." and confidential documents are designated as "C.R." Business proprietary information from confidential documents is designated using square brackets and is redacted from the public version of the brief, in accordance with Rule 5(g) of the Court's Rules.

PUBLIC VERSION

Zhongzhen's export activities and general operations.  Commerce determined that Zhongzhen's president/executive director and general manager/legal representative had significant ownership and control of Zhongzhen's parent company and were members and representatives of local GOC organizations.  Accordingly, Commerce's determination that Zhongzhen failed to rebut the presumption of government control, and therefore the application of a separate rate for Zhongzhen was not warranted, was supported by substantial evidence and was otherwise in accordance with law.

> **C.  Whether Commerce's assignment of the highest antidumping duty margin derived from the petition as adverse facts available ("AFA") to the China-wide entity was supported by substantial evidence on the record and otherwise in accordance with law.**

**Yes.**  Commerce lawfully determined that the China-wide entity, which it determined included Junbang, Zhongzhen, and Chinese exporters and producers who did not respond to Commerce's requests for information, did not act to the best of its ability.  Commerce therefore assigned the highest antidumping duty ("AD") margin to the China-wide entity as AFA, pursuant to 19 U.S.C. §§ 1677e(a) & (b), using a rate derived from the Petition, as permitted by the statute.  The Court of Appeals for the Federal Circuit ("Federal Circuit") has held that even if a Chinese entity has otherwise cooperated in a proceeding, if it has not rebutted the presumption of government control, then Commerce may apply the highest AD margin to the collective China-wide entity.  Accordingly, Commerce's application of the highest AD margin to the China-wide entity in this investigation was supported by substantial evidence on the record and was otherwise in accordance with law.

**D. Whether Commerce's conclusion that critical circumstances existed was supported by substantial evidence on the record and otherwise in accordance with law.**

**Yes.** Commerce determined that imports of pea protein from China were massive during the period of investigation ("POI"), and therefore, in accordance with 19 U.S.C. § 1673d(a)(3) and 19 C.F.R. § 351.206, that critical circumstances existed. No information on the record undermines the reasonableness or lawfulness of that determination. Accordingly, Commerce's critical circumstances determination was supported by substantial evidence and otherwise in accordance with law.

**E. Whether the rate applied by Commerce to the unexamined, separate rate respondents was supported by substantial evidence on the record and otherwise in accordance with law.**

**Yes.** Because Commerce determined that both examined respondents were part of the China-wide entity, Commerce calculated a separate rate for the unexamined respondents in accordance with 19 U.S.C. § 1673d(c)(5)(B) based on a simple average of the margins alleged in the Petition. The rate Commerce applied to the unexamined separate rate respondents was supported by substantial evidence and was otherwise in accordance with law.

## JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this action was commenced under 19 U.S.C. §§ 1516a(a)(2)(A) and (a)(2)(B)(i).

## STANDARD OF REVIEW

In reviewing Commerce's AD determinations, "the Court of International Trade" ("CIT") must sustain "any determination, finding or conclusion found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"

*Fujitsu Gen'l Ltd. v. United States*, 88 F.3d 1,034, 1,038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984); *PAM, S.p.A v. United States*, 582 F.3d 1,336, 1,339 (Fed. Cir. 2009). The specific factual findings on which Commerce relies in applying its interpretation "are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Under the substantial evidence standard, a Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo In. v. United States*, 501 F.3d 1,291, 1,296 (Fed. Cir. 2007). As the Supreme Court has held, substantial evidence is "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent" an agency determination from being "supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Accordingly, the CIT has explained that it will not substitute its judgment for that of Commerce in choosing between two fairly conflicting interpretations of the facts on the record. *See Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988); *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1,323, 1,326 (Ct. Int'l Trade 2006). Further, the Federal Circuit has held that "substantial evidence on the record means 'more than a mere scintilla' and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if some evidence on the record detracts from the agency's ultimate determination. *Atl. Sugar Ltd. v. United States*, 744 F.2d 1,556, 1,562-63 (Fed. Cir. 1984) (citing *Universal Camera*

*Corp. v. N.L.R.B*, 340 U.S. 474, 477 (1951)); *PAM S.p.A. v. United States*, 582 F.3d 1,336, 1,339 (Fed. Cir. 2009). As the Federal Circuit has held, the substantial evidence standard is a "high barrier" for a challenging party to overcome. *Nippon Steel Corp. v. United States*, 458 F.3d 1,345, 1,352 (Fed. Cir. 2006) (citing *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1,056, 1,060 (Fed. Cir. 2001)).

## STATEMENT OF FACTS

On July 11, 2023, PURIS, an American producer of high protein content pea protein[4] and Defendant-Intervenor in this litigation, filed a petition with Commerce alleging that Chinese exporters were selling pea protein to the United States for LTFV.[5] On August 1, 2023, Commerce initiated its LTFV investigation. *Pea Protein from China*, 88 Fed. Reg. 52,124 (Aug. 7, 2023) (initiation), PR 35. Soon afterward, Commerce selected two "mandatory" respondents for individual examination in the investigation, Junbang and Yantai Zhongzhen. *Respondent Selection Memorandum* (Dep't of Commerce Aug. 28, 2023), P.R. 83; C.R. 32.

Because Commerce considers China a nonmarket economy ("NME") country for purposes of its AD proceedings, in their responses to Commerce's initial AD questionnaire, both Junbang and Yantai Zhongzhen submitted information that they claimed showed that their export activities are sufficiently independent of the government to be eligible for a rate separate from that of the China-wide entity, as well as information about their corporate structure and affiliations. Letter from Craven Trade Law to Sec'y of Commerce, *Junbang's Section A Questionnaire Response* (Oct. 2, 2023) ("*Jungbang AQR*"), P.R. 155; C.R. 80 at 3-30, 30-35;

---

[4] Pea protein is a substance made from dry field peas typically containing 80 to 85 percent protein by weight. It is commonly produced as a dry powder and has a neutral flavor. Pea protein is used to add protein content to a wide range of human food products.

[5] PURIS also filed a countervailing duty ("CVD") petition, which resulted in an affirmative determination and imposition of an order.

Letter from GDLSK to Sec'y of Commerce, *Zhongzhen's Section A Questionnaire Response* at 2-21, 21-23 (Oct. 2, 2023) ("*Zhongzhen AQR*"), P.R. 150-151; C.R. 74-75 at 2-21, 21-23.  In addition, Yantai Zhongzhen's affiliates, Yantai Oriental and Jiujiang Tiantai, also filed separate rate applications, seeking an AD rate separate from the China-wide entity. Letter from GDLSK to Sec'y of Commerce, *Yantai Oriental Separate Rate Application* (Sept. 13, 2023), P.R. 119; C.R. 53; Letter from GDLSK to Sec'y of Commerce, *Jiujiang Tiantai Separate Rate Application* (Sept. 13, 2023), P.R. 118; C.R. 51.

In response to Zhongzhen's AQR, PURIS submitted eight exhibits providing "information regarding the roles of national and local People's Congresses and CPPCCs {Chinese People's Consultative Conferences} in China's government."  Letter from PURIS to Sec'y of Commerce, *PURIS Rebuttal Factual Information Submission* (Oct. 16, 2023) ("*PURIS RFI*"), P.R. 170 at 1-2, Exhibits 1-8.

Commerce determined that it required more information from Junbang on the corporate structure of the company and its affiliated entities and issued a supplemental questionnaire to Junbang.  In its response, Junbang provided responses and exhibits, such as various articles of incorporation and business licenses for various affiliates.  Letter from Craven Trade Law to Sec'y of Commerce, *Junbang Supplemental Questionnaire Response* (Oct. 30, 2023), P.R. 190; C.R. 148.

On November 7, 2023, PURIS submitted comments on Yantai Zhongzhen's Section A Questionnaire Response, arguing that Yantai Zhongzhen did not establish the absence of *de jure* or *de facto* government control of its activities.  Letter from PURIS to Sec'y of Commerce, *PURIS Deficiency Comments for Zhongzhen* (Nov. 7, 2023), P.R. 199; C.R. 150 at 1-5. Furthermore, on November 13, 2023, PURIS filed a claim with Commerce alleging the existence

of critical circumstances.  Letter from PURIS to Sec'y of Commerce, *PURIS Critical Circumstances Allegation* (Nov. 13, 2023), P.R. 204; C.R. 151.

Commerce subsequently issued a supplemental section A questionnaire to Yantai Zhongzhen, and Yantai Zhongzhen filed its response.  Letter from GDLSK to Sec'y of Commerce, *Zhongzhen Supplemental Section A Questionnaire Response* (Dec. 21, 2023) ("*Zhongzhen SQR*"), P.R. 269-270; C.R. 189.

On January 22, 2024, PURIS submitted comments and analysis for Commerce's consideration in advance of the preliminary determination, in which it argued that neither Junbang nor Yantai Zhongzhen qualified for a separate rate.  Letter from PURIS to Sec'y of Commerce, *PURIS Pre-preliminary Comments* (Jan. 22, 2024), P.R. 336; C.R. 244 at 1-7.

On January 26, 2024, Junbang responded to PURIS' Comments, arguing that its receipt of separate rate status was "not only appropriate," but "mandated by the facts."  Letter from Craven Trade Law to Sec'y of Commerce, *Junbang Response to PURIS Comments* (Jan. 26, 2024), P.R. 341; C.R. 246 at 1-4.

On February 7, 2024, Commerce issued a memorandum addressing Junbang's separate rate arguments.  Memorandum to the File from Sofia Pedrelli, International Trade Compliance Analyst, Office II, AD/CVD Operations through Rebecca Janz, Program Manager, Office II, AD/CVD Operations, *Preliminary Determination; Separate Rate Analysis Memorandum – Zhaoyuan Junbang Trading Co., Ltd.* (Feb. 7, 2024) ("*Junbang SRA Memo*"), P.R. 356; C.R. 253.  Commerce explained that Junbang is wholly owned by Yantai Shuangta Food, Co., Ltd. ("Shuangta Food"), and that Shuangta Food's "largest and controlling shareholder, Junxing Center, is collectively owned by the People's Government of Jinling Town, Zhaoyuan City,"

which it concluded "operates under the leadership of the Communist Party of China (CPC)." *Id.* at 5.

Commerce also explained that through "Shuangta Food's Articles of Association, the CPC is embedded within" the company and "has the ability to influence Shuangta Food's subsidiaries, *i.e.*, Junbang." *Id.* at 6.  In addition, Commerce found that Yang Jun Min, the "legal representative and factory manager (*i.e.* factory director) of Junxing Center," has substantial control over Shuangta Food as its founder, board chairman, and legal representative," "exercises 12.25 percent ownership" of the company, holds the power to recommend "at least five of the nine board members of Shuangta Food," "appoints the general manager, the deputy general manager, and the chief financial officer of Shuangta Food," and "serves as Junbang's director and manager." *Id.* at 7.

Furthermore, Commerce found that other members of Shuangta Food's board of directors also hold positions within Junxing Center.  *Id.*  Commerce concluded that the "People's Government of Jinling Town, through Yang Jun Min, has the potential to influence and control Junxing Center, Shuangta Food, and the respondent, Junbang."  *Id.* at 8.  Commerce therefore preliminarily determined that Junbang had not rebutted the presumption of *de facto* government control and was not eligible to receive a separate rate in the investigation.  *Id.* at 1.

The same day, Commerce also issued a preliminary "collapsing" memorandum for the various companies and affiliates making up Zhongzhen.  Memorandum to Minoo Hatten, Director, Office II, AD/CVD Operations, from Katie Smith, International Trade Compliance Analyst, Office II, AD/CVD Operations, through Rebecca Janz, Program Manger, Office II, AD/CVD Operations, *Preliminary Determination of Affiliation and Single Entity Determination for Yantai Zhongzhen Trading Co., Ltd.* (Feb. 7, 2024), P.R. 355; C.R. 252.  Commerce

determined that affiliates Yantai Zhongzhen, Yantai Oriental and Jiujiang Tiantai should all be collapsed and treated as one entity, Zhongzhen.

In another memorandum dated February 7, 2024, Commerce preliminarily addressed Zhongzhen's request for a separate rate.  Memorandum to the File, from Katherine Smith, International Trade Compliance Analyst, Office II, AD/CVD Operations, through Rebecca Janz, Program Manager, Office II, AD/CVD Operations, *Preliminary Determination: Separate Rate Analysis Memorandum – the Zhongzhen Companies* (Feb. 7, 2024) ("*Zhongzhen SRA Memo*"), P.R. 354; C.R. 251.

Commerce explained that Zhongzhen is wholly owned by [

] and that [     ] percent of that parent company was owned by a single person, [          ], directly or indirectly through partial ownership of other owners of that parent company.  *Id.* at 5.  Commerce also explained that [          ] is both president of Zhongzhen and a representative to the Zhaoyuan City People's Congress and Yantai City People's Congress ("People's Congresses").  *Id.*  Commerce cited to information on the record which showed that "local people's congresses are directly under the Central Government and function as a government entity."  *Id.* at 6 (citing Exhibit 1 from the *PURIS RFI*).

In addition, Commerce explained that Zhongzhen's general manager, [               ] also serves as the [                    ] for affiliated producers of the merchandise exported by Yantai Zhongzhen, Yantai Oriental and Jiujiang Tiantai, is a partial owner of one of the minority owners of [      ], and is "a member of the Chinese People's Political Consultative Conference of Zhaoyuan City" ("Zhaoyuan CPPCC").  *Id.*  Commerce explained that the "CPCC is a creation of the Communist Party of China (CPC) and is an important institution of multi-party cooperation and political consultations led by the CPC."  *Id.*  Commerce further explained that

the National People's Congress ("NPC") and CPPCC are "akin to the steering mechanism of a car that enables the {Chinese Communist} Party to transform its opinions and directives into national will through the enactment of laws." *Id* at 7.

Accordingly, Commerce held that both [        ] and [            ] are government officials and through their influence and control Zhongzhen had failed to demonstrate autonomy from government influence when negotiating and signing export contracts, selecting management, and making other personnel decisions. *Id.* at 7-9. Commerce therefore preliminarily concluded that Zhongzhen had failed to rebut the presumption of *de facto* government control and was ineligible for a separate rate. *Id.* at 10.

Finally, Commerce issued a critical circumstances memorandum, preliminarily finding that imports were massive during the period of February 2023 through November 2023. Memorandum to the File from Sofia Pedrelli, International Trade Compliance Analyst, AD/CVD Operations, Office II, through Rebecca Janz, Program Manager, AD/CVD Operations, Office II, *Preliminary Analysis of Critical Circumstances* (Feb. 7, 2024), P.R. 351.

On February 13, 2024, Commerce published its preliminary determination, determining that pea protein from China was being sold for LTFV in the United States and preliminarily determining that critical circumstances existed. *Certain Pea Protein from China*, 89 Fed. Reg. 10,038 (Dep't of Commerce Feb. 13, 2024) (prelim. determ.), P.R. 346; and accompanying Preliminary Decision Memorandum (Feb. 7, 2024) ("*PDM*"), P.R. 347.

On February 12, 2024, Zhongzhen requested that Commerce reconsider its determination that Zhongzhen was not entitled to a separate rate. Letter from GDLSK to Sec'y of Commerce, *Zongzhen Reconsideration Request* (Feb. 12, 2024), P.R. 357; C.R. 254. Zhongzhen disagreed with Commerce's conclusions that the People's Congresses and Zhaoyuan CPPCC are

government entities, and that the company leaders at issue were not free from government influence and control in their decision-making capacities.  *Id.* at 1-8.

On February 23, 2024, Junbang also requested that Commerce reconsider its separate rate determination for Junbang.  Letter from Craven Trade Law to Sec'y of Commerce, *Junbang Reconsideration Request* (Feb. 23, 2024), P.R. 360; C.R. 255.  Junbang argued that there was no evidence of "actual" control by the Chinese government of the company's decision-making capabilities, and claimed that the record evidence did not support that "an agricultural center controlled by the town of Jinling" had any influence over Yang Jun Min.  *Id.* at 1-5.

On March 21, 2024, Junbang and Zhongzhen filed their case briefs with Commerce. Junbang reiterated its arguments that the GOC exerted no influence over its export activities and general operations, and that Commerce should grant it a separate rate.  Letter from Craven Trade Law to Sec'y of Commerce, *Junbang Case Brief* (March 21, 2024) ("*Junbang Case Br.*"), P.R. 367; C.R. 256 at 1-11.   Zhongzhen similarly argued that Commerce should grant it a separate rate.  Letter from GDLSK to Sec'y of Commerce, *Zhongzhen Case Brief* (Mar. 21, 2024) ("*Zhongzhen Case Br.*"), P.R. 370; C.R. 258 at 4-36.  In addition, Zhongzhen argued that the AFA rate applied by Commerce to the China-wide entity, and therefore Zhongzhen, was unlawful because Zhongzhen fully participated in the investigation and Commerce could have used Zhongzhen's data in its calculations of the rate.  *Id.* at 40-44.  Finally, Zhongzhen argued that Commerce's critical circumstances finding was unlawful because Zhongzhen fully participated in the investigation.  *Id*. at 44-45.

PURIS submitted its rebuttal brief on March 28, 2024, arguing that Commerce properly determined that Junbang and Zhongzhen were part of the China-wide entity and thus not eligible for a separate rate.  Letter from PURIS to Sec'y of Commerce, *Rebuttal Brief* (Mar. 28, 2024)

("*PURIS Rebuttal Br.*"), P.R. 374; C.R. 259 at 1-32. PURIS pointed to record information to show that Commerce's decision did not deviate from its practice and was fully consistent with Court precedent. *Id.* In addition, PURIS defended Commerce's use of the highest petition rate as the AFA rate for the China-wide entity and argued that Commerce properly found the existence of critical circumstances. *Id*. at 37-39, 40-41.

On June 27, 2024, Commerce issued a final critical circumstances memo, continuing to determine that the volume of imports of subject merchandise increased by at least 15 percent from the adjusted base period to an adjusted comparison period, which it concluded was a "massive" increase. Memorandum to the File from Sofia Pedrelli, International Trade Compliance Analyst, AD/CVD Operations, Office II, through Christopher Hargett, Program Manager, AD/CVD Operations, Office II, *Final Analysis of Critical Circumstances Memorandum* (June 27, 2024) ("*Critical Circumstances Analysis*"), P.R. 383. Subsequently, on July 5, 2024, Commerce issued the *Final Determination*, continuing to find that critical circumstances existed. *Final Determination*, 89 Fed. Reg. at 55,559-60, P.R. 387. *See also IDM*, P.R. 388 at 36-38 (Comment 6).

With respect to Junbang's separate rate arguments, Commerce concluded that "the record evidence as a whole indicates *de facto* government control of Junbang through its parent company, Shuangta Food" and that Junbang had otherwise failed to rebut the presumption of government control. *IDM* at 20-29 (Comment 2). Likewise, Commerce also determined that the Zhongzhen Companies had not "demonstrated an absence of *de facto* government control." *IDM* at 6-20 (Comment 1,).

With respect to the AFA rate applied to the China-wide entity, Commerce continued to apply that rate in the *Final Determination* and provided citations to both statutory and judicial

authorities in support of its application of the highest margin rate derived from the petition as AFA. *IDM* at 31-36 (Comment 5).

Finally, because Commerce had determined that the two examined respondents were part of the China-wide entity, and the China-wide entity rate was based on AFA, pursuant to 19 U.S.C. § 1673d(c)(5)(B) Commerce calculated a simple average of the margins alleged in the Petition and applied that resulting average to the unexamined exporters for whom Commerce concluded that the application of a separate rate was appropriate. *Final Determination*, 89 Fed. Reg. at 55,560.

Plaintiffs timely appealed. *See, e.g.,* Summons, ECF No. 1; Compl. ECF No. 9.

## SUMMARY OF THE ARGUMENTS

Substantial evidence supports Commerce's determination that the GOC had the ability to control the export activities and general operations of Junbang and Zhongzhen during the POI. Both companies challenge the lawfulness and reasonableness of Commerce's determination that they failed to rebut the presumption of NME government control. However, Commerce's determinations that neither Junbang nor Zhongzhen rebutted the presumption of government control, and therefore a separate rate was not warranted for either respondent, were supported by substantial evidence on the record and were otherwise in accordance with law.

Furthermore, once Commerce determined that Junbang and Zhongzhen should be treated as part of the China-wide entity, consistent with Federal Circuit precedent, Commerce correctly and lawfully applied an AFA rate to the China-wide entity, including Junbang and Zhongzhen, using information derived from the Petition.

In addition, because Commerce concluded that there was a massive increase in imports between the analyzed comparison periods, Commerce's determination that critical circumstances

existed in the LTFV investigation was supported by substantial evidence on the record and was otherwise in accordance with law.

Finally, Commerce's calculation of the rate applied to the unexamined separate rate companies was consistent with its practice and the statute.

## ARGUMENT

**I.    COMMERCE'S DETERMINATIONS THAT JUNBANG AND ZHONGZHEN DID NOT REBUT THE PRESUMPTION OF GOVERNMENT CONTROL, AND THEREFORE NO SEPARATE RATE WAS WARRANTED FOR THOSE RESPONDENTS, IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW**

Commerce analyzed the record as a whole and determined that neither Junbang nor Zhongzhen rebutted the presumption of government control.  For both respondents, Commerce concluded after an analysis of the companies' ownership and management, as well as local GOC organizations, that the GOC had the potential to influence or control their export activities or general operations.  The record evidence overwhelmingly supports Commerce's determinations.

### A.  Legal Framework

Commerce considers China to be an NME country, pursuant to 19 U.S.C. § 1677(18)(A), which defines a nonmarket economy country as a country with an economy that does "not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."

Under Commerce's long-standing "separate rate" practice, Commerce presumes that a company exporting from an NME country is "subject to government control and, thus, should be assigned a single antidumping duty deposit rate," unless the exporter is able to rebut the presumption of government control based on record evidence.  *Pirelli Tyre Co. v. United States*, 128 F.4th 1,265, 1,268 (Fed. Cir.  2025) (describing Commerce's separate rate practice)

("*Pirelli*").  *See also* 19 C.F.R. § 351.107(d) (stating that in AD proceedings involving imports from an NME country, rates "may consist of a single dumping margin applicable to all exporters and producers").

The Federal Circuit has affirmed Commerce's separate rate practice in numerous decisions and held that it is the exporter who "carries a burden of persuasion to justify a separate rate." *Pirelli*, 128 F.4th at 1,270 (citing, for example, *Zheijiang Machinery Import & Export Corp. v. United States*, 65 F. 4th 1,364, 1,366 (Fed. Cir. 2023) ("*Zheijiang*"); *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1,304, 1,311 (Fed. Cir. 2017) ("*Diamond Sawblades*"); *Sigma Corp. v. United States*, 117 F.3d 1,401, 1,405-06 (Fed. Cir. 1997) ("*Sigma*"); *Dongtai Peak Honey Industry Co. v. United States*, 777 F.3d 1,343, 1,350, 1,354 (Fed. Cir. 2015)).

Most recently, in *Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, 145 F.4th 1,308, 1,316 (Fed. Cir. 2025), the Federal Circuit held that Commerce's separate rate practice is grounded in 19 U.S.C. § 1673d(c)(1)(B)(I), which allows Commerce to determine that the NME-entity is a single entity being "individually investigated," and 19 U.S.C. §§ 1677(18)(B)(iv) and (v), in which Congress acknowledged that NME governments may control the "means of production" and the "allocation of resources" and "price and output decisions." *Id.* at *10 & *7 (citing, i*nter alia*, *China Manufacturers Alliance, LLC v. United States I*, 1 F.4th 1,028, 1,037 (Fed. Cir. 2021) and *Sigma*, 117 F.3d at 1,405).

To overcome the presumption of NME government control, an exporter must affirmatively demonstrate that the government does not retain actual or potential *de jure* or *de facto* control or influence over an exporter's activities, including both export-related activities and "all significant management decisions." *Pirelli,* 128 F.4that 1,270.  *See also Zheijiang*, 65

F.4th at 1,370 (agreeing with the CIT in *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1,350, 1,359 (Ct. Int'l Trade 2018) that "{w}here a majority shareholder has potential control {,} that control is, for all intents and purposes, actual control.") and *AMS Associates, Inc. v. United States*, 791 F.3d 1,376, 1,379 (Fed. Cir. 2013) (explaining that an exporter must "affirmatively demonstrate its entitlement to a separate rate by showing the absence of both *de jure* and *de facto* government control" over its activities).

To affirmatively prove the absence of *de facto* government control, an exporter must provide evidence, for example, that it "sets its prices independently of the government and of other exporters, negotiates its own contracts, keeps the proceeds of its sales (taxation aside), and selects its management autonomously." *Id.* (citing *Sigma*, 117 F.3d at 1,405).

For its part, in determining if an exporter has overcome a presumption of *de facto* government control, Commerce must "consider the entirety of the record in making its finding," including the composition of boards of directors, shareholder rights, the ability of managers to control day-to-day operations and board-controlled pay, a company's Articles of Association, and other such relevant information. *China Manufacturers Alliance, LLC v. United States II*, No. 23-2391, 2025 WL 1214993(Fed. Cir. Apr. 28, 2025) at *2-*3; *Zheijiang*, 65 F.4th at 1,370 (explaining that when evidence on the record shows that a "minority shareholder could exercise its right to control – such as Articles of Association without restrictions on the minority shareholder's rights, or evidence that the minority shareholder stifled other shareholders' opportunity to put competing nominations to the board or indirectly appointed board members – a determination of *de facto* government control is reasonable.").

Historically, Commerce has considered four factors when evaluating if an exporter is subject to *de facto* government control: (1) whether export prices are set by, or are subject to the

approval of, a government agency; (2) whether the exporter has authority to negotiate and sign contracts and other agreements; (3) whether the exporter has autonomy from the government in making decisions regarding the selection of management; and (4) whether the exporter retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.  *Silicon Carbide from the People's Republic of China*, 56 Fed. Reg. 22,585, 22,586-89 (Dep't of Commerce May 2, 1994) (fin. determ.).

As the Federal Circuit has held, the emphasis for Commerce's analysis of the rebuttable presumption is not on whether the evidence on the record shows that the government actually exercised control during the relevant period, but whether the government had the "potential" to exercise control of the exporter's management, decisions and activities.  *Zheijiang*, 65 F.4[th] at 1,371.

In the *Junbang SRA Memo, Zhongzhen SRA Memo*, and *IDM*, Commerce analyzed and fully addressed the arguments and record evidence cited by Junbang and Zhongzhen.  The examined respondents failed to rebut the presumption of government control because the record clearly establishes the organizations and individuals who own and manage those companies, and the ties those organizations and individuals have with Chinese government authorities and agencies.

Both Junbang and Zhongzhen argue in their briefs that despite those organizations and individuals, and despite those GOC ties, Commerce did not understand the alleged lack of authority held by local government entities and Chinese party organizations.  Junbang Br. at 7-17; Zhongzhen Br. at 27-40.  However, in the separate rate memos and the *IDM*, Commerce fully addressed those arguments and pointed to information on the record that contradicted the self-serving claims about the lack of alleged government influence on the record.  *Junbang SRA*

*Memo* at 6-9; *Zhongzhen SRA Memo* at 5-10; *IDM* at 6-29. Substantial evidence supports Commerce's determination that the Chinese government had the potential to control the export activities and general operations of Junbang and Zhongzhen during the POI.

### B. The Chinese Government Has the Potential to Control or Influence Junbang's Export Activities and General Operations

At the core of Junbang's argument is the status and authority of the Zhaoyuan Junxing Agricultural Development Center ("Junxing Center"). Junxing Center is a government entity, collectively owned by the People's Government of Jinling Town, Zhaoyuan City. *Junbang SRA Memo* at 5. In other words, Junxing Center is a wholly state-owned enterprise. There are numerous facts on the record supporting the conclusion that Junxing Center has extensive ties and potential or actual control of Junbang, and Commerce's analysis and determination was based on a consideration of the totality of all evidence. *IDM* at 21-29. Accordingly, this Court should affirm Commerce's separate rate determination with respect to Junbang.

First, Junbang is wholly owned by Yantai Shuangta Food., Co., Ld. ("Shuangta Food"), a joint stock company, of which Junxing Center owns 34.31 percent of the shares and is the largest single shareholder. *Junbang SRA Memo* at 5. Indeed, Shuangta Food's own financial statements state that the "ultimate controller" of Shuangta Food, "is the People's Government of Jinling Town, Zhaoyuan City." *Junbang's Section A Response*, Exhibit A-28, at 98; *Junbang SRA Memo* at 5.

Second, Yang Jun Min is Shuangta Food's founder, legal representative, and chairman of board of directors for the company. In that role he has the power to recommend five of the nine directors, besides himself. *Id.* at 6-7. He also owns 12.25 percent of Shuangta Food's shares and serves as Junbang's director and manager. *Id.* at 7.

There is no question that Yang Jun Min controls and influences Shuangta Food's and Junbang's commercial decisions. What is most important for Commerce's separate rate analysis is that Yang Jun Min is also the legal representative and factory manager/director of Junxing Center. *Id.* As the legal representative and factory manager/director of Junxing Center, he controls 34.31 percent shares of Shuangta Food, in addition to the 12.25 percent shares he owns personally. Thus, either directly or indirectly, Junxing Center and Yang Jun Min, collectively, control 46.56 percent, a plurality, of the Shuangta Food's shares. *Id.* at 7-8.[6]

Furthermore, as Commerce explained in the *Junbang SRA Memo*, "multiple members of Shuangta Food's board of directors are associated with Junxing Center," besides Yang Jun Min, including two directors "who both serve in the office of the factory manager of Jinxing Center and report to Yang Jun Min." *Junbang SRA Memo* at 7.

In addition, Commerce explained that Junxing Center's Articles of Association state that the position Yang Jun Min holds must be "approved by the Mark Supervision and Administration Bureau of Zhaoyuan City, a government entity." *Junbang SRA Memo* at 7. Accordingly, Commerce determined that on the basis of his position, job responsibilities, and approval by a government supervision and administration bureau, Yang Jun Min "acts under the authority and as an agent of the People's Government of Jinling Town, Zhaoyuan City, who collectively owns Junxing Center." *Id.* at 6.

Furthermore, evidence on the record concerning a transfer of Shuangta Food shares to a group of senior managers that occurred after the POI showed that the process of application and approval of the shares required that Shuangta Food and Junxing Center seek approval from the

---

[6] The remaining 53.18 percent of the shares of Shuangta Food are owned by the Zhaoyuan Jinling Gold Mine (which is wholly-owned by the GOC), 0.26 percent, and other shareholders with less than 5% ownership each. *Junbang SRA Memo* at 5.

People's Government of Jinling Town before the shares could be transferred.  *Id*. at 8.  In other words, the record showed that the government exercised effective control in directing the operations of Shuangta Food and Junbang through Junxing Center's ownership stake in the company.  *Id.*

Finally, Shuangta Food's Articles of Association explicitly direct the company to establish a party organization and party committee in accordance with the [            ] of the Communist Party of China ("CPC").  *Id.* at 6.  The Articles of Association contain language that Commerce determined "embedded" the CPC within Shuangta Food and allowed the CPC to "influence Shuangta Food's subsidiaries, *i.e.*, Junbang."  *Id.* at 6.

Applying its standard four-part *de facto* government control analysis, Commerce determined that the GOC exercised "control and influence over Junbang's export activities and general operations, including its ability to set export prices, to negotiate and sign contracts, to select management, and to make decisions regarding dispositions of profits and financing of losses," and it preliminarily concluded that Junbang was not eligible for a separate rate.  *Junbang SRA Memo* at 4.

In the *IDM*, Commerce affirmed each aspect of its analysis from the *Junbang SRA Memo* and responded to each of Junbang's arguments challenging Commerce's separate rate determination, finding them groundless or unpersuasive.  *IDM* at 21-29.  Importantly, Commerce did not determine that the government had the potential to control Junbang on any single basis, but made its determination on the evidence as a whole.  As Commerce explained, "{t}aken together, the totality of the record supports finding that Junbang is not free from government control."  *IDM* at 27.

The burden was on Junbang to provide affirmative evidence that rebutted the presumption of government control.  Commerce concluded that Junbang provided no "evidence on the record to rebut the evidence of Jingling Town's influence and control of Shuangta Food as the plurality shareholder of Shuangta Food" or any "support for Junbang's assertion that Yang Jun Min has merely a 'working relationship'" with government entities, or that Yang Jun Min only acted in his personal capacity in Shuangta Food and Junbang.  *IDM* at 27-28.  Commerce's decision was supported by the overwhelming evidence on the record and was otherwise in accordance with law.

Nothing Junbang raises in this litigation undermines the agency's determination.  Indeed, in its Brief, rather than address the basis for Commerce's determination that the record as a whole showed that the government had *de facto* actual or potential control of Junbang's export decisions and actions, Junbang challenges each piece of evidence as insufficient on its own to support Commerce's determination, as if Commerce had made its *de facto* government control decision based on each of those pieces independently of each other.  *IDM* at 21-23.

First, Junbang focuses solely on the shares of ownership shared by the Junxing Center and Yang Jun Min.  Junbang claims that Commerce's separate rate determination is faulty because Junxing Center "only" currently owns "25 percent" of Shuangta Food "after adjustment for sales of ownership."  Junbang Br. at 8.  However, that 25 percent number did not apply to Commerce's analysis in the underlying investigation because, as Commerce pointed out in the *Junbang SRA Memo*, the "sale of ownership" to which Junbang refers occurred <u>after</u> the completion of the POI.  *Junbang SRA Memo* at 8.  Accordingly, Junbang mistakenly relies on a fact that was not applicable during the POI.  *Id.*

Second, ignoring Junxing Center's and Yang Jun Min's 46.56 percent combined ownership amount, Junbang argues that Junxing Center's 34.31 percent of the shares is less than 50 percent, and that such an ownership amount is "far less than a controlling amount of shares." Junbang Br. at 8. However, Commerce never claimed that Junxing Center's 34.31 percent ownership share, or even the combined 46.56 percent ownership amount, was a "controlling amount" of shares. Instead, Commerce explained that the "Junxing Center holds the plurality of the shares (*i.e.*, a greater amount of shares than any other shareholder) of {Shuangta Food} and consequently exercises its position to nominate six of the nine board members via Yang Jun Min, effectively exercising majority control of the company, which in turn is the sole owner of Junbang." *IDM* at 23 (quoting the *Junbang SRA Memo* at 8 including Yang Jun Min, who was also a board member, in referring to "six of the nine board members"). Again, Commerce did not limit its analysis just to the government's ownership of Shuangta Food, but instead consistently analyzed its plurality of share ownership with other factors to determine that the government had *de facto* control of Junbang's export activities or general operations during the POI.

Junbang argues that the "publicly traded" nature of the other shares is proof that the government cannot have control over Shuangta Food or Junbang. Junbang Br. at 8. However, that conclusion is illogical if the largest owner of the company's shares manages and controls the operations of the company through additional means as well, which was the case with respect to the Jinxing Center, Shuangta Food and Junbang, as explained above. *Junbang SRA Memo* at 7-8. Accordingly, there is no merit to Junbang's claim that if a company is "publicly traded," the government cannot influence a company's export or overall determinations.

Junbang's next argument pertains to the "sole mention of the CPC" in Shuangta Food's articles of incorporation in its Articles of Association, claiming that a "mere reference to the CPC" was standard language in China for many businesses and did not support Commerce's conclusion "that the Communist Party was 'embedded' in Shuangta Foods." Junbang Br. at 9-13. However, Commerce was clear in the *Junbang SRA Memo* and *IDM* that it did not reach its conclusions about the CPC "merely" based on the reference of the CPC in Shuangta Food's Articles of Association. As Commerce explained in the *Junbang SRA Memo*, "Commerce has determined that local governments and village committees are not independent entities but, rather, operate under the leadership" of the CPC. *Junbang SRA Memo* at 5 (citing *Brake Rotors from China*, 70 Fed. Reg. 69,937 (Dep't of Commerce Nov. 18, 2005) (fin. rev.), and accompanying IDM at 9-23 (Comment 7)). Under Commerce's separate rate practice, "if a company's export activities are subject to government control at any level, including that of a local government or village, there is the potential that export prices and export-related activities" could be "subject to manipulation by the relevant NME government entity." *Id.* The reference to the CPC in Shuangta Food's Articles of Association, therefore, memorialized the government presence and authority already understood by Commerce's separate rate practice. *IDM* at 25.

Furthermore, Junbang cites to various Commerce AD proceedings for the idea that merely having "a position with the Communist Party" or just participating "in the local bodies of the CPC, NPC, and CPPCC is not dispositive," but, again, Commerce did not reach its separate rate conclusions in this case merely on the basis of either of those factual scenarios. Junbang Br. at 9-10. Instead, as Commerce reiterated in the *IDM*, Commerce considered the "record evidence as a whole" and found that the government had *de facto* control of Junbang through its parent company, Shuangta Food. *IDM* at 26 (explaining, for example, that in a case cited by

Junbang in its Brief, *Certain Vertical Shaft Engines*, Commerce explicitly found that that the

record "as a whole" supported a finding that the company was free from *de jure* and *de facto*

government control when the respondent provided "affirmative evidence" showing the

government was not invested or involved with the company.  *Certain Vertical Shaft Engines*

*Between 99cc and up to 225cc, and Parts Thereof, from the People's Republic of China*, 86 Fed.

Reg. 14,077 (Dep't of Commerce Mar. 12, 2021) (fin. determ.) ("*Certain Vertical Shaft*

*Engines*") and accompanying IDM at 65-80 (Comment 10).

      In furtherance of this argument, Junbang argues that it is important that the CPC does not

"appear in the shareholder structure of the Corporation," and the Articles of Association suggest

that it is "merely limited to the publicity and political work, as well as the protection of an

employee's interest," but not to relevant "price or price negotiations or control over exports."

Junbang Br. at 27.  However, as Commerce explained in the *IDM*, "if the local administration,

*i.e.*, government, can impose articles of association on a company, that information . . . is

indicative of government control of the company, not that the company is free of it."  *IDM* at 26.

Furthermore, again, Commerce did not make its determination based solely on the fact that

"Shuangta Food's articles of association requirement that it maintain a CPC organization within

it to implement CPC policies," but instead determined that Junbang had failed to rebut the

presumption of government control based on the record as a whole, including the fact that "the

government has direct ownership of Shuangta Food and the power to control Junbang, and … a

representative of the government also has significant power within Shuangta Food and

consequently Junbang."  *IDM* at 26-27.

      Finally, Junbang dismisses Yang Jun Min's extensive roles in Junxing Center, claiming

that just because he "has a working relationship with an agricultural center controlled by a

town," that "does not make him a state-controlled agent."  Junbang Br. at 14.  Junbang claims

that Yang Jun Min does not have the "authority to set government policy," and in all of his roles

outside of leading the Junxing Center, he "acted independently."  *Id.*  Junbang cites to Shuangta

Foods' certifications, claiming that the company negotiated export prices and sales without the

involvement of the government and emphasizing that the majority of shares of the company are

not owned by the government.  *Id.* at 14-16.

      Commerce fully responded to this set of arguments in the *IDM*.  Significantly, Commerce

noted that Junbang cited to no "evidence on the record to support this minimization of Yang Jun

Min's roles within Junxing Center and Shuangta Food."  *IDM* at 27.  The record overwhelmingly

shows that Yang Jun Min "has significant control over Junxing Center, Shuangta Food, and

Junbang" through his various ownership and leadership roles, and therefore it was logical for

Commerce to determine "that the People's Government of Jinling Town, through Yang Jun Min,

has the potential to influence and control Jungxing Center, Shuangta Food, and the respondent,

Junbang."  *Id.* at 27-28.

      In response to Junbang's claim that Yang Jun Min had merely a "working relationship"

with Junxing Center, Commerce emphasized that he is both the "legal representative and factory

manager" for the Center, "which is the most senior position at Junxing Center," in which he

"oversees the operation of the management of the enterprise," as well as directs the "daily

production and operation" of the factory.  *IDM* at 28.  As this shows, Yang Jun Min's leadership

roles at Junxing Center were far more than merely a "working relationship."

      Furthermore, in response to the claim that the Junxing Center was just an "agricultural

center controlled by a town," Commerce emphasized that it has long recognized that, as a factual

matter in China, "local governments and village committees are not independent entities but,

rather, operate under the leadership of the CPC, so the level of government of Junxing Center is not relevant to our analysis." *Id.* (citing, *inter alia*, *Brake Rotors from China IDM* at 9-23 (Comment 7)).

In addition, in response to Junbang's claims that the approval of Yang Jun Min by a government official is just a formality, Commerce noted that Junbang provided no record evidence to support this interpretation of the record information. *IDM* at 28. Accordingly, Commerce rejected Junbang's claim that Yang Jun Min's "only influence" was "as a private businessperson." *Id.*

As Junbang points out in its Brief, it provided copies on the record of e-mail correspondence showing price and export terms negotiations, appointment letters, and income statements recording profits and losses. Junbang Br. at 15 (citing page 26 of *Junbang's AQR*, P.R. 155; C.R. 80 at 34; Exhibit A-10a, P.R. 158; C.R. 82, at 24-29; and Exhibit A-6b; P.R. 158; C.R. 81, at 50-76). However, it is worth highlighting that Shuangta Food's general manager, deputy general manager, and chief financial officer, Li Yun Zin, Zhang Shu Cheng, and Sui Jun Mei, respectively, would have been instrumental during the POI to those transactions and company operations due to their positions in the company. *Junbang SRA Memo* at 7 (citing to *Junbang's SQR* at 2-4). Notably, all three were not only appointed by Shuangta Food's board of directors but *also* served on Shuangta Food's board of directors. *Id.* Accordingly, it would be illogical to presume that the GOC, through its control and influence of the Shuangta Food board of directors, would not also have had influence or control over Junbang's transactions and operations during the POI.

However, even if Commerce had determined that those documents reflected the absence of actual involvement by the GOC in certain appointments and transactions (which it did not),

those documents in no way reflected the absence of potential control by the government. Junbang Br. at 15 (citing *Junbang's AQR* at 26, P.R. 155; C.R. 80 at 34; Exhibit A-10a, P.R. 158; C.R. 82 at 24-29; and Exhibit A-6b; P.R. 158; C.R. 81 at 50-76). As explained above, the Federal Circuit has confirmed that for a company to rebut the presumption of government control for purposes of Commerce's separate rate test, a respondent must not just show that the government was not actually in control, but in fact that the government did not have the potential to exercise control of an exporter's management, decisions and activities. *Zheijiang*, 65 F.4th at 1,371.

In short, Junbang provided no evidence on the record that affirmatively demonstrated its entitlement to a separate rate by showing the absence of potential *de facto* government control over its activities. *AMS Associates*, 791 F.3d at 1,379. Instead, the record reflects that the GOC had several different means by which it could control Junbang during the POI, and in the case of the transfer of a certain number of Junxing Center's shares of Shuangta Food to senior managers as an equity incentive, as Commerce pointed out in the *Junbang SRA Memo*, the evidence showed that Junbang was "required to seek permission from the People's Government of Jinling Town to perform this transfer." *Junbang SRA Memo* at 8. In other words, the record showed that the Chinese government had the ability to control "Shuangta Food's compensation of management via Jinling Town's power to accept or reject the granting of an equity incentive." *Id.*

Junbang failed to rebut the presumption of government control during the POI, and nothing Junbang argues in its Brief undermines Commerce's analysis and conclusions on this issue. Junbang argues that Commerce should have verified the absence of state control and that Commerce should have given greater weight to its arguments that, because over 50 percent of the

shares were not held by the GOC, those shareholders, collectively, had "ultimate, and explicit" control over the Corporation, including the ultimate appointment of all of the officers and directors of the Corporation. Junbang Br. at 16 - 17. But Commerce was under no obligation to verify Junbang's information once it had determined that Junbang had failed to rebut the presumption of government control, and Junbang cites to no authority in support for such a claim.

Furthermore, as Commerce explained in the *IDM*, the agency did not make its determination that the Chinese government had the potential for *de facto* control over Junbang solely on the basis that Junxing Center and Yang Jun Min together held 46.56 percent of Junbang's parent company, but instead made its determination on a consideration "as a whole" of all of the possible means by which the government could control its export activities and operational decisions. Accordingly, neither of these claims undermine the reasonableness or lawfulness of Commerce's determination that Junbang failed to rebut the presumption of *de facto* government control in the investigation.

As the Federal Circuit has held, "the burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1,318, 1,324 (Fed. Cir. 2011) ("*QVD Food*"); *see also Nan Ya Plastics Corp. v. United States*, 810 F.3d 1,333, 1,337-38 (Fed. Cir. 2016). In this investigation, Junbang failed to rebut the presumption of potential *de facto* government control of Junbang. Thus, for the reasons provided herein, Commerce's decision to deny Junbang a separate rate in the *Final Determination* was supported by substantial evidence and was otherwise in accordance with law.

### C. The Chinese Government Has the Potential to Control or Influence Zhongzhen's Export Activities and General Operations

Similar to Junbang's claims, Zhongzhen's arguments also challenge Commerce's determinations on the status and authority of the Peoples' Congresses and the Zhaoyuan CPPCC. Nothing Zhongzhen argues in its Brief undermines the reasonableness of Commerce's determination that the Chinese government had the potential to control Zhongzhen's export or overall decisions during the POI, or the reliability of the record information relied upon by Commerce in making that determination. Accordingly, the Court should affirm Commerce's separate rate determination with respect to Zhongzhen as supported by substantial evidence and otherwise in accordance with law.

### 1. The executive director and the general manager of the Zhongzhen companies controlled Zhongzhen's export decisions and general operations during the POI

Most of the facts involving Zhongzhen's ownership and management are not in dispute. Zhongzhen is wholly owned by [          ]. *Zhongzhen AQR*; P.R. 150, 151; C.R. 74, 75 at 14 & Exhibit A-6. One individual, [          ]: 1) holds the position of executive director and president of Yantai Zhongzhen, a Zhongzhen trading company that exported subject merchandise produced by other Zhongzhen companies, Yantai Oriental and Jiujiang Tiantai; 2) is the [          ] of Jiujiang Tiantai, which both produces and exports subject merchandise; and 3) directly owns [   ] percent of [          ] and indirectly owns [          ] percent of [          ] through [          ] ownership of [

]. *Id.*, P.R. 150, 151; C.R. 74, 75 at 14, 16, Exhibits A-6, A-9.

Commerce therefore found that, collectively, [         ] owns [      ] percent of [         ].
*Zhongzhen SRA Memo*, P.R. 354; C.R. 251 at 5.  Furthermore, Zhongzhen's Articles of
Association lay out that the executive director is responsible for authorizing documents on behalf
of Zhongzhen, including the negotiation of export contracts and other agreements.  *See id*. at 7
(citing *Zhongzhen AQR*, P.R. 151; C.R. 75 at Exhibit A-8).  Accordingly, the facts on the record
clearly show that [         ] is an owner of Zhongzhen and has the ability to control or influence
Zhongzhen's export or overall activities.

In addition, another individual, [              ], is the general manager of Yantai
Zhongzhen, Yantai Oriental and Jiujiang Tiantai.  *Zhongzhen AQR*; P.R. 150, C.R. 74 at 17.  He
is also the legal representative for both Yantai Oriental and Jiujiang Tiantai.  *Zhongzhen SRA
Memo* at 6 (citing *Zhongzhen AQR*, P.R. 151; C.R. 75, 76 at Exhibits A-8, A-16).  Furthermore,
[              ] owns [      ] percent of [          ], which owns [    ] percent of [         ].
*Zhongzhen AQR*, P.R. 151; C.R. 75, at Exhibit A-6.  [              ] therefore also has the
ability to influence or control Zhongzhen's export or overall activities through his leadership and
ownership in Yantai Zhongzhen, Yantai Oriental, Jiujiang Tiantai, and [         ].

### 2. The People's Congresses and CPPCC had the potential to control Zhongzhen during the POI

Once Commerce analyzed and determined that [         ] and [              ] have the
ability to control Zhongzhen, the remainder of its analysis was focused on the ability of the
Chinese government to control or influence Zhongzhen through those two individuals.  [
] was a representative of the People's Congresses during the POI, while [              ] was a
member of the Zhaoyuan CPPCC during that time period.  *Zhongzhen AQR*, P.R. 150; C.R. 74 at
17.  Zhongzhen explained to Commerce that as a representative to the People's Congress, [
] was entitled to:  1) attend People's Congresses sessions, "deliberating on all bills, reports

and other issues, and voicing his opinions;" 2) "{j}ointly table bills, proposals for addressing inquiries, proposals for removal of officials from office and so on, according to the law;" 3) put "forward proposals, criticisms or opinions concerning a wide range of matters;" 4) participate "in elections which are held by the people's congresses at corresponding levels;" 5) participate "in votes which are held by the people's congresses at corresponding levels;" 6) have "access to necessary information and all kinds of guarantees for his lawful performance of functions as deputies;" and 7) "{o}ther functions as stipulated by law." *Zhongzhen SQR*, P.R. 269; C.R. 189 at 4.

With respect to [                    ], Zhongzhen explained that as a member of the local CPPCC, he performed duties and fulfilled obligations in accordance with the local CPPCC Charter. *Id.* Specifically, Zhongzhen stated that he enjoyed "the following rights:  the right to vote, the right to elect and the right to be elected at the local {C}PPCC sessions, the right to make suggestions and criticisms concerning the work of the local {C}PPCC; the right to fully air his opinions and participate in discussions on local policies and principles and important local affairs at the sessions and through their committees." *Id.*

Zhongzhen argued to Commerce that despite these obligations and the authority that came with these leadership roles, the Chinese government had no control or influence over those individuals or Zhongzhen because the "People's Congress in China is a ceremonial legislature that functions as a rubber stamp" and the "CPPPC is not a governmental entity or otherwise an agency of the {"People's Republic of China"} government," but instead merely an entity that serves "to provide the government with business and economic consultation from a perspective outside the government." *Id.* at 17-18.  Furthermore, Zhongzhen argued that the "local People's Congress and local CPPCC have never been involved" with Zhongzhen and that the companies

all were "operated and controlled by their shareholders, board of directors and management independently."  *Id.* at 18.

During the investigation, in response to Zhongzhen's initial questionnaire response identifying and addressing the People's Congresses and Zhaoyuan CPPCC connections to Zhongzhen, PURIS submitted eight exhibits drawn from public sources which provided "information regarding the roles of national and local People's Congresses and CPPCCs {Chinese People's Consultative Conferences} in China's government."  PURIS RFI, P.R. 170 at 2.  Some exhibits appeared in China Daily and Global Times, the Chinese Mission to the European Union's ("Chinese Mission") website, and the website of the U.S. Congressional-Executive Commission on China.  *Id.* at Exhibits 1-8.  Commerce relied, in part, on those sources, concluding that Zhongzhen had failed to rebut the presumption of government control. *See, e.g., Zhongzhen SRA Memo*, P.R. 354; C.R. 251, at 6-7.

With respect to the People's Congresses, Commerce cited to a China Daily article describing that in 2022 Li Zhanshu, Chairman of the NPC Standing Committee, explained at a meeting of the NPC that the "people's congress system" is "a fundamental political system in China" that "should be fully utilized to ensure that the people, based on the law, manage State affairs, economic and cultural undertakings and social affairs through various channels and ways."  *Id.* at 5-6 (citing PURIS RFI, P.R. 170 at Exhibit 1).

Commerce highlighted that the article explained that the Chinese "Constitution stipulates that all power in the People's Republic of China belongs to the people, and the organs through which the people exercise state power are the NPC and the local peoples' congresses at all levels."  *Id.*  In addition, the article explained that there are "five levels of people's congresses: township, county, city, provisional and national" and Chairman Zhanshu stressed that "an

important principle and design of the people's congress system is that the power of all State organs and their staff is under supervision." PURIS RFI, P.R. 170 at Exhibit 1.

In addition, Commerce explained that "local people's congresses are directly under the Central Government and function as a government entity," citing to the Chinese Mission's website, which explained that "{l}ocal people's congresses at various levels ensure the observance and implementation of the Constitution and the law and the administrative rules and regulations in their respective administrative areas." *Zhongzhen SRA Memo* at 6 (quoting from PURIS RFI at Exhibit 3).

Furthermore, PURIS submitted documents describing "China's State Organizational Structure," taken from the United States Congressional-Executive Commission on China website. These documents explained that the "NPC is defined in the 1982 Constitution as 'the highest organ of state power'" and described the "local people's congresses" as "the NPC's local counterparts," with "all local organs" being "essentially extensions of central government authorities" and "responsible to the 'unified leadership' of the central organs." PURIS RFI at Exhibit 5; P.R. 150. Commerce noted that "{l}ocal people's congresses have risen in prominence and importance in recent years, and the Chinese Constitution charges local congresses and governments with legislating on specific matters relating to the localities and drafting local regulations to implement certain National People's Congress laws." *Zhongzhen SRA Memo* at 6 (citing PURIS RFI at Exhibit 5).

In the *IDM*, Commerce expanded on that analysis, pointing again to the Chinese Mission's website, where the Chinese government described "the local People's Congresses as having "the power to examine and decide on major issues," including to "decide on the plans for the construction of the local economy." *IDM* at 11 (citing PURIS RFI at Exhibit 2).

Furthermore, Commerce also recognized that the Congressional-Executive Commission on China had indicated that "in the context of the local People's Congresses," "{t}he Communist Party still exercises control over the lawmaking process at every level." *IDM* at 13 (citing PURIS RFI at Exhibit 5).

With respect to the Zhaoyuan CPPCC, Commerce explained in the *Zhongzhen SRA Memo* that "the CPPCC is a creation of the Communist Party of China (CPC) and is an important institution of multi-party cooperation and political consultation led by the CPC," citing to an article on the "Chinese People's Political Consultative Conference (CPPCC)" from the globalsecurity.org website. *Zhongzhen SRA Memo* at 6 (citing to PURIS RFI at Exhibit 7, as well as the Chinese Mission's website at Exhibit 4, which explained that the CPPCC is composed of both national and regional committees).

Similarly, Commerce quoted the Chinese Mission's website as explaining that local CPPCC committees "have the obligation to observe and carry out national decisions adopted by the National Committee and lower-level committees have the obligation to observe and carry out regional decisions adopted by the higher-level committees." *Id.* at 7 (citing to PURIS RFI at Exhibit 4).

Commerce also cited to a report from the East Asia Forum in 2020 that stated that "the NPC and CPPCC have played increasingly important legislative roles in China in recent years" and that "the function of the NPC and CPPCC is akin to the steering mechanism of a car that enables the {Chinese Communist} Party to transform its opinions and directives into national will through the enactment of laws. *Id.* at 6-7 (citing to PURIS RFI at Exhibit 6); *IDM* at 12 (citing the same source).

Based on all of these sources, Commerce concluded that "evidence on the record of this investigation indicates that the local People's Congresses and CPPCC have real power and that local People's Congresses "supervise provisional-level government activities." *IDM* at 14 (citing PURIS RFI at Exhibit 5).

Commerce explained that the only evidence provided by Zhongzhen "to support their argument that local People's Congresses and the CPPCC are not government entities" was a 2015 article from the Harvard Kennedy School, "that discusses the nature of the NPC" as it was in 2013, with no "substantial information regarding the local People's Congresses nor the CPPCC." *IDM* at 12 (referencing Exhibit SA-6.b of Zhongzhen SQR, P.R. 269; C.R. 189).

Commerce explained that Zhongzhen's "executive director/president" was "a member of two local People's Congresses – not the NPC" and "contrary to the respondent's argument, the article's limited discussion of local legislatures and congresses states that those entities do, in fact, have legislative powers." *Id.* Commerce said the article provided by Zhongzhen very briefly discussed "the CPPCC as a political and advisory body," but otherwise only described how the NPC and CPPCC functioned over 10 years ago. *Id.*

In contrast, Commerce noted that the information PURIS had placed on the record indicated that "local People's Congresses have recently risen in prominence and importance," and both the NPC and CPPCC have "become core institutions of party-state constitutionalism within China" in recent years. *Id.* Accordingly, Commerce concluded that Zhongzhen "provided no information to rebut evidence on the record of the growing power of the local People's Congresses and CPPCC, despite having the opportunity to do so." *Id.*

In the *IDM*, Commerce applied its *de facto* control test to Zhongzhen and, after considering its "high-level management" and all of the information on the record, Commerce

found that through Zhongzhen's executive director/president the Chinese government could: 1) "exercise considerable control over" Zhongzhen's general operations, 2) exercise control over the "negotiation and singing of contracts and other agreements," and 3) exert control over the "disposition of profits or financing losses." *IDM* at 16-17. Furthermore, Commerce found that through both the executive director/president and general manager/legal representative, the Chinese government could exert control over the selection of personnel and management. *Id.* at 11, 16-17. The substantial evidence on the record supports Commerce's conclusions under the *de facto* control test.

### 3. Zhongzhen's arguments do not undermine Commerce's conclusion in the Final Determination that Zhongzhen failed to rebut the presumption of government control

As noted above, the Federal Circuit has explained that to rebut the presumption of government control for purposes of Commerce's separate rate test, a respondent must show that the government was not just in control during the relevant period of time, but that the government did not have the potential to exercise control of an exporter's management, decisions and activities. *Zheijiang*, 65 F.4th at 1,371.

Zhongzhen cites to no evidence on the record in its Brief, besides the 2015 NPC article and the company's own certifications, that substantiates its claims that the Chinese government had no potential means to control Zhongzhen's export activities or general operations through Zhongzhen's executive director/president and the general manager/legal representative of the various Zhongzhen companies. Zhongzhen Br. at 16-32.

Instead, Zhongzhen references language in a CIT case, *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1,317, 1,349 (Ct. Int'l Trade 2014), to argue that Commerce was required to prove that the Chinese government directed Zhongzhen during the

POI "with respect to its day-to-day export related operations of any of the companies" in order to show the existence of government control.  Zhongzhen Br. at 19 & 22.  However, it is Zhongzhen's burden to prove that the potential for government control did not exist during the POI, not Commerce's burden to prove that actual government control existed in the POI.

In response to Zhongzhen's claim, Commerce explained in the *IDM* that the "*Jiasheng* decision was made in 2012, before the 2014 *Diamond Sawblades* litigation which reevaluated Commerce's separate rate practice."  *IDM* at 18.  Furthermore, the Federal Circuit has consistently upheld that the concern is not whether the government had actual control during the POI, but whether the NME government had the potential to control a company's export or overall decisions.  *See Pirelli*, 128 F.4th at 1,270; *Zheijiang*, 65 F.4th at 1,370; *AMS Associates*, 791 F.3d at 1,379.

Zhongzhen argues that this case should be considered unique and analyzed differently because there is no evidence of direct government ownership.  Zhongzhen contends that Commerce must provide "additional indicia of control" if there is no evidence that the government does not own "either directly or indirectly," any "shares" in the company before it could conclude that the company did not rebut the presumption of *de facto* government control.  Zhongzhen Br. at 18 (citing *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1,350, 1,359 (Ct. Int'l Trade 2018) ("*An Giang Fisheries*")).  However, as Commerce explained in the *Final Determination*, in the *An Giang Fisheries* holding, the Court "upheld Commerce's denial of a separate rate on remand based on the 'potential for actual control,'" and it has always been Commerce's practice to analyze whether an exporter "has satisfied each of the four factors of *de facto* control," regardless of whether they have majority or

minority ownership, or, as in this case, control of an exporter through government officials. *IDM* at 13, 19 (citing *An Giang Fisheries*, 284 F. Supp. 3d at 1,350).

In fact, there is no merit to Zhongzhen's claim that in addition to considering all the information on the record pertaining to the People's Congresses and the CPPCC, as well as the four factors that have been part of its analysis for decades, Commerce also had to provide "additional indicia" on the record before determining that Zhongzhen had failed to rebut the presumption of government control in this investigation. This line of argument appears to be an attempt by Zhongzhen to move the legal goalposts because the substantial evidence on the record did not support its claim that the government did not have the potential to control Zhongzhen's export or overall activities during the POI. There is simply no legal support for Zhongzhen's claims in this regard and no reason for the Court to apply a new evidentiary standard in this litigation.

Zhongzhen also suggests that because both [        ] and [            ] "have *minority* ownership interests in Zhongzhen," and because their leadership roles in Zhongzhen "can be replaced by the majority shareholder," that these facts undermine the idea that those individuals control Zhongzhen's export decisions and general operations. Zhongzhen Br. at 34 (emphasis in the Brief). Such an argument is illogical and unsupported by any case law on the issue. Without question, the executive director/president and general manager/legal representative of the companies could control and influence Zhongzhen's export pricing, contract negotiation, selection of management, disposition of profits and financing of losses, and other such company activities and decisions during the POI – those duties were included in their job descriptions. The fact that those jobs could hypothetically be revoked in the future by a majority shareholder does not change that fact.

Furthermore, if an exporter "failed to demonstrate an absence of government control pursuant to the *de facto* test," the fact that it was "not majority-owned by an NME government" did not reverse the finding that the presumption of government control had not been rebutted. *IDM* at 13. Commerce determined that the record evidence showed that "local People's Congresses and the CPPCCs are part of the Chinese government," and that they had "the ability to control and influence the Zhongzhen companies" through their "president/executive director" and "general manager/legal representative." *IDM* at 11. The ability of the majority shareholders to terminate those individuals or their minority ownership stake was not key to Commerce's separate rate analysis and in no way undermines the reasonableness of that analysis.

Next, Zhongzhen argues that for the president and general manager to be "government officials," Commerce was required to conclude they were "professional politicians" and "politically active to benefit their company." Zhongzhen Br. at 26 & 30. As explained above, in its supplemental questionnaire response Zhongzhen set forth the obligations and rights (including voting rights) to which the two Zhongzhen leaders were entitled through their roles in the Peoples' Congresses and CPPCC. *Zhongzhen SQR*, P.R. 269; C.R. 189 at 4. Nonetheless, Zhongzhen glosses over those obligations and rights, and argues that because the Zhongzhen leaders were "mere" "members" of those organizations, Commerce cannot determine that they were government officials. Zhongzhen Br. at 26 & 31 (stating that Commerce "unreasonably concluded that mere membership transforms a member into a government official or employee").

As explained above, however, substantial record evidence established that the local Peoples' Congresses and CPPCC are extensions of the Chinese government that "exercise government powers." *IDM* at 14. Far from just holding an honorary title in those organizations, [      ] and [           ] enjoyed obligations and rights to vote and participate in the

functions of those government entities.  *Zhongzhen SQR*, P.R. 269; C.R. 189 at 4.  Indeed, as

Commerce explained, it is of little import if a position in the People's Congresses is "unpaid and

honorary," because "this does not negate evidence from various sources that indicates these

organizations are nonetheless government entities and their members that serve in such entities

are government officials."  *IDM* at 14.

In fact, there is no legal requirement in the trade remedy laws that the government of an

NME country be able to only influence or control "career politicians" but not other active

members in local government organizations, and Zhongzhen cites to no authority for such a

claim in its Brief.   If such a restriction existed in enforcing the rebuttable presumption of

government control, in the cases in which the government did not directly own shares in a

company, one would expect the NME country's government could always easily evade the

discipline of the AD laws by influencing the decision making of government organization

members and then arguing that none of them are "career politicians."  It is an illogical argument

with no foundation in trade law or policy.

Instead, for support, Zhongzhen draws comparisons between Elon Musk, Tesla and the

United States Government and the facts in this case, and between City Councils and Industry

Trade Advisory Committees in the United States and the People's Congresses and CPPCC.

Zhongzhen Br. at 22 & 26.  However, none of these illustrative examples are accurate or

appropriate.  The rebuttable presumption of NME government control exists because in an NME

country, "all commercial entities in the country are presumed to export under the control of the

state," and "the burden" to "demonstrate an absence of central government control" is placed on

exporters.  *Diamond Sawblades*, 866 F.3d at 1,311.  None of those examples are comparable to

the facts on the record of this case because no such rebuttable presumption exists in the United

States, and the American system of government is drastically different from that of China.

Accordingly, there is no merit to Zhongzhen's "government officials" arguments, and the

parallels that Zhongzhen draws between the United States and China to support those claims

have no basis in the political or economic reality of those countries.

In addition, like Junbang, Zhongzhen cites to the 2021 case, *Certain Vertical Shaft

Engines*, in which Commerce determined that the record indicated that the NPC and CPPCC had

no real power and the Chinese government had no control over their members.  Zhongzhen Br. at

20-21 (citing *Certain Vertical Shaft Engines*, 86 Fed. Reg. 14,077, IDM at 77).  Likewise,

Zhongzhen notes that in the 2016 administrative review, *Small Diameter Graphite Electrodes

from the People's Republic of China*, 81 Fed. Reg. 62,474 (Dep't of Commerce Sept. 9, 2016)

(fin. res.) ("*Graphite Electrodes*"), and accompanying IDM at 14-16, Commerce determined that

the record showed that the People's Congresses and CPPCC had no real authority and the fact

that membership was honorary was important.  Zhongzhen Br. at 20.

In response to both of those determinations, Commerce explained in the *IDM* that "as

previously discussed, here a company official is a member of two local People's Congresses –

not the NPC," and that "evidence on the record of this investigation indicates that the local

People's Congresses and CPPCC have real power and that local People's Congresses 'supervise

provincial-level government activities.'"  *IDM* at 14.  Furthermore, Commerce pointed out that

the records of those cases "were established before 2020," while the record of this investigation

indicated that "local People's Congresses have recently risen in prominence and importance."

*Id.* at 14-15.  In sum, while Commerce distinguished *Graphite Electrodes* and *Vertical Shaft

Engines* in the *IDM*, the key factor was that the records in those cases did not demonstrate that

the People's Congresses and CPPCC had "real power," while the substantial evidence on the

record of this investigation supported Commerce's determination that such "real power" existed during the POI.  *IDM* at 14.

In the end, Zhongzhen had "the burden of creating an adequate record" before Commerce in the LTFV investigation showing that the People's Congresses and Zhaoyuan CPPCC were not government organizations, and that the GOC was unable to control or influence Zhongzhen's export or operational activities or decisions.  *QVD Food Co. v. United States*, 658 F.3d at 1,324. Zhongzhen failed to meet that burden and rebut the presumption of government control. Commerce's determination that Zhongzhen was ineligible for a separate rate was supported by substantial evidence on the record and should be affirmed by this Court.

## II. COMMERCE'S APPLICATION OF THE HIGHEST PETITION RATE AS AFA TO THE CHINA-WIDE ENTITY IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW

If Commerce determines that an exporter has not sufficiently proven the absence of *de jure* and *de facto* government control, the Federal Circuit has affirmed that Commerce may apply the China-wide entity rate to imports of the exporter's subject merchandise.  *Diamond Sawblades*, 866 F.3d at 1,311.  This is true even if the exporter cooperated in the conduct of an NME AD proceeding.  As the Federal Circuit has held, "if the party, despite its cooperation, fails to rebut the presumption of government control, the party remains part of the country-wide entity and therefore receives the country-wide entity rate."  *Id.* at 1,315.

The Federal Circuit has explained that the China-wide entity rate is "composed of numerous entities" and if Commerce determines that the China-wide entity is "subject to an AFA-based rate," that determination "logically requires Commerce to apply the same AFA-based rate to all members of the" China-wide entity "that have not proven their independence

from the state{.}" *Id.* at 1,313 (citing to *Transcom, Inc. v. United States*, 294 F.3d 1,371, 1,373 (Fed. Cir. 2002)).

Zhongzhen makes two arguments regarding the AD margin applied to its merchandise in the *Final Determination*. The first is directly contradicted by the Federal Circuit's holding in *Diamond Sawblades*. It argues that the rate applied to Zhongzhen "cannot be based on AFA because there is no evidence that Zhongzhen withheld information or impeded the investigation." Zhongzhen Br. at 40-41. However, the Federal Circuit in *Diamond Sawblades* expressly held that "the fact that a country-wide rate may have been calculated using AFA does not change its applicability to an NME-entity that cooperated, but ultimately failed to qualify for a separate rate." *Diamond Sawblades*, 866 F.3d at 1,312. Accordingly, there is no merit to Zhongzhen's claim that Commerce was prohibited from applying the China-wide entity rate to Zhongzhen's entries.

Zhongzhen's second argument is that the AFA rate applied by Commerce to the China-wide entity was "punitive and uncorroborated," and therefore "cannot be lawfully applied to Zhongzhen or the China-wide entity." Zhongzhen Br. at 44. However, Commerce explicitly determined in the *IDM* that it had corroborated the Petition rates. *IDM* at 32. Specifically, Commerce stated that it had analyzed the export price and normal value calculations in its initiation checklist and determined them to be reliable. *Id.* (citing the Antidumping Duty Investigation Initiation Checklist (Aug. 1, 2023), P.R. 34; C.R. 19). Further, Commerce explained that no other information had been placed on the record that "would make us question the validity of the sources of information" or the U.S. price or normal value data found in the Petition. *Id.* Accordingly, Commerce determined that it had "confirmed the accuracy and validity of the information underlying the derivation of the margin in the Petition by examining

source documents, as well as publicly available information, and found the highest Petition rate"

to be reliable.

Furthermore, Commerce explained that the Petition rate was also "relevant because it is

based on a price quote for the merchandise under consideration" and surrogate values "that are

contemporaneous with the POI." *IDM* at 33.  Thus, pursuant to 19 U.S.C. § 1677e(c), because

Commerce determined that the Petition rate was both reliable and relevant, it determined that

rate to be corroborated, and nothing Zhongzhen argues in its Brief undermines the

reasonableness of that conclusion.  *IDM* at 33.

In addition, under 19 U.S.C. § 1677e(d)(2) in applying an AFA rate, Commerce may

apply the highest margin on the record based on an evaluation of the situation that resulted in

Commerce using the adverse inference in selecting among the facts otherwise available.

Furthermore, under 19 U.S.C. § 1677e(d)(3)(B), Commerce is under no obligation to

demonstrate that the LTFV margin applied as AFA "reflects an alleged commercial reality of the

interested party."  Thus, despite Zhongzhen's arguments to the contrary, Commerce was under

no legal obligation to use either Zhongzhen's or Junbang's information in calculating the AFA

rate derived from the Petition and applied to the China-wide entity.

With respect to the rate applied to the China-wide entity, Commerce lawfully addressed

each of the arguments raised by Zhongzhen in its Brief in the *Final Determination* and the *IDM*.

First, with respect to the Petition rate, Commerce explained that it applied the highest rate

from the Petition because Commerce found that rate to be both reliable and relevant, it was a

"rate derived from information on the record," and Commerce found that it achieved "the right

balance between the goal of inducing future cooperation by the uncooperative respondent and the

rate not being punitive."  *Final Determination*, 89 Fed. Reg. at 55,560.

Second, despite Zhongzhen's unfounded claims to the contrary, Commerce explained that it was under no obligation to "attempt to obtain information from the Chinese government." *Id.*

Third, with respect to Zhongzhen's reliance on 19 U.S.C. § 1677m(d), which states that if a submission is "deficient," Commerce should provide an "opportunity to remedy" that "deficiency," Commerce explained that several companies in the China-wide entity "did not provide a response at all" and "thus there was no requirement" that Commerce "provide an opportunity for the China-wide entity to remedy a deficiency" under that provision. *Id.*

Fourth, with respect to Zhongzhen's reliance on *Baoding Mantong Fine Chem Co. v. United States*, 113 F. Supp. 3d 1,332, 1,338 (Ct. Int'l Trade 2015), for the argument that an AFA rate must be commercial in nature, that decision was issued based on the text of the AFA statute before 19 U.S.C. § 1677e(d)(3)(B) was amended in 2015 to explicitly state that there is no requirement that a rate be based on alleged "commercial reality," and in any case, as Commerce explained in the IDM, the legal issue in that case was "not the application of an AFA rate, but the selection of surrogate values to calculate a margin." *IDM* at 34. *See also* Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 364 (2015).

Finally, with respect to Zhongzhen's citation to the 2014 investigation of *53-Foot Domestic Dry Containers from the People's Republic of China*, 74 Fed. Reg. 21,203 (Dep't of Commerce Apr. 17, 2015) (fin. determ.) and accompanying IDM at 1 n. 1 ("*Dry Containers*") for the argument that Commerce's practice in determining the China-wide entity rate is to consider member-company's information, Commerce explained that *Dry Containers* was an exceptional case in which there were "only two producers/exporters of subject merchandise" operating out of China, the company which was determined to be government controlled fully cooperated in the proceeding, and that company "was the entire China-wide entity," so Commerce used the

company's information to determine the China-wide entity rate. *IDM* at 35. As Commerce concluded in the *IDM* for this investigation, unlike in *Dry Containers*, "the China-wide entity producer/exporter in this investigation comprises multiple companies, including the Zhongzhen companies." *Id.* at 36. Accordingly, because Zhongzhen did "not represent the China-wide entity as whole" during the POI, it would not have been "appropriate to calculate a margin based on the sales and production experience of one entity out of the many companies that make up the China-wide entity in this investigation." *Id.*

Nothing Zhongzhen argues in its Brief undermines the lawfulness and reasonableness of Commerce's analysis and determination. Instead, Zhongzhen ignores the Federal Circuit's holdings in *Diamond Sawblades*, even though Commerce directly cited to that precedent in the *IDM*. *See IDM* at 34 ("The courts have repeatedly held that the conduct of individual companies within an NME-wide entity is not a necessary condition to sustain an AFA-based NME-wide entity rate applied to a cooperating mandatory respondent who is part of the NME-wide entity") and n.195 (citing to the *Diamond Sawblades* Federal Circuit decision). Accordingly, this Court should reject Zhongzhen's arguments on the rate applied to the China-wide entity and affirm Commerce's application of the AFA rate derived from the Petition to the China-wide entity rate in the *Final Determination* as supported by substantial evidence on the record and otherwise in accordance with law.

## III. COMMERCE'S DETERMINATION THAT CRITICAL CIRCUMSTANCES EXISTED IS IN ACCORDANCE WITH LAW

With respect to Commerce's finding of critical circumstances in the *Final Determination*, 19 U.S.C. § 1673d(a)(3) states that, where the presence of critical circumstances has been alleged, Commerce's final determination shall "contain a finding of whether" – "(A)(ii) the person by whom, or for whose account, the merchandise was imported knew or should have

known that the exporter was selling the subject merchandise at less than fair value and that there was likely to be material injury by such sales, and (B) there have been massive imports of the subject merchandise over a relatively short period, resulting in a critical circumstances determination."

Under 19 C.F.R. § 351.206(h)(1), in determining whether imports of the subject merchandise were "massive" during the POI under the statute, Commerce will "normally" examine the volume and value of imports on the record, seasonal trends, and the share of domestic consumption accounted for by the examined imports.  19 C.F.R. § 351.206(h)(1)(i)-(iii).  However, if there are no imports of examined respondents to review on the record, as Commerce explained in the *Final Determination* and *IDM*, then it is Commerce's practice to use general import data, such as those derived from Global Trade Atlas ("GTA"), to determine if there were massive imports over a relatively short period of time, as facts otherwise available, pursuant to 19 U.S.C. § 1677e(a).  *See IDM* at 37-38.

In the *Final Determination*, consistent with its practice, Commerce relied on GTA import data from the base and comparison periods of January through June 2023, and July through December 2023 as "facts otherwise available," to determine if there was a massive increase in imports.  *Critical Circumstances Analysis*, P.R. 383.  Commerce determined that the volume of imports increased by at least 15 percent between the two periods, and therefore, imports were massive.  Accordingly, Commerce determined the existence of critical circumstances.  *Final Determination*, 89 Fed. Reg at 55,559.

Zhongzhen argues that because Commerce should have determined that it warranted the application of a separate rate, Commerce's critical circumstances analysis is faulty, as it was based on the use of facts available instead of consideration of Zhongzhen's reported Q&V data.

Zhongzhen's Brief at 44-45.  In the *IDM*, Commerce responded to that argument, noting that Zhongzhen did "not explain how they believe Commerce should reconsider its critical circumstances analysis, let alone any support for such a reconsideration," so it continued to apply its standard critical circumstances analysis.  *IDM* at 38.

As explained above, Commerce correctly determined that Zhongzhen failed to rebut the presumption of government control and that the application of a separate rate to its merchandise was unwarranted.  Accordingly, there is no merit to Zhongzhen's claim that Commerce should have adjusted its critical circumstances analysis to take into consideration Zhongzhen's data. Therefore, this Court should affirm Commerce's critical circumstances determination as supported by substantial evidence and otherwise in accordance with law.

## IV.   THE AD RATE COMMERCE APPLIED TO THE UNEXAMINED, SEPARATE RATE RESPONDENTS WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE IN ACCORDANCE WITH LAW

In the *Final Determination*, Commerce determined that certain unexamined exporters were eligible for a separate rate.  *Final Determination*, 89 Fed. Reg. at 55,560.  Because the examined respondents in the investigation did not have individually calculated margins, but instead were determined to be part of the China-wide entity (*i.e.*, based on AFA), Commerce determined the rate for the unexamined separate rate exporters in accordance with 19 U.S.C. § 1673d(c)(5)(B), which allows Commerce to use "any reasonable method to establish the all-others rate for exporters and producers individually investigated" when all the respondents margins have been determined to be zero, *de minimis* or based on AFA.  *Id.*  Under that analysis, Commerce determined the rate for the separate rate exporters using a simple average of the margins alleged in the Petition.  *Id.*  The resulting simple average rate was 122.19 percent.  *Id.*

Junbang argues that the Petition rates used in Commerce's separate rate calculation were "unrelated to actual transactions" and that Commerce should have used Junbang's and

Zhongzhen's reported costs and sales for the separate rate companies, rather than the rates derived from the Petition.  Junbang Br. at 17.  However, Junbang cites to no legal authority for such a claim, and Commerce's calculations were consistent with its long-standing interpretation of 19 U.S.C. § 1673d(c)(5)(B) and practice.

The language of section 1673d(c)(5)(B), on its face, only applies when Commerce is determining an "all-others rate," and Commerce only calculates "all-others rates" in market economy cases.  Nonetheless, Commerce looks to that provision for guidance when determining a separate rate for unexamined exporters in an NME proceeding.  *Final Determination*, 89 Fed. Reg. at 55,560 n.8 (citing, for example, to *Certain Preserved Mushrooms from Spain*, 88 Fed. Reg. 18,120 (Dep't of Commerce Mar. 27, 2023) (fin. determ.)).  Furthermore, the CIT has affirmed Commerce's use of an average of petition rates as a separate rate as reasonable and lawful when "the individually investigated rates are based entirely on adverse facts available." *Bristol Metals L.P. v. United States*, 703 F. Supp. 3d 1370, 1378-1379 (Ct. Int'l Trade 2010).

Commerce followed its long-standing methodology in selecting the rate to apply to unexamined separate rate exporters in this case, and nothing on the record undermines the reasonableness of that methodology.  Accordingly, this Court should reject Junbang's request for a recalculation of the rate applied to the unexamined separate rate companies and affirm that rate as in accordance with law.[7]

---

[7] Junbang also argues that if the Court remands the separate rate determinations for calculation of a margin for either Zhongzhen or itself, Commerce should recalculate the separate rate to use one or both of the companies' information.  Junbang Br. at 17.  PURIS disagrees that such a step is a foregone conclusion, as it is possible that even if Commerce were ordered to apply a separate rate to Zhongzhen or Junbang, that it might still, in the end, apply partial or total AFA to one or both of those companies.

PUBLIC VERSION

## CONCLUSION

For the foregoing reasons, Defendant-Intervenor respectfully requests that this Court deny Plaintiffs' motions for judgment on the agency record and sustain Commerce's *Final Determination* as supported by substantial evidence and otherwise in accordance with law.

Respectfully submitted,

Date:  February 17, 2026    */s/ Adam H. Gordon*
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

*Counsel to Defendant-Intervenor PURIS*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION**

I hereby certify that according to the word count function of Microsoft Word, which was used to prepare the brief, the foregoing brief contains 14,876 words and therefore complies with word count limitation in the Standard Chambers Procedures.

/s/ Adam H. Gordon
Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

*Counsel to Defendant-Intervenor PURIS*