# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| ———————————————————x<br>              :<br>YANTAI ORIENTAL PROTEIN TECH CO.,<br>LTD., *et al.,*      :<br>              :<br>        *Plaintiffs,*    :<br>              :<br>and             :<br>              :<br>ZHAOYUAN JUNBANG TRADING CO., LTD., :<br>*et al.*,         :<br>              :<br>   *Consolidated-Plaintiffs,* :<br>              :<br>and              :<br>              :<br>KTL PHARMACEUTICAL, CO., LTD., *et al.*, :<br>              :<br>   *Plaintiff-Intervenors*, :<br>              :<br>      v.       :<br>              :<br>UNITED STATES,      :<br>              :<br>        *Defendant*,  :<br>     and       :<br>              :<br>PURIS PROTEINS, LLC,   :<br>              :<br>   *Defendant-Intervenors.* :<br>———————————————————x | Consol. Court No. 24-00181<br><br>**PUBLIC VERSION** |

## <u>PLAINTIFFS' REPLY BRIEF</u>

Ned H. Marshak*
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

-and-

*599 Lexington Ave., 36th Floor
New York, New York 10022

*Counsel for Plaintiffs Yantai Oriental Protein
Tech Co., Ltd., Yantai Zhongzhen Trading
Co., Ltd., Jiujiang Tiantai Food Co., Ltd.,
and Yantai Yiyuan Bioengineering Co., Ltd.*

Dated: April 22, 2026

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT.................................................................................................................... 2

   I.   COMMERCE'S SEPARATE RATE DENIAL IS NOT SUPPORTED BY
      SUBSTANTIAL EVIDENCE OR BY JUDICIAL PRECEDENT INVOLVING
      COMPANIES WITH ACTUAL GOVERNMENT OWNERSHIP ................................... 2

  II.  ZHONGZHEN REBUTTED THE PRESUMPTION STATE CONTROL AS THE
      RECORD OVERWHELMINGLY EVIDENCES A LACK OF STATE CONTROL........ 8

      A.   Zhongzhen Demonstrated Independent Contract Authority.......................................... 10

      B.   Zhongzhen Demonstrated Autonomy Over Management Selection ............................ 11

      C.   Zhongzhen Demonstrated Retention of Export Sale Proceeds .................................... 12

 III.  COMMERCE UNLAWFULLY DEVIATED FROM ESTABLISHED AGENCY
      PRACTICE.................................................................................................................... 13

 IV.  COMMERCE UNLAWFULLY ASSIGNED ZHONGZHEN THE 281.31% CHINA-
      WIDE ADD RATE AND DISREGARDED REPORTED DATA................................... 19

CONCLUSION.............................................................................................................. 22

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
284 F.Supp.3d 1350 (CIT 2018)........................................................................3, 4, 7, 15

*Aukerman Co. v. R.L. Chaides Constr. Co.*,
960 F.2d 1020 (Fed. Cir. 1992)..................................................................................8, 9

*China Mfrs. Alliance, LLC v. United States*,
1 4 F.4th 1028 (Fed. Cir. 2021) ...............................................................................2, 19

*CITIC Trading Co. v. United States*,
27 CIT 356 (2003) ..........................................................................................................6

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938).....................................................................................................5, 6

*Diamond Sawblades Mfrs. Coal. v. United States*,
866 F.3d 1304 (Fed. Cir. 2017)...........................................................................18, 19, 21

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)...................................................................................................14, 15

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997)........................................................................................11

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
28 F.Supp.3d 1317 (CIT 2014)........................................................................................17

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
121 F.Supp 3d 1263 (CIT 2015)......................................................................................18

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)........................................................................................6

*Pirelli Tyre Co. v. United States*,
677 F.Supp.3d 1322 (CIT 2023), aff'd, 128 F.4th 1265 (Fed. Cir. 2025) ................................3

*Save Domestic Oil, Inc. v. United States*,
357 F.3d 1278 (Fed. Cir. 2004)..................................................................................13, 14

*SKF USA, Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)..................................................................................14, 18

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011).................................................................................14

*WelCom Prods., Inc. v. United States*,
    865 F.Supp.2d 1340 (CIT 2012).................................................................................14

*Yantai CMC Bearing Co. v. United States*,
    203 F.Supp.3d 1317 (CIT 2017).................................................................................2

*Zhejiang Machinery Import & Export Corp. v. United States*,
    65 F.4th 1364 (Fed. Cir. 2018) ..................................................................................3

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States,*
    350 F.Supp.3d 1308 (CIT 2018).............................................................................3, 7

## Statutes and Regulations

19 U.S.C. § 1677e ................................................................................................20, 21

19 U.S.C. § 1677m.....................................................................................................20

19 C.F.R. 351.206 ......................................................................................................22

## Federal Register Notices & Publications

*53-Foot Dry Dock Dry Containers from China*, 80 Fed. Reg. 21,203
    (Apr. 17, 2015) (final determination) .......................................................................21

*Pea Protein from China,* 88 Fed. Reg. 52,124 (Aug. 7, 2023) (initiation).............................20, 21

*Pea Protein from China*, 89 Fed. Reg. 55,559 (July 5, 2024) (final determination)...........1, 21, 22

*Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474
    (Sept. 9, 2016) (final results) ................................................................15, 16, 17, 18

*Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from China*,
    86 Fed. Reg. 14,077 (Mar. 12, 2021) (final determination)............................................ *passim*

## Other Authorities

L. Dykowski, *By Any Other Name?: The U.S. Steel "Golden Share" and State
    Enterprise Disciples Under International Agreements*, GEORGETOWN LAW
    INTERNATIONAL INSTITUTE OF ECONOMIC LAW (2006) ..........................................................19

PUBLIC VERSION

**INTRODUCTION**

Plaintiffs Yantai Zhongzhen Trading Co., Ltd. ("Zhongzhen"), Yantai Oriental Protein Tech Co., Ltd., Jiujiang Tiantai Food Co., Ltd., and Yantai Yiyuan Bioengineering Co., Ltd., reply to the Response Briefs filed on February 3, 2026, by Defendant United States, ECF 69-70 ("Def. Br."), and on February 17, 2026, by Defendant-Intervenor PURIS Proteins, LLC ("PURIS"), ECF 72-73 ("D-I Br."), in opposition to Plaintiffs' Motion for Judgement Upon the Agency Record filed on May 13, 2025, ECF 46-47 ("Pl. Br."). In their Opening Brief, Plaintiffs established that the U.S. Department of Commerce ("Commerce" or "Department"") in its less than fair value investigation of pea protein from the People's Republic of China ("China" or "PRC") unlawfully denied Zhongzhen an antidumping duty ("ADD") rate separate from the PRC-wide entity. Pl. Br. at 16-39; *Pea Protein from China*, 89 Fed. Reg. 55,559 (July 5, 2024), PR 387 ("*Final Determination*"), accompanying Issues and Decision Memorandum ("IDM"), PR 386.

Commerce's *Final Determination* is not rehabilitated by the Response Briefs of Defendant and PURIS because, as discussed in Plaintiffs' Opening Brief and below, Commerce unlawfully:

1. denied Zhongzhen a separate rate despite Zhongzhen having no government ownership whatsoever, an unprecedented action that is not supported by substantial evidence or by judicial precedent involving companies having majority or substantial government ownership;

2. found government control based on the mere fact that Zhongzhen officials held honorary positions in Chinese-government entities, when the record overwhelming evidences a lack of government control – far surpassing the minimum information needed to rebut the presumption for nonmarket economy ("NME") countries;

3. deviated from its well-established agency practice with insufficient explanation; and

4. assigned Plaintiffs the facially absurd 281.31% PRC-wide ADD rate and found that Zhongzhen's exports were massive without evaluating the actual data reported by Plaintiffs establishing the impropriety of these punitive and arbitrary actions.

## **ARGUMENT**

I. **COMMERCE'S SEPARATE RATE DENIAL IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE OR BY JUDICIAL PRECEDENT INVOLVING COMPANIES WITH ACTUAL GOVERNMENT OWNERSHIP**

This appeal presents a case of first impression where Commerce denied separate rate status for a respondent having no government ownership whatsoever. The only basis for Commerce's separate rate decision was that that Zhongzhen's President [                    ] and its General Manager [                         ] held "unpaid and honorary" positions in the People's Congress of Zhaoyuan City and Yantai City ("People's Congress") and the Chinese People's Political Consultative Conference ("CPPCC") of Zhaoyuan City, respectively. Zhongzhen Section A Questionnaire Responses (Oct. 2, 2023) ("AQR"), CR74-79/PR150-51, at 17-18; IDM Comment 1; Commerce Separate Rate Analysis Memorandum (Feb. 7, 2024), CR251/PR354 ("Separate Rate Memo"), at 5-9. Moreover, record evidence establishes that [          ] – who is not a member of the People's Congress or the CPPCC – holds a majority share (*i.e.*, [     ]%) of Zhongzhen's parent company, [

          ]. AQR Exhibits A-6, A-12.

In support of their position, Defendant and PURIS rely extensively on judicial precedent denying separate rates for respondents having either majority government ownership or a sizeable, controlling minority government ownership. Such cases include the following:

- *China Mfrs. Alliance, LLC v. United States*, 1 4 F.4th 1028, 1032 (Fed. Cir. 2021) ("**majority shareholder**") (emphasis added);

- *Yantai CMC Bearing Co. v. United States,* 203 F.Supp.3d 1317, 1323 (CIT 2017) ("**more than majority owned**") (emphasis added);

2

PUBLIC VERSION

- *Zhejiang Machinery Import & Export Corp. v. United States,* 65 F.4th 1364, 1368, 1371 ("owned in minority part . . . by the Zhenjiang Provincial {State-Owned Assets Supervision and Administration Commission of the State Council ('SASAC')}" and "majority shareholder, a union . . . under the control and direction . . . of the Chinese Communist Party") (Fed. Cir. 2018); and

- *Pirelli Tyre Co. v. United States*, 677 F.Supp.3d 1322, 1340 (CIT 2023) (**"36.9%"),** aff'd, 128 F.4th 1265 (Fed. Cir. 2025).

Def. Br. at 5-6, 17, 21-22, 33; PURIS Br. at 15-17, 28, 37-38.

These decisions do not support Commerce's denial of Zhongzhen's separate rate, since the Chinese government has a zero ownership interest in Zhongzhen. Moreover, in *An Giang Fisheries Import & Export Joint Stock Co. v. United States*, this Court recognized that "Commerce has required **additional indica of control** prior to concluding that a respondent could not rebut the presumption of de facto government control where the government owns, either directly or indirectly , only a minority of shares in the respondent company." 284 F.Supp.3d 1350, 1355-64 (CIT 2018). There, Commerce argued that "Mr. X, who was appointed to the Board of Directors as General Director . . .remains **beholden to the minority government shareholder**." *Id*. at 1361 (emphases added). This is because "absent contrary evidence, **Commerce reasonably infers that the government exerts *de facto* control by exercising its legal rights as a majority shareholder** of the exporter's parent company, rendering each link in the chain of ownership **ultimately beholden** to the government." *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States,* 350 F.Supp.3d 1308, 1317-18 (CIT 2018) (emphases added).

*An Giang* does not support Zhongzhen's separate rate denial, as it hinged on an analysis of record evidence relating to the minority government shareholder. This Court found that Commerce properly denied the separate rate due to an evidentiary gap; because the "Articles of Association {("AoA")} only relate{d} to a portion of the {period of review ("POR")}, . . . the court cannot presume that the . . . {AoA} restrict{ed} the minority government shareholder in

3

PUBLIC VERSION

any way." *An Giang*, 284 F.Supp.3d at 1363. No such concerns have been identified with

Zhongzhen's AoA. AQR Exhibit A-8. Defendant claims that "Zhongzhen ignores that . . . *An*

*Giang* sustained Commerce's *denial* of a separate rate . . . based on the *potential* for government

control." Def. Br. at 22 (emphases in original). However, the sentence upon which Defendant

relies for that proposition, *id*., confirms that government ownership dictated affirmance of

"Commerce's determination that there existed the potential for actual government control by the

**minority government shareholder**." *An Giang*, 284 F.Supp.3d at 1364 (emphasis added).

Because government ownership existed, this Court decided that Commerce reasonably denied

the separate rate because the government entity was not shown to be restricted for the entire POR

– such that Mr. X remained obligated to serve the government shareholder under "**Commerce's**

**beholden theory**." *Id*. at 1361 (emphasis added).

   *An Giang* does not support Zhongzhen's separate rate denial, regardless of whether

Commerce found actual or potential control – terms that gave this Court "difficulty in labeling"

due to evolving meanings and erroneous statements at oral argument. *Id*. at 1358 & n.11. Nor has

Zhongzhen alleged that this terminology makes a difference. Pl. Br. at 24 ("Regardless of

whether Commerce must show actual control or the potential thereof . . . ."). Rather, *An Giang*

recognized the need for "**additional indica of control**" in the minority shareholder context. In

this case, there is no government ownership whatsoever. Thus, at least some additional evidence

– beyond the standard substantial record evidence necessary to support Commerce's decision-

making – is needed to deny Zhongzhen's separate rate. *Id*. 18; 284 F.Supp.3d at 1364 (emphasis

added). Indeed, this standard has been expressly endorsed by Commerce in cases where there is

zero government ownership: "{W}here there is no government ownership in a company . . . it is

reasonable to conclude that additional indicia of state control would also be required." *Vertical*

*Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from China* ("*VSEs*"), 86 Fed. Reg. 14,077 (Mar. 12, 2021) (final determination), IDM Comment 10 (citing *An Giang*, 284 F.Supp.3d at 1359).

"The record here is bereft of any additional indica." *Id*. There is no record evidence that the Chinese government controls Zhongzhen, and the scant alleged support relied upon by Commerce is generic information purporting to show that "local People's Congresses and CPPCC have real power and that local People's Congresses 'supervise local provincial level government activities.'" IDM at 14 (quoting Letter from King & Spalding to Commerce (Oct. 16, 2023) PR170 ("PURIS RFI"), Exhibit 5). However, close examination of the information upon which Commerce relies does not establish a company is state controlled because a company official has membership in these organizations.

> the local people's congresses {("LPC"}--the {National People's Congress's ("NPC}} local counterparts-- . . . **held meetings every other month** to supervise provincial-level government activities. . . .
>
> LPCs . . . have risen in prominence and importance in recent years. The Chinese Constitution **charges local congresses and governments with legislating** on specific matters relating to the localities and drafting local regulations to implement certain NPC laws. Local governments also have the power to draft regulations or detailed implementation rules similar to those that a State Council ministry would draft.

PURIS RFI Exhibit 5 (emphasis added). Accordingly, the power in these entities is limited to working alongside local government and their authority is best characterized as symbolic:

> The function of the NPC and the CPPCC is akin to the steering mechanism of a car that enables the Party to transform its opinions and directives into national will through the enactment of laws. In this sense, the NPC can be understood as a modern version of the imperial seal, **symbolising ultimate authority** and sovereignty.

PURIS RFI Exhibit 6 (emphasis added).

Denying Zhongzhen's separate rate on this record is not supported by "such relevant

PUBLIC VERSION

evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol.*
*Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938). PURIS unpersuasively claims that the separate
rate was supported because Messrs. [     ] and "[     ] enjoyed the obligations and rights to
vote and participate in" the People's Congress and CPPCC, respectively. D-I Br. at 40 (citing
Zhongzhen Section A Supplemental Questionnaire Response (Dec. 21, 2023), CR189/PR269-70
("SAQR"), at 4). However, that Zhongzhen executives may have such "obligations and rights"
"**does not result in the company being affiliated with any national, provincial, or local**
**Chinese governments**, including ministries or offices of those governments." SAQR at 3
(emphasis added). Moreover, Commerce did not itself refer to this statement of rights and
obligations as a basis for separate rate denial. *See* IDM Comment 1. "{T}his court will not
accept Defendant-Intervenors' post hoc rationale as a basis for upholding a final determination."
*CITIC Trading Co. v. United States*, 27 CIT 356, 368 (2003).

Commerce's application of its separate rate legal analysis for companies having
government ownership to companies which do not constitutes an "attempt . . . to **move the legal**
**goalposts**." D-I Br. at 39 (emphasis added). PURIS reinforces the bankruptcy of Commerce's
denial through post-hoc conjecture that where "the government did not directly own shares in a
company, **one would expect** the NME country's government could always easily evade the
discipline of AD laws by influencing the decision making of government organization
members." *Id*. at 41 (emphasis added). Commerce likewise speculated that "the Chinese
government has the ability to control . . . Zhongzhen" because the Department "**would expect**
any majority shareholder . . . to have the ability to control . . . the operations and the company."
Separate Rate Memo at 4, 10 (emphasis added). These claims lack merit; "It is well established
that speculation does not constitute substantial evidence." *Lucent Techs., Inc. v. Gateway, Inc.*,

PUBLIC VERSION

580 F.3d 1301, 1327 (Fed. Cir. 2009).

A fatal flaw in Commerce's separate rate denial is that [          ], and not the Chinese government or Messrs. [                ], controls Zhongzhen. Pl. Br. at 32-34. There is no evidence that [          ] delegated control to Messrs. [                ], assuming *arguendo* they could be considered state actors (which they are not). According to PURIS, this "argument is illogical and unsupported by any case law on the issue." D-I Br. at 39. PURIS is wrong. [          ] relevance to Commerce's separate rate analysis results directly from "Commerce's beholden theory." *An Giang*, 284 F.Supp.2d. at 1361. With majority ownership, "absent contrary evidence, **Commerce reasonably infers that the government exerts *de facto* control**. . . , rendering each link in the chain of ownership **ultimately beholden** to the government." *Zhejiang Quzhou,* 350 F.Supp.3d at 1317-18 (emphases added). With minority ownership, there must be "additional indicia" such as shareholder protections not extending for the entire period. *An Giang*, 284 F.Supp.3d at 1363. Where there is no government ownership, Commerce's beholden theory does not apply. The facts that [          ] has no state involvement whatsoever and ultimately owns Zhongzhen prevent any inference that that "each link in the chain of ownership is ultimately beholden to the government." *Zhejiang Quzhou,* 350 F.Supp.3d at 1317-18.

In sum, Commerce's separate rate denial is not supported by judicial precedent or substantial evidence. Precedent affirming government control findings where there is majority or controlling government ownership cannot support denying Zhongzhen's separate rate. Because [          ] is the majority owner of Zhongzhen and he does not hold a position with the any government organization, Commerce's beholden theory does not apply. Commerce's denial is based on sparse evidence generically alluding to supervisory roles of the People's Congress and CPPCC – organizations in which Messrs. [                ], hold unpaid honorary positions.

7

PUBLIC VERSION

Accordingly, the record does not contain any indicia of state control, let alone the extraordinary showing that should be necessary given the complete lack of any state ownership for Zhongzhen.

## II. ZHONGZHEN REBUTTED THE PRESUMPTION STATE CONTROL AS THE RECORD OVERWHELMINGLY EVIDENCES A LACK OF STATE CONTROL

The mantra repeated by Defendant, and PURIS to salvage Commerce's separate rate denial is that Zhongzhen did not rebut the presumption of state control. IDM Comment 1; Def. Br. at 11-12, 17-24; D-I Br. at 37-43. However, the U.S. Court of Appeals for the Federal Circuit ("CAFC") recognizes that:

> {A} presumption is not merely rebuttable but **completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact**. . . . {T}he evidence must be sufficient to put the existence of a presumed fact into genuine dispute. **The presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more**.

*Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (emphases added) (citations omitted). Indeed, Commerce has endorsed this CAFC standard when granting separate rates despite such membership. *VSEs*, 86 Fed. Reg. 14,077, IDM Comment 10 & n.548 (citing *Aukerman*, 960 F.2d at 1037).

Zhongzhen submitted a plethora of evidence far surpassing the "minimum quantum of evidence" to "put the existence of" its presumed state control "into genuine dispute." *Id.*; *Aukerman*, 960 F.2d at 1037. Zhongzhen reported that local People's Congresses: "**have never been involved with Yantai Zhongzhen and its affiliates' business operations**"; are "local legislative bodies similar to a City Council in a U.S. city"; and "the respective roles and activities of the CPPCC are highly comparable to {Commerce's} various Industry Trade Advisory Committees." AQR at 17-18 (emphasis added). Scholarly literature published by the HARVARD KENNEDY SCHOOL confirmed that these memberships are "ceremonial" and at "most, . . . a sign of recognition or appreciation by the national leadership that they have made contributions to

8

society or that they have particular expertise. . . . Most members cannot be considered as members of the government or as genuine legislators." SAQR Exhibit SA-6b.

Given submission of this "minimum quantum of evidence," the presumption that Zhongzhen is state controlled "**completely vanishe{d}**." *Aukerman*, 960 F.2d at 1037 (emphasis added). Commerce, Defendant, and PURIS misconstrue the operation of presumptions in belaboring that the HARVARD KENNEDY SCHOOL article "published in 2010" and PURIS submitted information that they "have recently risen in prominence and importance." IDM at 12 (citing SAQR Exhibit SA-6; PURIS RFI Exhibit 5); Separate Rate Memo at 6; Def. Br. at 16; D-I Br. at 34. However, since the presumption no longer exists, Commerce became obligated to affirmatively establish state control – which was not achieved by merely stating that "Zhongzhen . . . provided no information to rebut evidence on the record of the growing power of the local People's Congresses and CPPCC." IDM at 12. Moreover, the evidence heralded by Commerce itself confirms that these entities are not government organizations and have no governance power:

- "The major function of the CPPCC is to conduct political consultation";

- "The Shanghai People's Congress has been a pioneer in holding open hearings";

- "deputies are expected to pass pre-decided laws"; and

-  "The major function of the CPPCC is to conduct political consultation and exercise democratic supervision."

PUIRIS RFI Exhibits 4-7; Pl. Br. at 29.

Zhongzhen accordingly carried its burden, as the record is devoid of indicia of state control. In particular, Zhongzhen established a lack of state control pursuant to each of the four factors used in Commerce's separate rate analysis. Pl. Br. at 35-39. As an initial matter, Commerce recognized a lack of *de jure* control and that Zhongzhen established that its export

prices are neither set by nor subject to the approval of, a government agency. Separate Rate Memo at 4-5. Moreover, contrary to Commerce's claims and as detailed in turn below, Zhongzhen provided compelling evidence establishing an absence of government control over: (a) contracts and agreements; (b) management selection; and (c) disposition of profits and financing of losses. When considering this evidence that Commerce uses to support the separate rate denial, it becomes apparent that the Department has created an irrebuttable presumption through a company whose officials have memberships in the People's Congress and CPPCC can never "shift away its burden of proving that even potential government control did not exist." Def. Br. at 21.

### A.      Zhongzhen Demonstrated Independent Contract Authority

Zhongzhen certified that it has "independent authority to negotiate and sign export contracts and other agreements (conducts independent price negotiation)." AQR at 15; SAQR at 3. *Id*. Zhongzhen provided sales documentation confirming that it independently engages in price negotiation correspondence – and signs contracts with – unaffiliated U.S. customers. *Id*, Exhibit A-1. Accordingly, Zhongzhen rebutted the presumption by evidencing its ability to negotiate and sign contracts free of government approval. Contrary record evidence does not exist, and Commerce incorrectly used the debunked nexus between government control and voluntary membership to deny Zhongzhen's separate rate on this criterion. IDM at 11; Section II, *supra*. Defendant, PURIS, and Commerce unpersuasively herald generic a AoA statement about the Executive Director "signing relevant legal documents." Def. Br. at 18; D-I Br. at 31; Separate Rate Memo at 4 (quoting AQR Exhibit A-8). However, the Executive Director is not a state actor and nothing indicates government control over Zhongzhen's contracting. This boilerplate AoA provision accordingly does not constitute any indicia of state control, let alone substantial evidence supporting the separate rate denial.

**B.    Zhongzhen Demonstrated Autonomy Over Management Selection**

Zhongzhen certified that it "**has autonomy from all government entities/communist party regarding the selection of its management**." SAQR at 1, 3 (emphasis added); AQR at 16. Defendant emphasizes that "[        ] acting as executive director signed [    ] own appointment letter as manager of Zhongzhen, ultimately granting this position to [        ]." Def. Br. at 20; Separate Rate Memo at 8 (citing AQR Exhibit A-10). Yet that cited exhibit is preceded by the "**Decision of Shareholder**" in which [            ] formally: "Appoint{s} [        ] as executive director." AQR Exhibit A-10 (emphasis in original). This necessary "**Signature of Representative of Shareholder: [            ]**" confirms that management selection is controlled by [            ], the majority owner of [      ] who has no relationship with the Chinese government, People's Congresses, or the CPPCC. *Id*. (emphasis in original). This document sequence and titling makes clear that the appointment of [        ] necessarily occurred at the direction of [            ], proving the latter's control over Zhongzhen. Pl. Br. at 32-34. By selectively relying on the second, subsidiary appointment while ignoring the first one signed by [            ], Commerce denied Zhongzhen's separate rate "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted).

Nor do the generic AoA relied upon by Defendant and Commerce support state control over Zhongzhen's management selection. Def. Br. at 2; Separate Rate Memo at 8-9. Zhongzhen's AoA contain rules and procedures governing the selection of board members and senior management that are no different from those of a typical U.S. corporation. For example, AoA § 10.2 provides that: "The shareholder shall exercise the following powers and functions.. . . Deciding on or replacing executive directors and supervisors; deciding on the remuneration matters of the Company's senior management and the wages of the employees." AQR Exhibit A-

11

PUBLIC VERSION

8. The "shareholder" given such management selection authority is clearly [        ], whose majority owner [                ] has no government affiliations. Therefore, even assuming *arguendo* that Messrs. [                ] are state actors (which they are not), Zhongzhen has rebutted the presumption of state control through AoA and appointment documentation. Commerce misplaces reliance on those same documents, which evidence neither additional indicia of state control nor substantial evidence supporting Zhongzhen's separate rate denial.

### C.    Zhongzhen Demonstrated Retention of Export Sale Proceeds

Zhongzhen certified that it "retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of loses." AQR at 18; SAQR at 3. Zhongzhen further confirmed that it did not make any disbursements to government accounts other than for tax or government-provided goods or services. *Id*. at 19. Next, Zhongzhen confirmed its profit distribution autonomy by submitting: (1) a list of all bank accounts; (2) its unaudited financial statements before and during and the period of investigation ("POI"); and (3) its chart of accounts. AQR at 25, Exhibits A-7, A-11, A-16–17. Further, Zhongzhen reported that neither it nor its affiliates "have internal financial statements or profit and loss reports or other financial report filed with the local or national government." *Id*. at 25. Finally, Zhongzhen provided supporting documents demonstrating that its profit distribution schemes are decided by shareholders. For example, AoA § 10.6 establishes that shareholders shall exercise powers and functions to "consider and approve the Company's profit distribution plan and plan for making up losses." *Id*. Exhibit A-8.

This extensive documentation rebuts any presumption that Zhongzhen is not acting independently when distributing profits. Defendant echoes Commerce's findings based on generic AoAs that "[        ] will [

                        ]" and "that the Executive Director will . . . [

12

]" Def. Br. at 20;

Separate Rate Memo at 9 (quoting AQR Exhibit 8-A). Again, without any state ownership or

other showing of state control, these AoA at most establish control over profit distribution by

[          ] and its majority owner [                    ] who has no government affiliations. This absence

of control remains accurate even if "[            ] or [                    ] . . . were government officials"

– as Defendant emphasizes is necessary for its position. Def. Br. at 20. Once more, there is no

merit to this lynchpin of Commerce's separate rate denial:

> The fact that Mr. [      ] has unpaid honorary positions in the{} local People's
> Congress does not result in the company being affiliated with any national,
> provincial, or local Chinese governments, including ministries or offices of those
> governments. **The local People's Congress has never been involved with** . . .
> **Zhongzhen and its affiliates' business operations. The companies' businesses**
> **are operated and controlled by their shareholders**, board of directors, and
> management independently.

SAQR at 3 (emphasis added).

"In short, the fact that [          ] and [                    ] are members of a local People's

Congress and CPPCC does not mean that they are government officials or employees."

Zhongzhen Case Brief (Mar. 21, 2024), CR238/PR370, at 15. The responsibilities afforded to

these individuals under Zhongzhen's AoA for profit distribution plans – as well to appoint

management and sign contracts – are subservient to the authority of [          ] and its majority

owner who lacks such membership. AQR Exhibits A-6, A-8, A-12. Accordingly, Commerce's

reliance on generic AoAs and its unfounded claims that Messrs. [                    ] are government

officials renders Zhongzhen's separate rate denial unsupported by substantial evidence.

## III.    COMMERCE UNLAWFULLY DEVIATED FROM ESTABLISHED AGENCY PRACTICE

The law is clear that Commerce must provide a heightened explanation before a major

deviation in practice. "Despite Commerce's statutory discretion, . . . if Commerce had a routine

practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004). "When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) . "If the Department provides no reasonable explanation for changing a practice that it has consistently followed, such a change is an unacceptable agency practice." *WelCom Prods., Inc. v. United States,* 865 F.Supp.2d 1340, 1344 (CIT 2012); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("the agency must show . . . a more detailed justification . . . when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy.").

Commerce in this investigation abruptly deviated from its longstanding practice of granting separate rates for companies that lack state ownership altogether. Counsel for Zhongzhen is unaware of any prior instance where Commerce has acted in this manner; previous separate rate denials have been based on the government actually owning either the majority or a sizeable minority of shares. As recounted by Defendant and PURIS, Commerce merely treated this case as if there were government ownership by insisting that Zhongzhen had not rebutted the presumption. Def. Br. at 8-9; 11, 19-23; D-I Br. at 33, 36-43; IDM Comment 1. By ignoring this changed practice of granting separate rates "in like situations," Commerce failed to "provide a reasonable explanation." *Save Domestic Oil*, 357 F.3d at 1283 (Fed. Cir. 2004). Commerce further failed to "show . . . a more detailed justification," as became necessary because "its new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC*,

14

556 U.S. at 515. In particular, denying separate rates without any government ownership contradicts "Commerce's beholden theory" that previously governed the separate rate analysis. *An Giang*, 284 F.Supp.2d. at 1361.

Commerce further deviated from its specific practice of granting separate rates for companies whose officials were members of the People's Congress and CPPCC. Pl. Br. at 19-24. For example, Commerce granted separate rates for respondents – including one having minority SASAC ownership – in *Small Diameter Graphite Electrodes from China* ("*SDGEs*"), 81 Fed. Reg. 62,474 (Sept. 9, 2016) (final results), IDM Comment 1. Defendant and Commerce recognize that *SGDEs* involved "specific record evidence . . . of autonomy," and claim that by contrast, "here Commerce determined that the record evidence was not sufficient to demonstrate that Zhongzhen had such autonomy, or that the Chinese government did not have the ability to control Zhongzhen's export operations." Def. Br. at 16; IDM at 14. This attempt to distinguish *SDGEs* fails because there the "specific information on the record" involved the same certifications attesting to the lack of government control on this record:

> . . . Mr. Xingming, Fushun Carbon Chairman of the Board, also held a position as deputy of the Fushun Municipality People's Congress during the POR. Again, **there is no record evidence that this post amounts to a path** through which Mr. Xingming is able **to exert *de facto* government control** over Fushun Carbon. . . .
>
> The Fangda Group **reported, under certification, that no government body had a role in any of the Fangda Group's operations or that its owners, directors, or senior managers were not operating under the direction of the Chinese government**.
>
> For these reasons we find that the Fangda Group had control over its export functions. . . .
>
> Without examples of these constitutional powers being employed in a way that amounts to evidence of de facto control over export activities exercised by the government through the individual owners, board members, or senior managers, **the respondents' certified claims that the positions are honorary, and that the legislatures are perfunctory in nature, cannot be discredited**.

15

*SDGEs*, 81 Fed. Reg. 62,474, IDM Comment 1 (emphases added). Likewise here, "there is no record evidence that this post amounts to a path through which {[                    ] are} able to exert *de facto* government control over" Zhongzhen. *Id*.

Commerce provided insufficient explanation for "discredit{ing} Zhongzhen's **"certified claims that the positions are honorary, and that the legislatures are perfunctory in nature**." *Id*. (emphasis added). According to Defendant and PURIS, Commerce found that an intervening sea change occurred through which "the power and influence of the NPC and CPPCC have been increasing since 2020" such that they now have "real power." Def. Br. at 16; D-I Br. 42-43; IDM at 14-15. Yet the documents relied on show only that the People's Congresses have "**meetings every other month**" to supervise "**governments with legislating** on specific matters relating to the localities," and that the CCP merely "**symboli{zes} ultimate authority**" rather than having any "real power" as Commerce claims. PURIS RFI Exhibits 5-6 (emphases added); IDM at 14. Nothing on the record evidences People's Congress and CPPCC members suddenly after 2020 becoming state actors having actual governmental authority, even if those organizations "have risen in prominence and importance in recent years." PURIS RFI Exhibit 5.

Commerce had no basis to deviate from its 2021 grant of a separate rate to Loncin Motor Co., where it found that "**information on the record demonstrates that these organizations have no real power**, serve in advisory or other unofficial roles, and do not have any policymaking ability." *VSEs*, 86 Fed. Reg. 14,077, IDM Comment 10. Indeed, the record in *VSEs* featured much of the same evidence on this record:

- "Loncin provided **price negotiation email correspondence with its U.S. customer**, its price list, quotation sheet, and purchase order from its customer demonstrating independence in price negotiations and signing contracts";

- "Loncin **certified that it retained the proceeds of its sales** and made independent decisions with respect to the disposition of profits or financing of

16

losses. . . . In addition, Loncin provided a complete list of its bank accounts and its audited financial statements covering the POI . . . .";

- "Loncin's **AoAs provide the procedures** Loncin follows when selecting board members and senior management **which are no different than a typical U.S. corporation**"; and

- "Loncin's AoAs . . . establish procedures for the selection of senior management."

*Id*. (emphases added) With Zhongzhen having provided the same evidence as Loncin, the contradictory outcome is neither justified nor sufficiently reasoned. Commerce's explanation "that the record in this case has been more fully developed" is not based on any evidence. Def. Br. at 15.

*SGDEs* and *VSEs* accordingly reflect an agency practice to grant separate rates to companies having officials with memberships in the same organizations as did Zhongzhen, and Commerce did not sufficiently explain its deviation therefrom. Defendant and Commerce unpersuasively attempt to distinguish g *VSEs* because "the owner of the respondent company . . . 'served as a representative to the NPC and CPPCC *prior to*' the POI and *SDGEs* because "membership in a people's congress was sufficient to find they were a government official." Def. Br. at 15 (citing IDM at 14 (emphasis added). Yet these cases did not turn on such facts. Instead, those separate rates were granted because "these organizations have **no real power**" and "no record evidence that this post amounts to a path . . . to exert *de facto* government control over" *VSEs*, 86 Fed. Reg. 14,077, IDM Comment 10 (emphasis added); *SDGEs*, 81 Fed. Reg. 62,474, IDM Comment 1. Given the record that overwhelmingly supports these same findings for Zhongzhen, Commerce's separate rate is denial "is arbitrary" because "the agency offer{ed} insufficient reasons for treating similar situations differently." *SKF*, 263 F.3d at 1382.

*SGDEs* and *VSEs* further underscore the unlawful shift in Commerce practice by supporting their separate rate grants through reliance on this Court's ruling in *Jiangsu Jiasheng*

17

*Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317, 1349 (CIT 2014). *SDGEs*, 81 Fed. Reg. 62,474, IDM Comment 1 n.55; *VSEs*, 86 Fed. Reg. 14,077, IDM Comment 10 n.479. In *Jiangsu*, this Court affirmed Commerce's decision to grant a separate rate to a respondent even though "the wholly state-owned enterprise holding the **twenty percent share** was involved in the selection of {the respondent's} high-level management personal." *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F.Supp.3d 1263, 1266 (CIT) (emphasis added). In that investigation, as with Zhongzhen here, "there is no record evidence of PRC government direction with respect to the day-to-day export related operations of any of the companies with senior board members or managers in the CPC, CPPCC, {or} NPC." *Id*. at 1349. Defendant seeks to minimize this ruling: "As Commerce explained, *Jiansgu* was issued in 2012, prior to Commerce's revision of its separate rate practice in response to the *Diamond Sawblades* litigation in 2014." Def. Br. at 21 (citing IDM at 18). However, in that case "Commerce found {SASAC}, a Chinese government agency, owned . . . a **majority share**" in the company eventually denied a separate rate on that basis. *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1307 (Fed. Cir. 2017) (emphasis added). Thus, Commerce's practice was revised where the government held majority ownership in a respondent. That revision does not support denying a separate rate for Zhongzhen, which has no government ownership. Section I, *supra*.

Finally, Commerce's unjustified reversal of practice is undermined by recent actions by the U.S. government. Zhongzhen stands by its analogy to Elon Musk, Pl. Br. at 26, which Defendant dismisses as "bizarre." Def. Br. at 23. Claims by Defendant that "the United States is not an NME country" and PURIS that "the American system of government is drastically different from that of China" miss the point of Zhongzhen' analogy. Trading partners of the United States could treat Tesla as state-owned by applying the standard employed by Commerce

18

in this case. Def. Br. at 26; PURIS Br. at 42. Indeed, the United States' recent acquisition of a "golden share" in U.S. Steel raises concerns that "U.S. Steel is a state-owned enterprise under the USMCA {which} would subject U.S. Steel to duties on its products sold in Canada and Mexico—reducing its profitability, and incentivizing Nippon Steel to shift investment, production, and jobs away from U.S. Steel." L. Dykowski, *By Any Other Name?: The U.S. Steel "Golden Share" and State Enterprise Disciples Under International Agreements*, GEORGETOWN LAW INTERNATIONAL INSTITUTE OF ECONOMIC LAW (2006),[1] at 46. These U.S. government actions over U.S. Steel and Tesla underscore the hypocrisy of Commerce inexplicably deciding that Zhongzhen is not entitled to a separate rate merely because to two of its officers hold honorary positions in two quasi-government organizations,

## IV.    COMMERCE UNLAWFULLY ASSIGNED ZHONGZHEN THE 281.31% CHINA-WIDE ADD RATE AND DISREGARDED REPORTED DATA

Zhongzhen demonstrated that it was unlawfully assigned the punitive and uncorroborated 280.31% China-wide ADD rate through application of adverse facts available ("AFA"). Pl. Br. at 40-44. In response, Defendant and PURIS once more misplace reliance on inapplicable precedent involving majority government ownership. Def. Br. at 33 (citing *China Mfrs. Alliance*, 1 F.4th at 1039-40; *Diamond Sawblades*, 866 F.3d at 1313); D-I Br. at 43-44 (citing *Diamond Sawblades*, 866 F.3d at 1313). Even assuming *arguendo* that Zhongzhen was properly denied a separate rate, the unique facts here prevent Commerce from disregarding all data submitted:

- AFA was applied merely because five of the 18 companies alleged by PURIS to export pea protein did not provide quantity and value ("Q&V") data early in the investigation, when Commerce took no steps to confirm the identity and exportation of those companies;

- Zhongzhen undisputably cooperated to the best of its ability and otherwise did all that was asked by Commerce, which should preclude AFA applicability;

---

[1]    https://georgetown.box.com/s/y5nsw1p2q7rb6ikqli2i374xv5arykkk

- no notice and opportunity to cure was provided to any respondent or the Government of China ("GOC"), as required before AFA application;

- mandatory respondents Zhongzhen and Consolidated Plaintiff Zhaoyuan Junbang Trading Co., Ltd., both of which were denied separate rates, accounted for more than [          ] kilograms of pea protein exported to the United States during the POI; and

- the China-wide ADD rate was based on "estimated dumping margins for pea protein rang{ing} from 18.48 percent to 280.31 percent" using data from PURIS that was readily accepted by Commerce at the outset of the investigation.

Pl. Br. at 40-44; 19 U.S.C. §§ 1677e, 1677m(d); *Pea Protein from China,* 88 Fed. Reg. 52,124, 52,126 (Aug. 7, 2023) (initiation), PR33 ("*Initiation Notice*"); Commerce Initiation Checklist (Aug. 1, 2023), CR19/PR34, at 5-6; IDM Comments 1-2; Commerce Respondent Selection Memorandum (Aug. 28, 2023), CR32/PR83 ("Selection Memo"), Attachment.

Defendant responds that Zhongzhen's cooperation is irrelevant because "several companies did not provide any {Q&V} response at all, so there were no deficient submissions to remedy." Def. Br. at 34. Yet no efforts were taken to check that the five companies identified by PURIS in fact exported pea protein to the United States. Although "the relevant {Q&V} request had not been directed" to the GOC, the imposition of such draconian consequences should have required GOC confirmation or something beyond accepting PURIS' bare allegation – as a matter of statutory interpretation and substantial evidence. Likewise, Commerce departed from its practice by not using actual reported data to calculate the PRC-wide rate as it did in *53-Foot Dry Dock Dry Containers from China*, 80 Fed. Reg. 21,203 (Apr. 17, 2015) (final determination). PURIS defends Commerce having distinguished that case because here other companies were found part of the PRC-wide entity. D-I Br. at 46-47. Yet this binary assessment of whether the PRC-wide entity is comprised of one or multiple companies does not withstand scrutiny because Commerce had reported data for more than [          ] kilograms of pea protein found to be

20

PUBLIC VERSION

part of the PRC-wide entity. Selection Memo Attachment; IDM Comments 1-2. It defies

credulity to disregard such an [          ] amount of reported data merely because a few

companies alleged to export pea protein declined to submit Q&V data at the investigation outset.

Defendant unpersuasively notes that the PRC-wide methodology could be more accurate: "For a company controlled by the Chinese government, assigning a rate based on a methodology that recognizes and reflects the realities of NME governmental control over a company could very well be more accurate than utilizing a method that ignores a country's NME status." Def. Br. n.36. The "methodology" through which the 280.31% rate was calculated involved only a spot-check of data provided by PURIS over two weeks before initiation. Commerce Supplemental Questionnaire (July 17, 2023), CR12/PR19, at 1-4. This cursory exercise should not satisfy the statutory corroboration requirement, 19 U.S.C. § 1677e, let alone reasonably be considered to yield data more accurate than the voluminous ADD questionnaire responses submitted over the course of several months.

There is no rational basis to use petition data over reported actual data, or to use the highest such rate that is more than fifteen times the 18.48% rate calculated using the same data. *Initiation Notice*, 88 Fed. Reg. at 52,126. Given Zhongzhen's full participation, it cannot be credibly found that doing so "achieved 'the right balance between the goal of inducing full cooperation . . . and the rate not being punitive." D-I Br. at 45 (quoting *Final Determination*, 89 Fed. Reg. at 55,560). The PRC-wide rate selected was more than three times the 82.12% assigned in *Diamond Sawblades*, heralded by Defendant and PURIS as giving Commerce *carte blanche* to select sky-high ADD rates untethered to reality. 866 F.3d at 1305; Def. Br. at 33-34; D-I Br. at 47. Commerce here constructed an untenable series of legal fictions and blindly accepted PURIS' allegations to disregard Zhongzhen's reported data and assign it the 280.31%

21

rate. While this rate need not reflect commercial reality, as belabored by Defendant and PURIS, Def. Br. at 35; D-I Br. at 46, it constitutes a punitive, uncorroborated, arbitrary, and aberrational result as applied to Zhongzhen given the facts of this investigation. Pl. Br. at 40-44.

Finally, Commerce for the same reasons Commerce unlawfully disregarded Zhongzhen's Q&V data to find critical circumstances based on AFA. *Id.* at 44-45. Commerce has not sufficiently explained why as a general matter it should disregard volume data of a company found to be state-controlled to assess whether imports "have increased by at least 15 percent" after petition filing; an NME would not be expected to manipulate volumes as it may with prices. 19 C.F.R. 351.206(h); IDM Comment 6. Moreover, as recognized by Defendant and PURIS, Def. Br. at 37-38; D-I Br. at 48-49, this issue is subsidiary to the larger separate rate denial question before this Court. Zhongzhen accordingly submits that Commerce's critical circumstances finding should be reversed based on the invalidity of its separate rate denial. Pl. Br. at 16-39, Sections I-III, *supra*.

## CONCLUSION

Plaintiffs request that this Court hold that Commerce's *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law and remand the *Final Determination* with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully submitted,

*/s/ Jordan C. Kahn*
Jordan C. Kahn
Ned H. Marshak*

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

22

PUBLIC VERSION

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(212) 783-6881

-and-

*599 Lexington Ave., 36th Floor
New York, New York 10022

*Counsel for Plaintiffs Yantai Oriental Protein Tech Co., Ltd., Yantai Zhongzhen Trading Co., Ltd., Jiujiang Tiantai Food Co., Ltd., and Yantai Yiyuan Bioengineering Co., Ltd.*

Dated: April 22, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 6,871 words, less than the 7,000 word limit.

/s/ Jordan C. Kahn
Jordan C. Kahn

*Counsel for Plaintiffs*

Dated: April 22, 2026

15220775_1