Slip Op. 26-136

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**YANTAI ORIENTAL PROTEIN TECH CO., LTD. ET AL.,**

**Plaintiffs,**

**and**

**ZHAOYUAN JUNBANG TRADING CO., LTD., ET AL.,**

**Consolidated-Plaintiffs,**

**and**

**KTL PHARMACEUTICAL, CO., LIMITED ET AL.,**

**Plaintiff-Intervenors,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**PURIS PROTEINS, LLC D/B/A PURIS,**

**Defendant-Intervenor.**

**Before: Claire R. Kelly, Judge**

**Consol. Court No. 24-00181**
**PUBLIC VERSION**

**OPINION AND ORDER**

[ Remanding the United States Department of Commerce's final determination that Zhongzhen failed to rebut the presumption of de facto government control in the less-than-fair-value investigation of Certain Pea Protein from the People's Republic of China. ]

Dated: November 5, 2026

Ned H. Marshak, Andrew T. Shutz, Brandon M. Petelin, Dharmendra N. Choudhary, Elaine F. Wang, Eve Q. Wang, Jordan C. Kahn, and Mia F. Howard, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY for Plaintiffs Yantai Oriental Protein Tech Co., Ltd., Yantai Zhongzhen Trading Co., Ltd., Jiujiang Tiantai Food Co., Ltd., and Yantai Yiyuan Bioengineering Co., Ltd. and Plaintiff-Intervenor KTL Pharmaceutical Co. Limited.

David J. Craven, Craven Trade Law LLC, of Chicago, IL for Consolidated Plaintiffs Zhaoyuan Junbang Trading Co., Ltd., Linyi Yuwang Vegetable Protein Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Fenchem Biotek Ltd., Jianyuan International Co., Ltd., Yosin Biotechnology (Yantai) Co., Ltd., Yosin Import and Export (Yantai) Co., Ltd.

Jeffrey S. Grimson, Bryan P. Cenko, Clemence D. Kim, Jill A. Cramer, Kristin Heim Mowry, Ronalda G. Smith, Sarah M. Wyss, Yixin Li, Mowry & Grimson, PLLC, of Washington, D.C. for Plaintiff-Intervenor Yantai T.Full Biotech Co., Ltd.

David G. Ross, Stephanie E. Hartmann, Sydney J. Warren, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, of Washington, D.C. for Plaintiff-Intervenor NURA USA, LLC.

Douglas G. Edelschick, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, argued for Defendant. With him on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Franklin E. White, Jr., Assistant Director. Of counsel was Sapna Sharma, Senior Counsel, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Adam H. Gordon, Benjamin J. Bay, and Scott D. McBride, The Bristol Group, PLLC of Washington, D.C. for Defendant-Intervenor Puris Proteins LLC/dba PURIS.

Kelly, Judge: Before the Court is a motion for judgment on the agency record pursuant to United States Court of International Trade ("USCIT") Rule 56.2 filed by Plaintiffs, Yantai Oriental Protein Tech Co., Ltd. (Yantai), Yantai Zhongzhen Trading Co., Ltd. (Zhongzhen), Jiujiang Tiantai Food Co., Ltd. (Jiujiang), and Yantai

Yiyuan Bioengineering Co., Ltd. (Yiyuan) (collectively, "Zhongzhen") and consolidated-plaintiffs Zhaoyuan Junbang Trading Co., Ltd. (Junbang), Linyi Yuwang Vegetable Protein Co., Ltd., Shandong Yuwang Ecological Food Industry Co., Ltd., Fenchem Biotek Ltd, Jianyuan International Co., Ltd., Yosin Biotechnology (Yantai) Co., Ltd., and Yosin Import and Export (Yantai) Co., Ltd, (collectively, "Junbang"), and plaintiff-intervenor Yantai T.Full Biotech Co. Ltd. (T.Full) ("Plaintiff-Intervenor" or "T.Full"). See Pls.' Mot. J. Agency Rec., May 13, 2025, ECF Nos. 46, 47 ("Zhongzhen Mot."); Consol. Pls.' Mot. J. Agency Rec., May 13, 2025, ECF No. 48 ("Junbang Mot."); Pl.-Int. Mot. J. Agency Rec., May 27, 2025, ECF No. 53 ("Pl.-Int. Mot."); see also USCIT R. 56.2. Zhongzhen and Junbang challenge the final determination by the U.S. Department of Commerce ("Commerce") in the less-than-fair-value investigation of certain pea protein from the People's Republic of China ("PRC" or "China"). See Zhongzhen Mot.; Junbang Mot. Plaintiff-Intervenor challenges Commerce's final critical circumstances determination and separate rate calculation. See Pl.-Int. Mot. at 3.

## BACKGROUND

In August 2023, Commerce initiated an antidumping duty investigation of certain pea protein from China. See Certain Pea Protein from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation, 88 Fed. Reg. 52,124 (Dep't of Commerce Aug. 7, 2023) ("Initiation Notice") P.R. 33. Commerce sent 18 Quantity and Value ("Q&V") Questionnaires to Chinese exporters and producers that the

Petitioner, Puris Proteins, LLC, ("Puris" or "Petitioner") originally identified in its petition and received eight responses from companies required to respond, and seven from other companies, for a total of 15 Q&V responses. See id. at 11; see also Quantity and Value Delivery Confirmation (Aug. 23, 2023) barcode 4421935-01. Commerce notified exporters and producers wishing to obtain an individual dumping rate separate from the PRC-wide entity, to submit a separate rate application. See Initiation Notice at 12. Commerce selected Zhongzhen and Junbang as mandatory respondents, and both submitted separate rate applications. See Respondent Selection Memorandum (Aug. 28, 2023) ("Resp. Selection Memo.") at 5, P.R. 83, C.R. 32; see also Yantai Oriental Protein Tech Co., Ltd. Separate Rate Application (Sept. 13, 2023) ("Yantai Separate Rate App.") P.R. 119, C.R. 53; Junbang Separate Rate Application (Oct. 22, 2025) barcode 4840499-01.

In its preliminary determination, Commerce concluded that neither company established it was free of de facto government control, and therefore, both were subject to the PRC-wide rate. See Certain Pea Protein from China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 89 Fed. Reg. 10,038 (Dep't of Commerce Feb. 7, 2024) ("Preliminary Determination"), and the accompanying preliminary Issues and Decision Memorandum, (Feb. 7, 2024) ("PDM") at 7, P.R. 347; see also Preliminary Determination: Separate Rate Analysis Memorandum – the Zhongzhen Companies

("Zhongzhen SRM") at 1–2, P.R. 354, C.R. 251; Preliminary Determination: Separate Rate Analysis Memorandum – Zhaoyuan Junbang Trading Co., Ltd., ("Junbang SRM") at 1, P.R. 356, C.R. 253. Commerce also concluded that because some companies within the PRC-wide entity had not responded to the Q&V questionnaires, it would use facts otherwise available with an adverse inference ("AFA")[1] for the PRC-wide entity. See PDM at 11–14. Additionally, Commerce determined that critical circumstances existed regarding pea protein imports from China pursuant to 19 U.S.C. § 1673b(e)(1) and 19 C.F.R. § 351.206. See Analysis of Critical Circumstances (Feb. 7, 2024) P.D. 351–52.

Commerce published its final determination on July 5, 2024. See Certain Pea Protein from China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Critical Circumstances Determination, 89 Fed. Reg. 55,559 (Dep't of Commerce July 5, 2024) ("Final Determination") P.R. 387, and the accompanying Issues and Decision Memorandum ("IDM") P.R. 386. Commerce, in its Final Determination, continues to find that Zhongzhen and Junbang are subject to PRC control and therefore should receive the PRC-wide rate, calculated with AFA,

---

[1] Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available and, second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available." See 19 U.S.C. § 1677e(a)–(b), (d).

and continues to find critical circumstances. See IDM at 1, 31–36, 36–38. As a result of the affirmative Final Determination, Commerce issued the antidumping duty order on the PRC-wide entity at a margin of 280.31% on certain pea protein from China. See Certain Pea Protein from China: Antidumping and Countervailing Duty Orders, 89 Fed. Reg. 68,390 (Dep't of Commerce Aug. 26, 2024) P.R. 390.

On May 13, 2025, Plaintiffs Zhongzhen and Junbang filed Motions for Judgment on Agency Record pursuant to USCIT Rule 56.2. See Zhongzhen Mot.; Junbang Mot. Plaintiff-Intervenor filed its Motion for Judgment on the Agency Record on May 27, 2025. See Pl.-Int. Mot.[2] Defendant filed its response brief on February 3, 2026. See Def. Resp. Opp. Mot. for J. Agency Rec., Feb. 3, 2026, ECF Nos. 69, 70 at 11–38 ("Def. Resp."). Defendant-Intervenor, Puris, filed its response to Plaintiff's Motion on February 17, 2026. See Def.-Int. Resp. Opp. to Mot., Feb. 17, 2026, ECF Nos 72, 73 ("Def.-Int. Resp."). Plaintiffs Zhongzhen and Junbang filed replies to Defendant and Defendant-Intervenor on April 22, 2026. See Zhongzhen Reply, Apr. 22, 2026, ECF Nos 77, 78 ("Zhongzhen Reply); see also Junbang Reply, Apr. 22, 2026, ECF No. 79 ("Junbang Reply"). On September 10, 2026, the Court heard oral arguments. See ECF No. 96, Sept. 10, 2026 ("Oral Argument").

[2] On November 22, 2024, the Court granted NURA USA, LLC's ("NURA") Consent Motion to Intervene as Plaintiff-Intervenor. See ECF No. 32. NURA did not file a 56.2 motion, a brief in support of Zhongzhen's or Junbang's 56.2 motions, or participate in oral argument.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 28 U.S.C. § 1581(c) to review Commerce's final determinations in an anti-dumping investigation. See 19 U.S.C. § 1516a(a)(2)(B)(i) (2026). The Court must set aside Commerce's determination where it is unsupported by substantial evidence on the record or otherwise not in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence requires Commerce consider the record as a whole, including evidence which detracts from its conclusion. See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (explaining that the substantial evidence standard "requires Commerce to examine the record and articulate a satisfactory explanation for its action").

## DISCUSSION

Zhongzhen and Junbang both challenge Commerce's denial of separate rate status. See Zhongzhen Mot. at 4–10, 16–27; Junbang Mot. at 7–16. Zhongzhen argues that Commerce ignores its prior determinations that found "separate rate status cannot be denied merely because a company's senior management are members of the Local People's Congresses ("LPC") or the [Chinese People's Public

Consultative Conference] [("CPPCC")]," Zhongzhen Mot. at 13, 16–27, and Commerce's determination that the government controls Zhongzhen, either "directly or indirectly" is unsupported by substantial evidence. Id. at 14, 27–32. Zhongzhen also argues that Commerce unlawfully calculates an AFA rate for Zhongzhen because there is no evidence Zhongzhen withheld information or impeded the investigation. See id. at 40–44. Finally, Zhongzhen argues that Commerce unlawfully finds critical circumstances exist to assign the PRC-wide antidumping rate. See id. at 44. Junbang separately argues that Commerce's finding that it failed to rebut the presumption of state control is unsupported because (1) no government entity "own[s] a controlling interest" in Junbang's parent company, (2) Junbang's Articles of Association ("AoA") reference to the Communist Party of China ("CPC") is insufficient to establish government control, and (3) Commerce improperly identifies "the primary person" of Junbang as a government agent. See Junbang Mot. at 7–16. Additionally, Junbang argues Commerce "failed to give proper weight" to the fact that Junbang is wholly owned by a publicly listed company, and therefore, cannot be subject to local government control. See id. at 1, 16–17. Plaintiff-Intervenor argues in support of Zhongzhen and Junbang's motions and requests the Court remand to Commerce to "assign [Pl.-Int.] a revised separate rate and make a negative critical circumstances

determination." Pl.-Int. Mot. at 3.[3] Defendant and Defendant-Intervenor argue that Commerce's determinations are in accordance with law and supported by substantial evidence. See Def. Resp. at 11–38; see also Def.-Int. Resp. at 15–43. For the reasons that follow, Commerce's determination is remanded in part.

## I. Separate Rate Eligibility

Plaintiffs Zhongzhen and Junbang challenge Commerce's determination denying the entities a separate rate, arguing that they are free from de facto government control. See Zhongzhen Mot. at 16–44; Junbang Mot. at 7–17. Zhongzhen argues that the individuals identified by Commerce as government officials are not government officials and, even if they were, the majority shareholder of the company, Mr. D,[4] controls the company. See Zhongzhen Mot. at 27–34. Junbang argues that as a publicly traded company, it cannot be controlled by the government and Commerce wrongfully identified Yang Jun Ming, the "primary person who directs" Junbang's parent company as a government official. See Junbang Mot. at 13–16, 16–17. Defendant argues that Commerce's evidence suggests government officials control both entities, and therefore, Zhongzhen and Junbang fail to rebut the presumption of government control and are subject to the PRC-wide rate.

---

[3] Plaintiff-Intervenor argues Commerce's "unlawful calculation of the separate rate for the non-selected companies . . . does not reasonably reflect their sales practices." Pl.-Int. Mot. at 3. Defendant argues in response that Commerce followed its established practice using a "simple average of the margins alleged in the petition." Def. Resp. at 39 (citing Final Determination, n. 8).

[4] Mr. D is [[ ]].

See Def. Resp. at 11 (citing IDM at 10–11); Def. Resp. at 24 (citing Junbang SRM at 5–9); see also Def.-Int. Resp. at 15.

### A. Separate Rate Framework

Once Commerce issues a final dumping determination, under the Tariff Act, Commerce must "determine the estimated weighted average dumping margin for each exporter and producer individually investigated." 19 U.S.C. § 1673d(c)(1)(B)(i)(I). "If it is not practicable to make individual weighted average dumping margin determinations under [Section 1673d(c)] because of the large number of exporters or producers involved in the investigation or review," Commerce may "determine the weighted average dumping margins for a reasonable number of exporters or producers," known as mandatory respondents. 19 U.S.C. § 1677f-1(c)(2); see also Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States, 145 F.4th 1308, 1312 (Fed. Cir. 2025). In cases involving imports from a non-market economy ("NME") country,[5] Commerce may calculate a single dumping margin applicable to all exporters and producers not individually examined. See 19 C.F.R. § 351.107(d)(1)(ii)(A)–(B) (2024) ("If [Commerce] has established a current separate

---

[5] An NME country is defined as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). Commerce treats the People's Republic of China as an NME country. See Antidumping Duty Investigation of Certain Aluminum Foil From the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair-Value and Postponement of Final Determination, 82 Fed. Reg. 50,858-03, 50861 (Dep't of Commerce Nov. 2, 2017).

cash deposit rate for the exporter of the subject merchandise" it will instruct Customs to apply that rate for the exporter. If not, Commerce will instruct Customs "to apply the cash deposit rate determined by [Commerce] for the nonmarket economy entity to entries of the subject merchandise, pursuant to § 315.108(b)."); Import Admin., [Commerce], Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving [NME] Countries, Pol'y Bulletin 05.1 at 1 (Apr. 5, 2005) ("Policy Bulletin 05.1"), available at https://www.trade.gov/sites/default/files/2026-03/B5.1%20Separate%20Rates%20and%20Combination%20Rates%20in%20Antidumping%20Investigations%20involving%20Non-Market%20Economy%20Countries.pdf?v=1792619229758 (last visited Nov. 2, 2026).

Commerce employs a rebuttable presumption that all companies within an NME country are controlled by the NME government, see Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1311 (Fed. Cir. 2017), and applies an NME-wide antidumping duty rate to those companies failing to rebut that presumption. See Jilin Forest, 145 F.4th at 1312–13 (collecting cases); see also Antidumping Methodologies in Proceedings Involving [NME] Countries: Surrogate Country Selection and Separate Rates, 72 Fed. Reg. 13,246, 13,247 (Dep't of Commerce Mar. 21, 2007) (request for comment) (stating the Department's policy of presuming government control for companies operating within NME countries). Respondents can overcome the presumption of government control and demonstrate eligibility for

a separate rate "by establishing the absence of both de jure and de facto government control." See Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1353 (Fed. Cir. 2015); see also Policy Bulletin 05.1 at 2.

Commerce considers four factors in determining whether a respondent exporter, who has applied for a separate rate, is free of de facto government control: (1) whether the exporter sets its own prices independently and without government approval; (2) whether the exporter negotiates and enters contracts independently; (3) whether the exporter has autonomy from the "central, provincial and local governments" regarding the selection of management; and (4) whether the exporter retains the proceeds of its export sales. See Policy Bulletin 05.1 at 2; Zhejiang Mach. Imp. & Exp. Corp. v. United States, 65 F.4th 1364, 1366 (Fed. Cir. 2023).[6] The exporter must demonstrate that all four factors are met to overcome the presumption of government control. See Yantai CMC Bearing Co. v. United States, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017); Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States, 350 F. Supp. 3d 1308, 1321 (Ct. Int'l Trade 2018). As part of its application, a company must indicate whether any of its managers or board members

[6] Commerce's de jure analysis considers, "(1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) legislative enactments decentralizing control over export activities of the companies; and (3) other formal measures by the government decentralizing control over export activities of companies." Zhongzhen SRM at 3 (citing Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China, 56 Fed. Reg. 20,588, 20,589 (May 6, 1991)). Commerce's de jure determination is not challenged here. See generally Zhongzhen Mot.; Junbang Mot.

work for the government at any level (national, provincial, or local). See Yantai Separate Rate App. at 17, 18; see also 19 C.F.R. § 351.108(b)(1)(i) ("When a [NME] government, at a national, provincial or other level, holds an ownership share of an entity, located in the [NME], either directly or indirectly, the level of ownership and other factors may indicate that the government exercises or has the potential to exercise control over an entity's general operations."). The separate rate applicant is responsible for populating the record with evidence rebutting the existence of de facto government control. See Sigma Corp. v. United States, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997).

Commerce considers the extent of a government's ownership of a company's shares in assessing de facto control. See Zhejiang Mach., 65 F.4th at 1370. Commerce views government majority ownership as actual control, regardless of whether that control is exercised. See id. (citing An Giang Fisheries Imp. and Exp. Joint Stock Co. v. United States, 284 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2018) (for a majority owner the potential to control, is "for all intents and purposes, actual control," because "the majority shareholder can typically control the operations of a company without actually removing directors or management since it is clear that directors or management could be removed.")); see also Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States, 121 F. Supp. 3d 1263, 1267 (Ct. Int'l Trade 2015) ("where a government entity holds a majority ownership share, either directly or indirectly, in

the respondent exporter or producer, such majority ownership holding in and of itself precludes a finding of de facto autonomy.") (internal quotations omitted).

However, "government minority ownership alone does not preclude the ability to rebut the presumption of control, whether that control be termed 'actual' or 'potential,'" An Giang, 284 F. Supp. 3d at 1359, and Commerce will look for "evidence of additional indicia of government control" that the potential for actual control exists. Zhejiang Mach., 65 F.4th at 1370 (citing An Giang, 284 F. Supp. 3d at 1361–64). When evaluating additional indicia of control, Commerce looks to record evidence, including an entity's AoAs, to evaluate the entity's management and ownership structure. See, e.g., An Giang, 284 F. Supp. 3d at 1362–63 (explaining Commerce's reliance on exporters AoAs to establish minority government shareholder's control); Pirelli Tyre Co., Ltd. v. United States, 638 F. Supp. 3d 1361, 1379 (Ct. Int'l Trade 2023) (upholding Commerce's reliance on record evidence of corporate documents, the entity's board of directors, and management structure as indicia of government control where government officials were minority owners), aff'd 128 F.4th 1265 (Fed. Cir. 2025); Zhejiang Mach., 65 F.4th at 1371–72 (upholding Commerce's determination that the respondent did not overcome the presumption of control based on Commerce's review of the respondent's corporate voting structure as detailed in respondent's AoAs).

### B. Zhongzhen

Zhongzhen argues that Commerce's denial of separate rate status to Zhongzhen, based on a finding of de facto government control, is both contradictory to its practice and unsupported by substantial evidence. See Zhongzhen Mot. at 16–32. Specifically, Zhongzhen argues there is no record evidence of a government entity having any ownership in Zhongzhen. See id. at 18. Further, Zhongzhen argues that the record does not support finding that Mr. B[7] or Mr. C[8] are government officials because neither the LPC nor the CPPCC are government agencies. See id. at 27. Zhongzhen also argues that it provided "substantial information evidencing their separate rate entitlement" and therefore rebutted the "presumption of state control." See id. at 35 (citing Jilin Forest, 617 F. Supp. 3d at 1368–69). Defendant responds that Commerce supported its determination with substantial evidence that Zhongzhen's management included government officials with the power to "control and influence" Zhongzhen's operations. Def. Resp. at 11 (citing IDM at 10–11); see also Def.-Int. Resp. at 30–37. Additionally, Defendant-Intervenor asserts that Zhongzhen has not cited evidence that "substantiates its claims that the Chinese government had no potential means to control Zhongzhen's export activities or general operations." Def.-Int. Resp. at 37.

---

[7] Mr. B is [[ ]].
[8] Mr. C is [[ ]].

Here, Commerce does not adequately address record evidence showing that Mr. D, the majority shareholder, has actual control over Zhongzhen, and therefore Commerce's determination must be remanded. In its de facto government control analysis, Commerce found that Zhongzhen failed to establish, (1) its "authority to negotiate and sign contracts and other agreements independent from government control," (2) "autonomy from the government in making decisions regarding the selection of management," and (3) that Zhongzhen could "make independent decisions regarding the disposition of profits or financing of losses." Zhongzhen SRM at 7, 8, 9. Commerce bases its determination on the presence of Mr. B and Mr. C, who it determines are government officials with executive roles within Zhongzhen. See id. at 5–10; IDM at 11.[9] Mr. B is the Executive Director of Zhongzhen.[10] See Zhongzhen SRM at 5 (citing Yantai Zhongzhen Trading Co., Ltd. Section A Questionnaire

---

[9] Zhongzhen is a trading company that exports subject merchandise produced by other Zhongzhen companies, Yantai Oriental and Jiujiang Tiantai. See Zhongzhen Sect. A. Quest. Resp. at 1. Zhongzhen is wholly owned by Company A. See Zhongzhen SRM at 5 (citing Zhongzhen Sect. A Quest. Resp. at 14 and Ex. A-6). Company A is [[ ]]. See id. (citing Zhongzhen Sect. A Quest. Resp. at 14 and Ex. A-6). Company A selects the executive leadership and management of Zhongzhen. See id. at 8 (citing Zhongzhen Sect. A Quest. Resp., Ex. A-8). Further, Zhongzhen's AoAs indicate that Zhongzhen [[ ]]. Id. (citing Zhongzhen Sect. A Quest. Resp., Ex. A-8).

[10] Commerce notes that the terms "Executive Director" and "President" are used interchangeably within Zhongzhen's AoA's and business documents. See Zhongzhen SRM at 5. It also notes that Mr. B also has some [[ ]] direct ownership in Company A, and indirectly owns various entities which have holdings in Company A, making Mr. B's ownership of Zhongzhen a total of [[ ]]. See id.

Response (Oct. 2, 2023) ("Zhongzhen Sect. A Quest. Resp.") Ex. A-9, P.R. 150–51, C.R. 74–79). Mr. B is a member of the People's Congresses of Zhaoyuan City and Yantai City, i.e., an LPC. See id. (citing Zhongzhen Sect. A Quest. Resp. at 17). Mr. C is Zhongzhen's General Manager and legal representative. See id. at 6 (citing Zhongzhen Sect. A Quest. Resp. at 17, Ex A-8 and A-16). Mr. C is a member of the CPPCC of Zhaoyuan City. See id. (citing Zhongzhen Sect. A Quest. Resp. at 17).

Commerce explains that Mr. B and Mr. C run the day-to-day operations of the company and therefore make decisions regarding: (1) whether the exporter negotiates and enters contracts independently; (2) whether the exporter has autonomy from the government regarding the selection of management; and (3) whether the exporter retains the proceeds of its export sales. See id. at 5–10; see also Policy Bulletin 05.1. Further, Commerce identifies evidence that Mr. B, as a direct and indirect minority owner of Zhongzhen's parent, Company A, has the ability to control the formulation of Zhongzhen's plan for profit distribution and financing of losses. See Zhongzhen SRM at 10. Mr. B is explicitly authorized by Zhongzhen's AoAs to appoint and dismiss company management and other personnel, suggesting that Mr. B could potentially hire, or fire, Mr. C, or someone in his position as general manager and legal representative. See IDM at 16 (citing Zhongzhen SRM at 8–9). Commerce also explains that the AoAs indicate that the General Manager, Mr. C, is appointed by the President, Mr. B, and exerts control over personnel and management. See id. Commerce points to record evidence that both Mr. B, as Executive Director, and Mr.

C, as legal representative, are empowered with the ability to sign and negotiate contracts on behalf of Zhongzhen. See IDM at 17 (citing Zhongzhen Sect. A Quest. Resp. at 17 and Ex. A-8); Zhongzhen SRM at 7. Despite Commerce's citation to record evidence showing Mr. B and Mr. C's involvement in the management of the company, Commerce's analysis and explanation glosses over record evidence concerning Mr. D.

It is undisputed that Mr. D owns a majority of Company A, which wholly owns Zhongzhen. See Zhongzhen Sect. A Quest. Resp. Ex. A-6; Zhongzhen SRM at 5. Majority ownership is actual control. See Zhejiang Mach., 65 F.4th at 1370 (citing An Giang, 284 F. Supp. 3d at 1359 ("[w]here a majority shareholder has potential control[,] that control is, for all intents and purposes, actual control.")); see also Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from the People's Republic of China, 86 ITADOC 14077 (Dep't of Commerce Mar. 5, 2021) ("Vertical Shaft Engines") at Cmt. 10 (Commerce expects any majority shareholder to "have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company."). Mr. D has the authority to appoint and replace the executive director and has authority over Zhongzhen's

finances. See Zhongzhen Sect. A Quest. Resp., Ex. A-8.[11] Therefore, Mr. D, not Mr. B, would seem to have the power "to control the formulation of Zhongzhen's plan for profit distribution and financing of losses" and control all the powers granted to Company A by the AoAs. Zhongzhen SRM at 10.

Commerce attempts to confront the argument that Mr. D's majority ownership amounts to actual control by stating:

> The fact that an individual holds a majority ownership of the parent company does not negate that in practice, the authority over the company has been delegated to the executive director/president who is a government official, and who exercises that authority over the Zhongzhen Companies' business operations and who exercised that authority to appoint a CPPCC member to a key role within the Zhongzhen Companies. Moreover, the CPPCC member, the Zhongzhen Companies' general manager/legal representative, is involved in the day-to-day business operations of the Zhongzhen Companies. Thus, regardless of the degree of government ownership of the Zhongzhen Companies, we find that consistent with our practice to analyze the de facto criteria, the Zhongzhen Companies have failed to rebut the presumption of government control.

IDM at 20. However, Commerce's statement does not adequately explain why the presence of a majority shareholder, who has no government affiliation is not enough to overcome any minority government official, nor does it address the AoA that outlines Company A's majority shareholder's control of Zhongzhen. See Zhongzhen Sect. A Quest. Resp., Ex. A-8; see also An Giang, 284 F. Supp. 3d at 1359. At oral

---

[11] Article 10 of the AoA's states, [[

]]. See Zhongzhen Sect. A Quest. Resp., Ex. A-8.

argument, Defendant argued that Mr. D has not taken steps to exert his authority over Mr. B. Oral Argument at 27:20. As a preliminary matter, Commerce does not make this argument. See Zhongzhen SRM at 5–10; see also IDM at 20. Moreover, the argument runs counter to the Court of Appeals' acknowledgment that potential to control through majority ownership is for all intents and purposes, actual control. See Zhejiang Mach., 65 F.4th at 1370. If Commerce believes that the principle discussed in Zhejiang Mach. is inapplicable to certain situations,[12] it should explain its reasoning. Likewise, if Commerce's position is that government presence in management, even in the absence of government ownership,[13] precludes separate

---

[12] The court in Zhejiang Mach. went on to explain that where the government has a minority interest, other indicia of control might be sufficient to preclude an exporter's ability to rebut the presumption of control. See 65 F.4th at 1370 (citing An Giang, 284 F. Supp. 3d at 1361–64).

[13] In Zhongzhen's SRM, Commerce makes two references to "government ownership." First, Commerce states, "we have considered the level of government ownership where necessary." Zhongzhen SRM at 4. Second, after recounting that Mr. B owns directly and indirectly, [[ ]] of Company A, it states, "[b]ecause of the level of government ownership and control, we preliminarily conclude that the Zhongzhen Companies have failed to rebut the presumption of de facto government control, consistent with our determination in the Diamond Sawblades Redetermination." Id. at 10 (citing Final Results of Redetermination Pursuant to Diamond Sawblades Manufacturers' Coalition v. United States, No. 13-00168, 2015 WL 4978726 (Ct. Int'l Trade Aug. 20, 2015)). Likewise, Defendant states its "determination was based on an analysis of company ownership and control linking Zhongzhen to the Chinese government." Def. Resp. at 7. Thus, both Commerce and Defendant seem to imply there is some type of government ownership of Zhongzhen. Throughout, its motion, Zhongzhen asserts numerous times that there is no government ownership of the Zhongzhen Companies. Zhongzhen Mot. at 1, 5, 13, 18,

(footnote continued)

rate status, it should say so, and, explain why that position is reasonable.[14] Therefore, Commerce's determination is remanded for Commerce to reconsider or further explain why Zhongzhen has not rebutted the presumption of control where the government lacks any ownership, and the majority owner, with no ties to the government, would appear to be able to control and direct the activities of management even if its managers are government officials.[15]

---

24–26, 34. Defendant does not respond directly to Zhongzhen's claims regarding the absence of government ownership. See generally Def. Resp. Defendant-Intervenor does reply and states, "it has always been Commerce's practice to analyze whether an exporter 'has satisfied each of the four factors of de facto control,' regardless of whether they have majority or minority ownership, or, as in this case, control of an exporter through government officials." Def.-Int. Resp. at 38–39 (citing IDM at 13, 19). If Commerce believes that Mr. B's position amounts to government ownership, it should clearly state so and provide the basis for that belief. Alternatively, if Commerce believes that Mr. B's ownership interests enhance his managerial control and can somehow affect the control Mr. D has over him, it should clearly state that position and explain the basis for that position.

[14] Although it is possible that a respondent might fail to rebut the presumption of government control even with the presence of a non-government majority shareholder, the record here, and Commerce's explanation, does not support such a determination. See An Giang, 284 F. Supp. 3d at 1361. For example, in An Giang, this Court sustained Commerce's denial of a separate rate where the government was not the majority shareholder because the general director of the company was beholden to the minority government shareholder for his job, and exercised control over the employees. See id. In An Giang, the government had a minority interest. See id. at 1359. Here, the government has no ownership, see Zhongzhen Sect. A Quest. Resp., Ex. A-6, and it appears that Mr. B is beholden to Mr. D for his position, not to the government. See id. Ex. A-10 (Zhongzhen appointment letter where the shareholders appointed Mr. B as the executive director).

[15] In its brief, and at Oral Argument, counsel for Zhongzhen argued that Commerce should be required to show "extraordinary indicia of control," given that there is no

(footnote continued)

Separately, Zhongzhen argues that neither Mr. B, nor Mr. C, is a government official because the LPC and CPPCC are not government agencies. See Zhongzhen Mot. at 27. Zhongzhen's argument fails as to the LPC for multiple reasons. First, Commerce's separate rate application asks whether there are any managers that hold positions in "any level of government." See Yantai Separate Rate App. at 17, 18. Therefore, Zhongzhen's argument that LPC's have limited power is of no moment. See Zhongzhen Mot. at 31. Second, Commerce points to record evidence that LPC's are part of the PRC government. For example, Commerce rests its determination that LPC's are a government entity on a series of articles that describe China's political and governmental system, and the Chinese Constitution. See Zhongzhen SRM at 5–6 (citing Puris Rebuttal Factual Information Regarding Zhongzhen Sect. A Quest. Resp. (Oct. 16, 2023) ("Pet. Rebuttal to Zhongzhen AQR") Ex. 1, P.R. 170) (explaining that an article states "the Constitution stipulates that all power in [China] belongs to the people, and the organs through which the people exercise State power are the NPC (National People's Congresses) and [LPCs] at all levels"). Commerce also relies on an article explaining that, recently, LPC's across China have

---

government ownership here. See Zhongzhen Mot. at 18 (internal quotations omitted); Oral Argument at 44:00-48:33. Zhongzhen bases its argument on Commerce's past determination affirmed in An Giang, which required other indicia of control in a case of minority government ownership. See Zhongzhen Mot. at 18. Zhongzhen argues that here, with no government ownership, Commerce should be required to show extraordinary indicia of control. See id. An Giang does not suggest a standard of "extraordinary indicia of control" and Zhongzhen does not point to any other authority for such a standard.

"risen in prominence and importance." See id. at 6 (citing Pet. Rebuttal to Zhongzhen AQR, Ex. 5). Third, and most tellingly, Commerce relies upon a "U.S. Congressional-Executive Commission on China" summary of China's State Organizational Structure listing LPC's as state institutions. See Pet. Rebuttal to Zhongzhen AQR at Ex. 5.[16] While Zhongzhen points to Commerce's determination in Vertical Shaft Engines for the proposition that "these organizations have no real power," Pl. Reply at 17 (citing Vertical Shaft Engines) that determination dealt particularly with the CPPCC, and therefore, Zhongzhen's claims that this determination found "these organizations" do not have power, is not accurate.

Further, Zhongzhen's citation to Small Diameter Graphite Electrodes may be more on point, but Commerce confronts and distinguishes Small Diameter Graphite Electrodes by explaining that on that record, although Commerce concluded members of an LPC are government officials, Commerce also found the membership did not outweigh other record evidence demonstrating the lack of de facto government control. See IDM at 13–14; see also Issues and Decision Memorandum for the

---

[16] In its motion, Zhongzhen attempts to argue that the U.S. Congressional summary "contradicts Commerce's position" that LPC's are "part of the Chinese government," and does not "indicate that individuals volunteering at these People's Congresses are state actors such that their places of employment are controlled by the Chinese government." Zhongzhen Mot. at 29. However, Zhongzhen's argument seems to completely ignore the contents of the U.S. Congressional summary which states, "[t]he state institutions below the national level are the local people's congresses," and the "administrative arm of these [National] people's congresses [is] the local people's government." Pet. Rebuttal to Zhongzhen AQR, Ex. 5, at 3.

Administrative Review of the Antidumping Duty Order on Small Diameter Graphite Electrodes from the People's Republic of China; 2014-2015, 81 ITADOC 62474 (Dep't of Commerce Sept. 2, 2016) ("Small Diameter Graphite Electrodes") at Cmt. 1.[17] Despite its decision in Small Diameter Graphite Electrodes, Commerce weighs the record evidence here and reasonably determines that LPCs are government agencies.

Conversely, Commerce's determination regarding the CPPCC is not supported on this record because Commerce fails to consider record evidence that detracts from Commerce's determination that the CPPCC is a government agency. The "U.S. Congressional-Executive Commission on China" summary of China's State Organizational Structure does not include the CPPCC as part of the Chinese government system. See Pet. Rebuttal to Zhongzhen AQR at Ex. 5. Additionally, at least one prior Commerce determination concluded that the CCPCC is not a government agency. See Vertical Shaft Engines.

Ultimately Commerce relies on Mr. B as "sufficient to find that Zhongzhen Companies failed to rebut the presumption of government control with respect to" the selection of management but adds that it finds further support for de facto government control due to Mr. C's "membership in the CPPCC." IDM at 16.

---

[17] In that determination, Commerce weighed management's "membership in a certain political organization" against "the record evidence of autonomy on the part of the companies to set prices, negotiate and sign agreements, select management, or decide how to dispose of profits or finance losses with respect to export activities." Small Diameter Graphite Electrodes at Cmt. 1.

However, Commerce also cites to its separate rate memo for Zhongzhen in the IDM which finds Zhongzhen's selection of management is not free from government control, "due to [Mr. B] and/or [Mr. C's] role as managers." Zhongzhen SRM at 9; see also Zhongzhen SRM at 9 (noting that regardless of who holds what position "both individuals are government officials and, thus, Zhongzhen's management decisions are controlled by a representative of the government."). If upon reconsideration, Commerce believes Mr. C's status as a member of the government is necessary to its determination, Commerce must further explain why the CPPCC is a government agency in view of that which detracts from its determination.

Therefore, Commerce's determination that the CPPCC is a government agency is not supported by substantial evidence and is remanded for further explanation or reconsideration. To the extent that Commerce relies upon Mr. C's status as an agent of the government, that determination is remanded for further explanation or consideration. Commerce's determination that Mr. B is a member of a government agency is reasonable on this record; however, despite Mr. B's role, Commerce fails to confront evidence that Mr. D who has no government affiliation actually controls the company and therefore its determination that Zhongzhen has failed to rebut the presumption of government control must be remanded for further explanation or reconsideration.

**C. Junbang**

Junbang contends Commerce's determination is unsupported by substantial evidence because Junbang is owned by a publicly traded company, of which the government owns a minority interest, and a publicly traded company cannot be controlled by the government. See Junbang Mot. at 2, 16–18. Junbang asserts that a "publicly traded company is, by its very nature, controlled by its public shareholders and thus cannot be controlled by the Government." Id. at 3; Oral Argument at 1:15:40. Junbang also argues that Commerce's determination that the CPC was "embedded" in Shuangta Foods through the AoAs was "[in]sufficient to establish control and goes against substantial precedent." Junbang Mot. at 9. Additionally, Junbang challenges Commerce's finding that Yang Jun Ming is a government agent.[18] Id. at 13. Defendant responds that Commerce's determination is supported by substantial evidence that the Chinese government could control Junbang "through its sole parent company, whose largest and controlling shareholder was a government entity." Def. Resp. at 24 (citing Junbang SRM at 5–9); see also Def.-Int. Resp. at 19. Further, Defendant responds that Commerce's determination that "an agent of the People's Government of Jinling Town, Zhaoyuan City held senior positions in both

---

[18] Although Junbang's brief's heading states, "Yang [Jun] Min Roles with Junxing Center do not make him a government entity," the brief does not present arguments concerning Commerce's determination that the Chinese government could control Junbang through Yang Jun Min. Junbang Mot. at 13. Instead, it focuses on how Shuangta Food "acted independently." Id. at 14–15.

Junbang" and Shuangta Foods, and could control Shuangta Food, is supported by record evidence. Def. Resp. at 26; see also Def.-Int. Resp. at 19–20.

Commerce's determination that Junbang has not rebutted the presumption of government control is supported by substantial evidence. As explained above, and by Commerce in its IDM, Commerce's practice is to find that "government control at any level, including that of a local government or village" amounts to the "potential that export process and export-related activities are subject to manipulation by the relevant NME government entity." See Junbang SRM at 5 (citing Zhaoyuan Junbang Trading Co., Ltd. Section A Questionnaire Response (Oct. 2, 2023) ("Junbang Sect. A Quest. Resp.") Ex. A-28, P.R. 155–158, C.R. 80–84). Where the government holds a minority interest, as it does here, Commerce must point to other indicia of control to support its denial of separate rate. See Zhejiang Mach., 65 F.4th at 1370 (explaining that "evidence of additional indica of control" such as AoAs "without restrictions" on a minority shareholder's rights, or evidence that the minority shareholder interfered with other shareholders' opportunities to hire board members supports is a reasonable basis for a finding of de facto government control). Commerce finds that Junbang is "wholly owned" by Shuangta Food, whose "largest and controlling shareholder" is Junxing Center, a government entity. See Junbang SRM at 5 (citing Junbang Sect. A Quest. Resp. at 18–19 and Ex. A-5 (explaining that Junxing Center is "100% owned by the local Government of Jinling town, Zhaoyuan city")).

Commerce then supports its determination with sufficient indicia of control. First, Commerce determines that Shuangta Food's AoA's allow the CPC to "influence Shuangta Food's subsidiaries" including Junbang. Junbang SRM at 6. Commerce explains that the AoA's establish a direct connection between Shuangta Food and the CPC.[19] See id. (citing Junbang Supplemental Questionnaire Response (Oct. 20, 2023) ("Junbang Supp. Sect. A Quest. Resp.,") SA-1, P.R. 190, C.R. 148). Commerce's finding that the CPC can control Junbang through Shuangta Food based on the AoA's is reasonable and supported by substantial evidence.

Second, Commerce finds that the CPC "has the ability to exercise and control Junbang through Yang Jun Min," who holds the most senior position at Junxing Center. Id. (citing Junbang Supp. Sect. A Quest. Resp. at 4–5, 7). Commerce notes that Yang Jun Min is a member of the board and recommended five of the nine board members. See id. at 7. Yang Jun Min's nomination as factory director of the Junxing Center was ultimately approved by "the Market Supervision and Administration Bureau of Zhaoyuan City, a government entity," which Commerce determines makes Yang Jun Min a government agent. Id. at 6 (citing Jungbang Supp. Sect. A Quest. Resp., SA-2). Additionally, Commerce finds that Yang Jun Min operates "under the

---

19 Specifically, the AoA's provide Shuangta Food can [[

]] Junbang SRM at 6 (citing Junbang Supp. Sect. A Quest. Resp., SA-1). Further, the AoA's direct the party committee to [[

]] Junbang SRM at 6 (citing Junbang Supp. Sect. A Quest. Resp., Ex. SA-1).

authority and as an agent” of the government. See Junbang SRM at 6. He “oversees the operation and management of the enterprise,” “directs daily production and operation,” and negotiates contracts.[20] Id. (citing Junbang Supp. Sect. A Quest. Resp., SA-2). Therefore, Commerce’s determination that Yang Jun Min is a government official who can influence Shuangta Foods is reasonable and supported by substantial evidence.

Despite Junbang’s concession that Junxing Center is a government entity, it asserts that Junxing Center does “not own a controlling interest Shuangta” and thus, there is no majority government ownership. See Junbang Mot. at 8. Commerce directly addresses this argument by explaining,

> [A]lthough not a majority owner, the collectively-owned Junxing Center holds the plurality of the shares (i.e., a greater number of shares than any other single shareholder) of Shuangta Foods and consequently exercises its position to nominate six of the nine board members via Yang Jun Min, effectively exercising majority control of the company which in turn is the sole owner of Junbang. Accordingly, Junxing Center’s plurality ownership of Shuangta Foods gives the People’s Government of Jinling Town the ability to exert control and influence, directly or indirectly, over the Junbang’s export activities, including, as discussed above, setting prices, selecting management negotiating and entering into contracts, and deciding how to distribute profits.

---

[20] Specifically, Commerce explains that Yang Jun Min “has the power to ‘[[ ]].’” Junbang SRM at 6 (citing Junbang Supp. Sect. A Quest. Resp., SA-2).

Junbang SRM at 8. Commerce has reasonably established, in this case, that plurality government entity ownership with significant indicia of control amounts to control such that Junbang cannot rebut the presumption of de facto government control.

Finally, Junbang insists that a publicly traded company cannot be controlled by the government. See Junbang Mot at 3, 16–17; Oral Argument at 1:16:20, 1:17:33. However, Commerce addresses this point explaining Junbang does not cite to anything "on the record to support its contention that a publicly traded company is ipso facto free from government control," or to evidence that the private individual shareholders of Shuangta Food "control or have the potential to control." IDM at 27. Therefore, Commerce sufficiently supports its conclusion that Junbang is not free from de facto government control, and its denial of a separate rate to Junbang is sustained.

## II. Commerce's Application of AFA

Zhongzhen argues that Commerce's application of facts otherwise available with an adverse inference to the PRC-wide entity because the PRC-wide entity "withheld requested information, failed to provide such information, and significantly impeded this proceeding" is unlawful. Zhongzhen Mot. at 40 (citing PDM at 10–12). Zhongzhen argues Commerce's justification for using AFA, that five exporters did not respond to the Q&V questionnaires, is unreasonable because Commerce did not independently establish the five non-responsive exporters exist or export pea protein to the United States. See id. at 40, 43–44. Zhongzhen argues that under 19 U.S.C. §

1677m(d), Commerce must "attempt to collect information from" the government of China and allow the government of China the opportunity to remedy deficiencies before applying an adverse inference. Id. at 40. Defendant argues that a rate calculated using facts available with an adverse inference is applicable to NME-entities that cooperated but nonetheless failed to qualify for a separate rate. See Def. Resp. at 34. Further, Defendant argues Commerce was not required to seek information from the government of China because Commerce sent Q&V questionnaires to companies "for which the petitioner provided complete contact information," which did not include the government of China, and therefore, 19 U.S.C. § 1677m(d) is inapplicable. See id. at 34–35.

Where information necessary to calculate a dumping margin is not available on the record populated by the parties, Commerce uses "facts otherwise available"[21]

---

[21] (a) In general
If--
(1) necessary information is not available on the record, or
(2) an interested party or any other person--
(A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
(C) significantly impedes a proceeding under this subtitle, or
(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

(footnote continued)

and under certain circumstances may use an adverse inference when selecting among the facts available:

> (b) Adverse inferences
> (1) In general
> If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle--
> (A) may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available; and
> . . .

19 U.S.C. § 1677e(b).

Additionally, Commerce must allow a party who has submitted information to correct a deficiency to the extent practicable:

> (d) Deficient submissions
> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either--
> (1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or

---

> the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a).

> (2) such response is not submitted within the applicable time limits, then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

19 U.S.C. § 1677m(d).

When calculating an NME-wide rate, Commerce may resort to facts otherwise available if information is missing from the record, and may apply an adverse inference, if it concludes that any interested party to the investigation in the NME-wide entity did not cooperate to the best of its ability. 19 U.S.C. § 1677e(a), (b); see, e.g., Diamond Sawblades, 866 F.3d at 1310; Jilin Forest, 145 F.4th at 1314 (sustaining Commerce's evidentiary presumption of NME control and its application of a facts otherwise available with an adverse inference rate in an administrative review); China Mfrs All., LLC v. United States, 1 F.4th 1028, 1040 (Fed. Cir. 2021) (sustaining the NME-wide rate to a cooperative mandatory respondent that failed to rebut the NME presumption in an administrative review). Thus, even if a particular entity within the NME cooperated, it may nonetheless be subject to a rate calculated with facts available and an adverse inference if it fails to rebut the presumption of control.

Here, Commerce applied the PRC-wide rate to Zhongzhen, and the other responding companies, pursuant to its practice, despite Zhongzhen fully cooperating with Commerce's inquiry. See Resp. Selection Memo at 2, n. 8; see also China Mfrs Alliance, 1 F.4th at 1034 (explaining that the respondent's "failure to rebut the

presumption of government control," rather than the "cooperation or non-cooperation" of the respondent or NME-entity "validated Commerce's determination to apply the AFA-derived PRC-wide rate" to respondent).

Nonetheless, here, it is unclear that Commerce's resort to an adverse inference is reasonable on this record. Commerce received a list of exporters from Petitioner. See IDM at 33; Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Certain Pea Protein from China (July 12, 2023) ("Petition") at Ex. I-14, P.R. 1–9, C.R. 1–10. Based upon that list, Commerce issued Q&V questionnaires. See Q&V Delivery Confirmation, Attachment I. Not all the questionnaires were delivered. See id. Of the 13 questionnaires that were delivered, only eight filed a response. See id. Zhongzhen argues that Commerce did nothing to confirm the existence of these entities that failed to respond or confirm that they exported pea protein to the United States. See Zhongzhen Mot. at 43–44. Thus, the only record evidence that there are non-responsive companies stems from the Petitioner's list. Neither Commerce nor Defendant explain or point to record evidence as to how Commerce could determine that an exporter "has failed to cooperate" without some confirmation that the party to whom the questionnaire was sent is an exporter. See 19 U.S.C. §1677e(b). Commerce's established practice is to apply an NME-wide rate where there are non-cooperating entities. See Diamond Sawblades, 866 F.3d at 1310 ("Commerce can use an inference 'that is adverse to the interests of [a] party in selecting from among the facts otherwise available' when determining the

party's rate if it finds that the interested party 'has failed to cooperate.'").[22] Therefore, Commerce's determination to use facts otherwise available with an adverse inference is unsupported by substantial evidence and on remand, Commerce must explain or reconsider why it is reasonable to accept the Petitioner's list of exporters as sufficient.

### III. Critical Circumstances

Zhongzhen argues Commerce "unlawfully found critical circumstances" and did not consider Zhongzhen specific data. Zhongzhen Mot. at 44 (citing Zhongzhen Case Brief (Mar. 21, 2024) at 4, P.R. 370, C.R. 258). Defendant responds that Commerce properly used facts otherwise available with an adverse inference because "there were no cooperating mandatory respondents that qualified for a separate rate." Def. Resp. at 37; see also Def.-Int. Resp. at 47–49.

Where a party alleges there are critical circumstances present under Section 1673b(e), Section 1673d(a)(3) provides,

> (a) Final determination by administering authority . . .
> (3) Critical circumstances determinations
> If the final determination of the administering authority is affirmative, then that determination, in any investigation in which the presence of

[22] Zhongzhen contends that Section 1677m(d) requires providing a party "submitting [a] response" with notice of a deficient response and an "opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d). Section 1677m(d) relates to insufficient responses and thus would not seem to apply to a case where there was no response at all. Nonetheless, Commerce must still act reasonably. See Vicentin S.A.I.C. v. United States, 404 F. Supp. 3d 1323, 1342 (Ct. Int'l Trade 2019) (noting that even though Commerce has discretion to select a calculation methodology in a determination, that methodology must nonetheless be reasonable), aff'd, 42 F.4th 1372, 1382 (Fed. Cir. 2022). It does not seem reasonable to simply accept the Petitioners list of exporters without more explanation or information.

> critical circumstances has been alleged under section 1673b(e) of this title, shall also contain a finding of whether--
> (A)(i) there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere of the subject merchandise, or
> (ii) the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the subject merchandise at less than its fair value and that there would be material injury by reason of such sales, and
> (B) there have been massive imports of the subject merchandise over a relatively short period.
>
> Such findings may be affirmative even though the preliminary determination under section 1673b(e)(1) of this title was negative.

19 U.S.C. § 1673d(a)(3). In determining whether there are critical circumstances, Commerce will examine whether there are "massive imports of subject merchandise" over a short period of time. 19 U.S.C. § 1673d(a)(3)(B).[23]

---

[23] Massive imports are calculated pursuant to 19 C.F.R. § 351.206(h),

> (h) Massive imports.
> (1) In determining whether imports of the subject merchandise have been massive under section 705(a)(2)(B) or section 735(a)(3)(B) of the Act, the Secretary normally will examine:
> (i) The volume and value of the imports;
> (ii) Seasonal trends; and
> (iii) The share of domestic consumption accounted for by the imports.
> (2) In general, unless the imports during the "relatively short period" (see paragraph (i) of this section) have increased by at least 15 percent over the imports during an immediately preceding period of comparable duration, the Secretary will not consider the imports massive.

19 C.F.R. § 351.206(h).

Here, Commerce finds there are massive imports and critical circumstances using facts available with an adverse inference, rather than Zhongzhen specific Q&V data, because the PRC-wide entity was "uncooperative." PDM at 19; see also IDM at 37–38. Zhongzhen states, "Commerce's critical circumstances finding was subsidiary to its unlawful determinations that [Zhongzhen was] ineligible for a separate rate and should be assigned an AFA rate." Zhongzhen Mot. at 45. Because the Court must remand Commerce's determination to use facts otherwise available with an adverse inference as unsupported on this record, Commerce's affirmative determination as to critical circumstances is also remanded for consistency with Commerce's redetermination.

## IV. Rate for Unexamined Companies

Junbang and T.Full challenge Commerce's calculated rate for the separate rate respondents not individually investigated. See Junbang Mot. at 17; Pl.-Int. Mot. at 2. Defendant responds that Commerce "followed its established practice" by averaging the margins in the petition. Def. Resp. at 38–39 (citing Final Determination at n. 8). Here, because Commerce assigned Zhongzhen's and Junbang's rates, both mandatory respondents, based on facts available with an adverse inference, Commerce calculated a margin for the non-investigated companies under 19 U.S.C. § 1673d(c)(5)(B), using "any reasonable method." See Final Determination at 55,560; 19 U.S.C. § 1673d(c)(5)(B). In view of the Court's determination that Commerce's denial of separate rate status to Zhongzhen is not

supported by substantial evidence, Commerce's "all-others rate" is also remanded for consistency with Commerce's redetermination.

## CONCLUSION

Commerce's denial of a separate rate for Plaintiff Junbang is reasonable and supported by substantial evidence. However, Commerce's denial of a separate rate for Plaintiff Zhongzhen is not supported by substantial evidence because it fails to engage with record evidence that there is a majority shareholder to whom a government official with a managerial position in the company is beholden. Commerce must explain why the non-government official majority shareholder is not sufficient to rebut the presumption of de facto government control, notwithstanding the presence of a minority shareholder, who is a member of a government entity. Additionally, Commerce's determination to use facts otherwise available with an adverse inference and its finding of critical circumstances is unsupported by substantial evidence. Commerce's determination as to non-individually investigated companies is also remanded. For the foregoing reasons, it is

**ORDERED** that Commerce's final determination as to Zhongzhen is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's final determination as to Junbang is sustained; and it is further

**ORDERED** that Commerce's determination to use facts available with an adverse inference is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's affirmative determination of critical circumstances is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's determination to assign the PRC-wide rate to non-individually investigated companies is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix, including the entire confidential record, within 14 days after the filing of replies to the comments on the remand redetermination; and is it further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing its remand redetermination.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: November 5, 2026
New York, New York